Ekwan E. Rhow - State Bar No. 174604
   erhow@birdmarella.com
Naeun Rim - State Bar No. 263558
   nrim@birdmarella.com
Christopher Jumin Lee - State Bar No. 322140
   clee@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Christopher
Philip Ahn

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    vs.<br><br>CHRISTOPHER PHILIP AHN,<br><br>        Defendant. | CASE NO. 2:19-MJ-01523-DUTY<br><br>**CHRISTOPHER PHILIP AHN'S APPLICATION FOR RECONSIDERATION OF ORDER GRANTING GOVERNMENT'S REQUEST FOR DETENTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Assigned to Hon. Jean Rosenbluth, U.S. Magistrate Judge<br><br>Hrg. Date: June 18, 2019<br>Hrg. Time: 3:00 p.m.<br>Courtroom 690, Roybal 6th Floor |

Relator Christopher Philip Ahn, by and through counsel of record, submits this application for reconsideration of the Court's Order of April 23, 2019, granting the government's request for detention. (Dkt. 11.) This application is based on the attached Memorandum of Points and Authorities and all arguments and evidence that may be presented to the Court at the hearing on this matter, including the following exhibits:

Exhibit A – Photos

Exhibit B – Letters from family and civilian supporters

1    Exhibit C – Letters from veteran supporters

2    Exhibit D – Letter from Korean American community organizations

3    Exhibit E – 2014 United Nations report on North Korea

4    Exhibit F – Surveillance photos

5    Exhibit G – CV's of Professor Jose Maria Rifa and Professor Manuel Richard

6    Exhibit H – Expert Opinion Regarding Availability of Bail in Spain

7    Sealed Exhibit 1 – Medical Records of Christopher Ahn[1]

8  DATED:  June 6, 2019              Respectfully submitted,

9
                                     Ekwan E. Rhow
10                                    Naeun Rim
                                     Christopher J. Lee
11                                    Bird, Marella, Boxer, Wolpert, Nessim,
12                                    Drooks, Lincenberg & Rhow, P.C.

13

14
                                     By:  _____/s/ Naeun Rim_____
15                                              Naeun Rim
16                                    Attorneys for Defendant Christopher Philip
17                                    Ahn

18

19

20

21

22

23

24

25

26

27

28
_____

[1]    Exhibit 1 has been concurrently filed under seal in a separate filing.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ...................................................................................... 6

II.    BACKGROUND ........................................................................................ 8

III.   ARGUMENT ............................................................................................ 9

    A.   This Court Has Broad Discretion to Determine What Constitutes
        a Special Circumstance Justifying Bail in Extradition Cases ................ 9

    B.   The Unique Circumstances of This Case Have Made Mr. Ahn an
        Object of Concern for Many Americans ............................................... 11

    C.   The Primary Source of the Allegations Is North Korea, a Country
        that Has No Extradition Treaty with the United States ....................... 14

    D.   The Extradition Proceedings in this Matter Will Be Especially
        Protracted Due to North Korea's Involvement .................................... 16

    E.   Ahn's Release Will Not Diminish the United States' Diplomatic
        Standing, As Similarly Situated Individuals Are Generally
        Granted Bail under Spanish Law .......................................................... 19

    F.   Ahn Is Unable To Care For His Seriously Ill Mother And
        Grandmother While In Custody ............................................................ 21

    G.   Mr. Ahn Is Not a Flight Risk ............................................................... 22

    H.   Mr. Ahn Is Not a Danger to the Community ....................................... 23

IV.    CONCLUSION ........................................................................................ 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ahmad v. Wigen*,
   726 F. Supp. 389 (E.D.N.Y. 1989)..................................................................14

*In re Extradition of Chapman*,
   459 F.Supp.2d 1024 (D. Haw. 2006) ......................................................10, 22, 24

*In re Extradition of Gonzalez*,
   52 F.Supp.2d 725 (W.D. La. 1999) ..............................................................10, 14

*In re Extradition of Mainero*,
   950 F.Supp. 290 (S.D. Cal. 1996) ...................................................................10

*In re Extradition of Molnar*,
   182 F.Supp.2d 684 (N.D. Ill. 2002)................................................................11

*In re Extradition of Nacif-Borge*,
   829 F.Supp. 1210 (D. Nev. 1993) ..............................................................10, 20

*In re Extradition of Santos*,
   473 F.Supp.2d 1030.........................................................................................10

*In re Gannon*,
   27 F.2d 362 (E.D. Pa. 1928)............................................................................10

*Hilton v. Guyot*,
   159 U.S. 113 (1895) ........................................................................................20

*Matter of Requested Extradition of Kirby*,
   106 F.3d 855 (9th Cir. 1996)....................................................................*passim*

*Salerno v. United States*,
   878 F.2d 317 (9th Cir. 1989) ..............................................................9, 11, 16

*U.S. v. Taitz*,
   130 F.R.D. 442 (S.D. Cal. 1999)..............................................................*passim*

*United States v. Kin–Hong*,
   83 F.3d 523 (1st Cir.1996) ..............................................................................16

APPLICATION FOR RECONSIDERATION OF ORDER OF DETENTION

*Wroclawski v. United States*,
  634 F.Supp.2d 1003 (D. Ariz. 2009)............................................................. 10, 21

**Statutes**

22 U.S.C. § 7801.......................................................................................................... 15

APPLICATION FOR RECONSIDERATION OF ORDER OF DETENTION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

This is an unusual and extraordinary case.  A few months ago, Christopher Ahn was an average American, anonymous to the world outside of those who personally knew him.  Today, given the attendant politics inherent in this case and the desire of the press to immediately report "facts" without waiting for evidence, his name has been plastered across international headlines identifying him as one of several participants in an alleged "attack" on the North Korean Embassy in Madrid, Spain.  Sympathizers of Mr. Ahn have publically decried[1] the United States' decision to accept Spain's extradition request of a United States citizen based on unsubstantiated statements made by North Korean officials, who have not yet testified and will likely never testify in a court.  In the ensuing media frenzy, Mr. Ahn has also been revealed to have helped Kim Han Sol, the nephew of North Korea's dictator Kim Jong Un, escape to safety after his father (and Kim Jong Un's brother) Kim Jong Nam – was brazenly poisoned in a coordinated assassination in a Malaysian airport.  As a result of these revelations, Mr. Ahn is now being hunted by one of the most dangerous regimes in the world – a fact that has been confirmed by FBI agents.

This bizarre series of events sets Mr. Ahn apart from "ordinary potential extraditees" and gives rise to a host of special circumstances that justify his release on bail.  *See Matter of Requested Extradition of Kirby*, 106 F.3d 855, 865 (9th Cir. 1996), as amended (Feb. 27, 1997) (affirming bail for Irish dissidents convicted in the United Kingdom of committing terrorist acts because they were "not ordinary potential extraditees").  This is not your run-of-the-mill extradition case.  North Korea's involvement and interest in Spain's case against Mr. Ahn changes the

---

[1]   https://www.washingtontimes.com/news/2019/may/30/kim-jong-un-opponents-should-be-persecuted-us/

stakes of his extradition dramatically.  Unlike the United States, Spain has bi-lateral relations with North Korea, a country that has a long, well-publicized history of murdering its enemies on foreign soil.  An order of extradition in this matter will not just result in Mr. Ahn being sent to Spain to go through the standard legal process – it will also expose Mr. Ahn to the North Korean regime and its agents, and put his life in jeopardy.

The danger created by North Korea's involvement in this matter is in itself a special circumstance.  It also creates other special circumstances, many of which have been recognized by courts in extradition cases:

First, the nature of the allegations is unique and has made Mr. Ahn an "object[] of concern to many Americans," particularly to those of Korean descent and in the veteran community.  *See id.*

Second, while the extradition request comes from Spain, the bulk of the allegations against Mr. Ahn come from officials of North Korea, a country with whom the United States has no extradition treaty or diplomatic obligations.

Third, the extradition proceedings in this matter will be unduly protracted due in part to the increased threat of deadly reprisal from North Korea upon Mr. Ahn's extradition to Spain.

Fourth, the impact that Mr. Ahn's release will have on the United States' diplomatic standing with Spain is substantially diminished because, according to the expert opinion of two Spanish criminal law professors (one of whom is a former Spanish judge), there is a high probability that a defendant in similar circumstances would be granted bail under Spanish law, both in a criminal proceeding and in the extradition context.  *See* Exh. H ("Expert Opinion Regarding Bail in Spain").

Fifth, in the context of these other special circumstances, Mr. Ahn's need to take care of his ill mother and grandmother also rises to the level of a special circumstance.

Finally, there is overwhelming evidence that Mr. Ahn is neither a flight risk

nor a danger.  As demonstrated by the numerous letters of support attached as Exhibits B and C to this application, Mr. Ahn is a man of exemplary character.  He is a reputable entrepreneur with no prior criminal history and a former U.S. Marine who was honorably discharged after serving his country.  While others implicated in this matter have made their whereabouts unknown, Mr. Ahn continued to live with his wife in his home openly and notoriously up until his arrest, even after the media had publicized Spain's investigation of this incident, after the FBI had visited him to question him about the matter, and after the FBI had informed him that there were credible threats to his life by North Koreans.  The only indication of danger comes from the unproven allegations outlined in the Complaint, which rely on statements made by North Korean officials who are beholden to the North Korean dictatorship and have every incentive to lie out of fear for their own safety.  Mr. Ahn deserves to be afforded the benefit of the doubt against allegations that have not yet been proven.  The Court should release Mr. Ahn on bail.

## II.  BACKGROUND

This case concerns an incident that allegedly occurred at the North Korean Embassy in Madrid on February 22, 2019 ("Madrid Incident").  According to the Complaint, at approximately 5:00 p.m., a group of individuals led by Adrian Hong Chang allegedly entered the Embassy.  (Dkt. No. 1. 3:25-4:10).  Hong Chang called at the door of the Embassy and asked to see Y.S.S. – the acting ambassador – and was immediately invited in by an embassy employee.  (*Id.*)  The government alleges that after entering the Embassy, "[m]embers of Hong Chang's group" subsequently struck and restrained certain employees, and then took Y.S.S. to a separate room and tried to convince him to defect from North Korea.  (*Id.* at 4:11-24; 5:14-18).  When Y.S.S. refused, the group is alleged to have left the embassy.  (*Id.* at 5:18-6:13).

On March 25, 2019, the Spanish National High Court ("Spanish Court") issued an order commencing criminal proceedings in connection with the Madrid Incident.

1    On or about April 12, 2019, the Spanish Court issued an international warrant
2    for Ahn's arrest.  That same day, the United States filed the Complaint in the instant
3    matter, seeking a provisional arrest pursuant to relevant extradition treaties between
4    the United States and Spain.

5    On April 12, 2019, the government filed a complaint for the provisional arrest
6    of Ahn.  (the "Complaint," Dkt. No. 1.)  Ahn was arrested on April 18, 2019.  After
7    Ahn's arrest, the government subsequently filed a request for detention pending
8    extradition proceedings. (Dkt. No. 12.)  As of the time of this filing, he is the only
9    accused participant in custody.

10   **III.   ARGUMENT**

11   **A.    This Court Has Broad Discretion to Determine What Constitutes a**
12   **Special Circumstance Justifying Bail in Extradition Cases**

13   Courts have the discretion to grant bail in international extradition cases upon
14   a showing of "special circumstances."  *Salerno v. United States*, 878 F.2d 317, 317
15   (9th Cir. 1989) (*citing Wright v. Henkel*, 190 U.S. 40, 63 (1903)).  The rationale for
16   holding individuals detained pending an extradition hearing to a higher bail standard
17   is essentially political, taking into account the loss of diplomatic standing the United
18   States would suffer should it fail to produce a fugitive to a foreign government to
19   whom it owes a treaty obligation.  *U.S. v. Taitz*, 130 F.R.D. 442, 446 (S.D. Cal.
20   1999).  Precisely because the heightened standard for bail in extradition cases is
21   inherently political, courts have not hesitated to find "special circumstances" for bail
22   in the converse, when detaining the individual implicates a separate set of political
23   concerns – potentially rendering continued detention an even more inauspicious
24   prospect to the standing of the United States than the risk of flight upon release. *See,*
25   *e.g., Kirby*, 106 F.3d at 864 (Ninth Circuit affirming bail for Irish Republican
26   dissidents because case implicated issues that "engaged and continue to engage the
27   attention of the citizens of the United States, including the President and the
28   Secretary of State").

1   "Special circumstances" are not limited to a showing of extreme hardship on

2   family members. "The determination of what factors to consider and how much

3   weight to give them is within the 'sound discretion' of the Court." *Wroclawski v.*

4   *United States*, 634 F.Supp.2d 1003, 1006 (D. Ariz. 2009) (citing *Beaulieu v.*

5   *Hartigan*, 554 F.2d 1, 1-2 (1st Cir. 1977)).  In considering whether to grant bail,

6   courts are "not bound by an exhaustive list" of special circumstances, *Wroclawski*,

7   634 F.Supp.2d at 1006, nor are they "limited to those previously recognized in

8   published decisions."  *In re Extradition of Gonzalez*, 52 F.Supp.2d 725, 736 (W.D.

9   La. 1999); *see also In re Extradition of Mainero,* 950 F.Supp. 290, 294 (S.D. Cal.

10  1996) ("The term 'special circumstances' has never been precisely defined and

11  courts have addressed on a case by case basis particularly sufficient circumstances

12  that would reverse the strong presumption against bail").

13   Courts have routinely exercised their discretion to grant bail based on a wide

14  variety of special circumstances.  S*ee, e.g., In re Extradition of Chapman*, 459

15  F.Supp.2d 1024, 1027 (D. Haw. 2006) ("complete lack of flight risk"); *In re*

16  *Extradition of Santos*, 473 F.Supp.2d  1030, 1042 ("high degree of uncertainty

17  regarding merits" of the underlying case); *In re Extradition of Nacif-Borge*, 829

18  F.Supp. 1210, 1221 (D. Nev. 1993) (availability of bail on the underlying offense in

19  requesting country); *In re Gannon*, 27 F.2d 362 (E.D. Pa. 1928) (availability of bail

20  on the underlying offense in the United States); *Taitz*, 130 F.R.D. at 447

21  (availability of bail generally for individuals facing extradition to the United States

22  in the requesting country).

23   Also within the scope of the Court's discretion is the ability to take a

24  "collective approach" to special circumstances, granting bail on the basis that the

25  totality of available circumstances justifies it – even if each circumstance taken in

26  isolation may not.  *Wroclawski*, 634 F.Supp.2d at 1006 (finding special

27  circumstances based on combination of: absence of flight risk, work with military

28  and law-enforcement personnel, delay in extradition proceedings, likelihood of

10

1   success on the merits, availability of bail of underlying offense, support of the

2   community); *see also In re Extradition of Molnar*, 182 F.Supp.2d 684, 689 (N.D. Ill.

3   2002) (financial assistance to seriously ill mother, provisional nature of arrest, lack

4   of criminal record, delay in extradition proceedings, friends' posting of homes as

5   security for release); *Taitz*, 130 F.R.D. at 445-6 (potential delay in extradition

6   proceedings, lack of criminal record, deterioration of health in custody, inability to

7   practice religion in custody, lack of diplomatic necessity).

8        In addition to special circumstances, the party seeking bail must also prove

9   that he is not a flight risk and does not pose a danger to the community. *Salerno*,

10  878 F.3d at 318.

11       **B.    The Unique Circumstances of This Case Have Made Mr. Ahn an**

12             **Object of Concern for Many Americans**

13       The Ninth Circuit has recognized that special circumstances exist in unique

14  cases that implicate international issues important to Americans.  In *Kirby*, the Ninth

15  Circuit considered bail in an extradition case involving three members of the Irish

16  Republican Army ("IRA") who were wanted by the United Kingdom for having

17  escaped from a prison along with 38 other prisoners.  Importantly, the flight risk and

18  danger elements were far more problematic for the relators in *Kirby* than those in

19  this case:

20       •    All three of relators had already been convicted of violent crimes.

21       •    Two of the relators were serving life sentences for murder convictions

22            – Kirby for participating in the bombing of a gas station that killed a

23            man, and Artt for killing a prison guard.[2]

24       •    After the prison escape, the relators had fled to the United States.

25       •    They had been living under assumed identities for approximately ten

26  _____

27  [2]   https://www.upi.com/Archives/1994/02/23/Irish-terrorist-arrested-in-Northern-
    California/9276761979600/ and https://www.irishtimes.com/news/escaper-fights-
28  uk-attempt-to-return-him-from-us-1.103363

years before they were arrested for the extradition proceedings. *See Kirby*, 106 F.3d at 857, fn.2.

Despite these facts, the Ninth Circuit nonetheless held that bail for the relators was appropriate and that special circumstances existed due to the "uniqueness" of these cases:

> These are not ordinary potential extraditees. They enjoy the sympathy and are objects of concern of many Americans, both of Irish descent and otherwise. The troubles between the Protestants and Catholics in Northern Ireland have in the past engaged and continue to engage the attention of the citizens of the United States, including the President and the Secretary of State.

*Id.* at 865-66.

This case has drawn the attention and concern of many Americans and falls squarely within the "special circumstances" recognized in *Kirby*. Mr. Ahn is accused of having acted in concert with a group called Free Joseon, a human rights group that supports North Korean defectors. The issue of human rights in North Korea and how to best alleviate the undeniable suffering of the North Korean people is one that has engaged the attention of many Americans, both of Korean descent and otherwise. As a result, the case has received extensive media attention and inspired varied commentary, including from those who support Free Joseon and question whether the Madrid incident was a "raid" or a non-violent political statement intended to offer hope to North Koreans seeking to defect or speak out against the regime. Dr. Sung-Yoon Lee, an assistant professor at Tufts University's Fletcher School of Law and Diplomacy, wrote an op-ed for the *Los Angeles Times* praising Free Joseon as a "textbook resistance movement" against a country "that employs a powerful web of security forces and a cruel penal system to oppress its own people."[3] Dr. Lee criticized the United States government for accepting "what is essentially a North Korean version of the events" and urged the government "to

---

[3] https://www.latimes.com/opinion/op-ed/la-oe-lee-free-joseon-north-korea-kim-resistance-20190425-story.html

protect the dissidents rather than hand them over to Spain." *Id*. NBC news reported, "Supporters of the group, Free Joseon (Free Korea), argue the storming of the North Korean embassy in Madrid on Feb. 22 was designed to rattle the Pyongyang leadership and that the defendants should be treated as political opponents of the regime, not as suspected criminals to be handed over to Spanish authorities."[4] These and other publications confirm that this case involves issues that "engage the attention of the citizens of the United States," as was the case in *Kirby* with respect to issues pertaining to sectarian conflict in Northern Ireland.

Like the relators in *Kirby*, Mr. Ahn has inspired the sympathy of many Americans, both because of the danger of reprisal from North Korea as well as the dubious credibility of statements made by North Korean officials – who have every incentive to present a self-serving account of the Madrid Incident in order to protect themselves or to deter further acts of political dissent. But unlike the relators in *Kirby*, Mr. Ahn has not been convicted of any actual crimes, much less murder. To the contrary, based on the evidence that this Court has before it, Mr. Ahn is an exemplary, law-abiding citizen. Eight members of the military community who know Mr. Ahn personally have written letters in support of his release, including a Congressional Medal of Honor nominee. *See* Exh. C at 33 (Bellavia Letter). A current Colonel in the U.S. Marine Corps Reserve writes:

> Like many who have had the pleasure of serving with Chris, I find the reported events which have led to his confinement to be shocking and out of character for the type of person who has been highly regarded and trusted throughout his military and civilian career. I only ask that Chris be given the opportunity to reunite with his family by using the last measure of trust we can possibly afford an individual who has served his Nation honorably, and who has risen from the ranks to become a successful businessman and no criminal record.

*See* Exh. C at 37 (Quiles Letter).

In addition to letters from those who know Mr. Ahn personally, four local

---

[4] https://www.nbcnews.com/news/north-korea/dissidents-battling-north-korea-s-kim-regime-find-they-are-n998131

1  Korean American community organizations – the Korean Community Lawyers
2  Association ("KCLA"), the Korean American Federation of Los Angeles
3  ("KAFLA"), the Orange County Korean American Bar Association ("OCKABA"),
4  and the Korean American Bar Association of San Diego ("KABA-SD") – have
5  signed a letter of support for Mr. Ahn, in which they ask the Court to consider North
6  Korea's well-documented history of human rights violations – as well as their
7  incentive to level false accusations against those who seek to expose such violations
8  – in weighing the credibility of the allegations and deciding whether he should be
9  released on bail.  *See* Exh. D (Korean American Community Support Letter).  The
10 genuine concern shown by these and other Americans regarding Mr. Ahn and the
11 implications of this case rises to the level of a special circumstance, and far
12 outweighs the vague, unsubstantiated risk of "diplomatic embarrassment"
13 implicated by his release.

14          **C.      The Primary Source of the Allegations Is North Korea, a Country**
15                    **that Has No Extradition Treaty with the United States**

16          Courts are not limited to an exhaustive list of special circumstances that have
17 been recognized in published decisions.  *See Gonzalez*, 52 F.Supp.2d at 736.  The
18 situation before this Court is unprecedented.  Spain, a country with which the United
19 States has an extradition treaty, is requesting extradition based on events that
20 allegedly occurred in the embassy of North Korea, a country with which the United
21 States does not have an extradition treaty.  The inextricable involvement of a
22 country that has no diplomatic relations with the United States should be treated as a
23 special circumstance.

24          The United States lacks an extradition treaty with North Korea because
25 "Congress and the executive branch do not enter into extradition treaties with
26 countries in whose criminal justice system they lack confidence."  *Ahmad v. Wigen*,
27 726 F. Supp. 389, 411 (E.D.N.Y. 1989), *aff'd,* 910 F.2d 1063 (2d Cir. 1990).  The
28 U.S. Department of State has long declared North Korea to be a dictatorship that

"continues to commit numerous, serious human rights abuses" with no regard for due process.  *See* 22 U.S.C. § 7801.  It has described the North Korean Penal Code as "[d]raconian, stipulating capital punishment and confiscation of assets for a wide variety of 'crimes against the revolution,' including defection, attempted defection, slander of the policies of the Party or State, listening to foreign broadcasts, writing 'reactionary' letters, and possessing reactionary printed matter." *Id.*  Consistent with these Congressional findings, in 2014 the United Nations Human Rights Council issued a report summarizing an extensive inquiry into North Korea's human rights violations.  *See* Exh. E ("2014 U.N. North Korea Report").[5]  The U.N. Report described the "gravity, scale and nature of these violations" as revealing "a State that does not have any parallel in the contemporary world." *Id.* ¶ 69.  North Korea was found to have routinely "disappeared" people to prison camps without a trial and with no notice to their families. *Id.* ¶ 66.  Inmates in North Korean political prison camps have been "gradually eliminated through deliberate starvation, forced labour, executions, torture, rape and the denial of reproductive rights enforced through punishment, forced abortion and infanticide." *Id.* ¶ 66.  Hundreds of thousands of political prisoners are thought to have died in these camps in the past five decades. *Id.*  In spite of these atrocities, Spain established diplomatic relations with North Korea in 2001.  In contrast, the United States has stood firm in refusing to do so.

Although the criminal process to which Mr. Ahn will be subjected will be the Spanish one, the specter of the North Korean penal system looms over this inquiry.  The draconian nature of that system is the very reason the United States does not have an extradition treaty with North Korea – because any criminal allegations arising from such a system must be considered to be devoid of all credibility.  Yet in

---

[5]   The same report was referenced in the community support letter submitted by local Korean American organizations.  *See* Exh. D.

1  this matter, Spain has requested extradition based on statements made by

2  representatives of the very regime, whose extradition request for the same

3  allegations would be summarily rejected by the United States. While Spain is the

4  country that is formally seeking extradition, the Court should take into account that

5  it is doing so to vindicate allegations of wrongdoing against officials of North

6  Korea, a country with whom the United States has made a conscious policy decision

7  not to enter into diplomatic obligations. Therefore, the diplomatic necessity to deny

8  bail is diminished under this special circumstance.

9      **D.**     **The Extradition Proceedings in this Matter Will Be Especially**

10         **Protracted Due to North Korea's Involvement**

11     In *Kirby*, the Ninth Circuit recognized that in cases of "unusual character"

12 such as this one, "highly probable lengthy delays" during extradition proceedings

13 can be a "special circumstance" that will justify bail. *See Kirby*, 106 F.3d at 863;

14 *see also Salerno,* 878 F.2d at 317 (unusually lengthy extradition appeals are a

15 special circumstance). Other circuits have expressed similar views. *See, e.g., United*

16 *States v. Kin–Hong,* 83 F.3d 523, 524 (1st Cir.1996) (stating that "'[s]pecial

17 circumstances' may include a delayed extradition hearing"). While delays caused

18 by the relator alone are not a special circumstance, undue delay that is attributable to

19 a complex set of factors that are not "exclusively" the responsibility of the relator

20 has been found to qualify as a special circumstance, particularly where the case has

21 international ramifications. *See Kirby*, 106 F.3d at 863.

22     The extradition proceedings here are likely to be especially protracted due to

23 circumstances that are outside of Mr. Ahn's control. While presumably

24 unintentional, the public manner in which Spain has moved forward with these

25 proceedings has put Mr. Ahn's life in serious danger. Just one day after a judge

26 ordered a formal investigation into the Madrid incident, the Spanish court unsealed

27

28

APPLICATION FOR RECONSIDERATION OF ORDER OF DETENTION

documents containing the full names of the suspected participants.[6]  The resulting
media coverage revealed those names to the world, including to the government of
North Korea, a country that treats political opposition and attempted defection as
capital offenses.

The danger against Mr. Ahn in particular has been further compounded by
reports in the press identifying him as a participant in the rescue of Kim Han Sol,
the nephew of North Korean dictator Kim Jong Un.[7] The significance of this
revelation should not be understated. Kim Han Sol is the eldest son of Kim Jong
Nam, who was the eldest son of the late dictator Kim Jong Il.  North Korea's line of
succession operates much like that of a traditional monarchy.  Thus, as eldest son,
Kim Jong Nam was the heir apparent prior to falling out of favor in lieu of his
younger brother.  Kim Jong Nam, therefore, remained a constant threat to his
brother's legitimacy.  In 2017, Kim Jong Un finally decided to remove the threat
once and for all, and Kim Jong Nam was brazenly murdered in broad daylight in a
Malaysian airport.[8]  The United States government has since concluded that North
Korea was responsible for the assassination.[9]  Since news of Mr. Ahn's arrest
became public, the media has identified him as one of the people who helped Kim
Han Sol and his mother and sister escape to an unknown location shortly after his
father was murdered.  This distinguishes Mr. Ahn from the average political
dissident.  As Kim Jong Nam's eldest son, Kim Han Sol has succeeded his father as
the greatest living threat to Kim Jong Un's legitimacy.  North Korea has every
incentive to either capture and torture Mr. Ahn to extract information regarding Kim

[6] https://www.npr.org/2019/03/26/706950699/north-korean-embassy-attack-suspects-fled-to-u-s-spanish-court-says

[7] www.koreatimes.co.kr/www/nation/2019/05/356_269710.html

[8] https://www.cnn.com/2019/05/02/asia/kim-jong-nam-trial-intl/index.html

[9] https://www.pbs.org/wgbh/frontline/article/trump-administration-says-north-korea-used-vx-to-kill-kim-jong-uns-half-brother/

Han Sol's whereabouts, or to simply murder him as retribution for embarrassing the regime.

As a result of these events, the options available to Mr. Ahn have narrowed. Extradition for Mr. Ahn is now about more than just facing his day in a Spanish court – it is a matter of life and death. Unlike the United States which has no bilateral relations with North Korea and has suspended entry for all North Korean nationals since September 24, 2017, (Presidential Proclamation No. 9645, Sept. 24, 2017, 2017 WL 4231190), Spain allows North Koreans to enter the country subject to standard visa requirements.[10] If extradited, Mr. Ahn would also be in close proximity to the North Korean Embassy in Madrid – the very location at which the alleged events took place. North Korea's foreign embassies are well-known as hubs of criminal activity aimed at securing cash for the regime, including smuggling[11] and drug trafficking.[12] These activities have often allowed North Korean diplomats to establish substantial contacts with the local underworld – such as the Yakuza in Japan or organized crime in Malaysia.[13] Indeed, the two women who were arrested for killing Kim Jong-nam in Malaysia were escorts who have reported that they were tricked into doing so by North Korean officials. There is no reason to think that North Korea has less access to criminal circles in Spain. It is undeniable that the regime would have easier access to Mr. Ahn in Spain, in or out of detention,

---

[10] http://www.exteriores.gob.es/Consulados/LONDRES/en/Consulado/Pages/CheckPassport.aspx

[11] https://www.reuters.com/article/us-northkorea-odds/diplomats-arrested-for-cigarette-smuggling-idUSTRE5AJ2Z420091120

[12] https://www.washingtonpost.com/news/worldviews/wp/2013/03/22/report-north-korea-ordered-its-foreign-diplomats-to-become-drug-dealers/?utm_term=.c729cf2da6a1

[13] https://www.cbc.ca/news/world/north-korea-criminal-empire-drugs-trafficking-1.4435265

than they would in the United States.

The heightened risk to Mr. Ahn in Spain is not a remote one.  North Korea has a long history of committing murders in other countries.[14]  According to the 2014 U.N. Report, North Korea also has a documented history of kidnapping people from locations around the world, including Europe.  *See* Exh. E ¶ 67.  The same report, however, makes no mention of such incidents in the United States, which enjoys relative safety from the regime.  The United States is currently the safest place in the world for Mr. Ahn, leaving him no choice but to vigorously contest his extradition to Spain, where he may be exposed to violent – and possibly fatal – retribution by North Korean agents.  Mr. Ahn must therefore explore every available legal avenue to challenge his extradition, including habeas petitions and all possible appeals.  That is especially so in a case like this, where the involvement of North Korea will raise novel legal issues that will likely be matters of first impression. This proceeding could go on for years, and keeping Mr. Ahn in detention throughout would effectively force him to serve a multi-year prison sentence before he is ever convicted of a crime.

As a result of the high stakes and the complexity of this case, the extradition proceedings will be unusually protracted.  The high probability of undue delay amounts to a special circumstance.

### E.   Ahn's Release Will Not Diminish the United States' Diplomatic Standing, As Similarly Situated Individuals Are Generally Granted Bail under Spanish Law

"The rationale for denying bail [in extradition proceedings] is that the United States will suffer consequences in foreign affairs if one subject to extradition absconds while on release." *Taitz*, 130 F.R.D. at 446.  The heightened standard for

---

[14]  https://www.nbcnews.com/news/north-korea/north-korea-has-history-assassination-attempts-foreign-soil-n823016

bail in extradition proceedings, therefore, is inextricably linked to concern regarding the potential for diplomatic protestations from the requesting country.  Such protestations, however, would ring hollow were bail to be available to a similarly situated individual in the requesting country itself.  Courts, therefore, have found that availability of bail – both for criminal defendants and for individuals facing extradition –  in the requesting country constitutes a special circumstance.  *See, e.g.*, *Nacif-Borge*, 829 F.Supp at 1220-21 (D. Nev. 1993) (finding that availability of bail on underlying offense in requesting country constitutes a special circumstance); *Taitz*, 130 F.R.D. at 446 ("The diplomatic necessity for denying bail does not exist in this case" due to availability of bail to individuals facing extradition in requesting country.)

Two Spanish law professors – both experts on criminal procedure and one a former judge – have provided a detailed legal opinion stating that were an individual with facts and circumstances similar to Ahn before a Spanish Court, he would likely be granted bail, whether in criminal proceedings or in the extradition context. [15] *See* Exh. H ("Expert Opinion Regarding Bail in Spain").  In particular, the availability of bail for a similarly situated individual in Spain in the extradition context is especially relevant as a special circumstance given the necessity for reciprocity. The principle of reciprocity – that the rights and obligations of a country in international relations should mirror those of its counterpart – is a fundamental building block of international law.  *See generally Hilton v. Guyot*, 159 U.S. 113 (1895).  Denying Ahn bail in this case would render extradition between the United States and Spain an inherently one-sided relationship: the United States would be

---

[15]   The professors were given access to various documents to allow them to accurately identify relevant facts and circumstances, including the Government's April 12, 2019 Complaint filed in this court, the April 11, 2019 arrest warrant issued in Spain, and the various support letters attached to this filing as exhibits.  *See* Exh H. at 99.

1   committing itself to detaining an American citizen upon request by Spanish
2   authorities, despite the fact that under Spanish law, Spanish citizens sought by
3   American authorities under similar circumstances would be left at liberty throughout
4   extradition proceedings.  The United States will suffer no diplomatic embarrassment
5   by applying to Ahn the exact same bail standards that Spain applies to its own
6   citizens facing extradition.

7        **F.      Ahn Is Unable To Care For His Seriously Ill Mother And**
8              **Grandmother While In Custody**

9        While this Court has already concluded that Mr. Ahn's responsibility to his
10  family is not a special circumstance on its own, in the context of the other
11  circumstances described above, the Court should consider this factor as part of the
12  "collective approach" to bail determinations in extradition cases.  *See Wroclawski v.*
13  *United States*, 634 F. Supp. 2d 1003, 1006 (D. Ariz. 2009).  Along with his brother,
14  Mr. Ahn shares the responsibility of caring for his mother and elderly grandmother,
15  both of whom have serious medical conditions that make them reliant on his
16  physical, emotional, and economic support.  Mr. Ahn's mother was diagnosed in
17  2007 with trigeminal neuralgia, a chronic nerve disease that causes "extreme,
18  sporadic, sudden burning or shock-like facial pain" occurring "in volleys lasting as
19  long as two hours."[16]  This constant, unbearable pain frequently leads to severe
20  clinical depression, earning the condition the colloquial moniker of the "suicide
21  disease."  Mr. Ahn's grandmother is 97-years old, is near-blind, and has severe
22  Alzheimer's disease that makes her prone to night-time wandering behavior.

23       Mr. Ahn's mother and grandmother rely upon him for "day to day needs as
24  well as in any emergencies."  *See* Exh. B at 17 (Kim Letter.)  He is their "main
25  financial supporter" and pays for their expenses including their "mortgage . . . [and]
26
27  _____
28  [16] https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Trigeminal-Neuralgia-Fact-Sheet

21

1   cell phone or internet bill." *See* Exh. B at 23 (Min Letter). Mr. Ahn's Detention

2   leaves both his mother and grandmother without a caretaker. His brother, Daniel

3   Ahn, lacks the resources to take on this burden alone. While other community

4   members may be able to provide moral support, these are extremely vulnerable

5   individuals that require the sort of around-the-clock care that only a devoted son or

6   grandson can provide. Mr. Ahn's detention has exacted a severe mental and

7   emotional toll on his mother, which is of particular concern given her condition.

8   The family has not yet informed Mr. Ahn's grandmother of her grandson's detention

9   out of concern for her health.

10        **G.**    **Mr. Ahn Is Not a Flight Risk**

11       Mr. Ahn's connection to the local community is so strong that his "complete

12   lack of flight risk" may on its own rise to the level of a special circumstance. *See*

13   *Chapman*, 459 F.Supp.2d at 1027 ("While this Court recognizes lack of flight risk as

14   the initial threshold Respondents must cross, it is such a prominent aspect of this

15   case that it rises to the level of a special circumstance in and of itself"). Mr. Ahn is

16   an American-born citizen who has spent nearly his entire life in Los Angeles. The

17   numerous letters of support provided by Mr. Ahn's friends, family, and colleagues

18   share a common theme: there is little to no risk that Ahn will attempt to escape

19   justice. *See* Exhs. B and C. His entire family – including his wife, mother, and

20   elderly grandmother – are in Los Angeles and have been since he was a boy. *See*

21   Exh. C at 40 (Buick Letter). "[E]verything that is important to him is here." *See*

22   Exh. B at 27 (Bialosky Letter). Mr. Ahn's family is "the center of his universe," *see*

23   Exh. B at 21 (Noonan Letter), and he "understands the effect that his actions would

24   have on his family" were he to evade justice. *See* Exh. C at 44 (Prescott Letter).

25   Mr. Ahn's former roommate – a Congressional Medal of Honor nominee – declares

26   that he would "be willing to mortgage [his] own freedom on the promise that

27   Christopher Ahn will never flee." *See* Exh. C at 35 (Bellavia Letter).

28       The irony is that of all of the alleged participants, Mr. Ahn is the only one

1 sitting in jail *precisely because he is not a flight risk.*  As early as late February, the
2 press began reporting that Spain was investing the Madrid incident, but Mr. Ahn did
3 not flee.  He was visited by the FBI and questioned a few weeks before his arrest.
4 Still he did not flee.  He was told by the FBI that there were credible threats to his
5 life from North Korea.  While that warning appears to have caused other alleged
6 participants to flee, even in the face of credible death threats, *still Mr. Ahn did not*
7 *flee*.  His wife confirms that while all of these events were ongoing, Mr. Ahn
8 continued to live with her at their home, going about his usual routine.  *See* Exh. B
9 at 10-11 (Wife's Letter).

10      By all accounts, Mr. Ahn is someone who is deeply devoted to his family.
11 Having lost his father suddenly at 17, Mr. Ahn had to step in as the man of the house
12 at a young age, taking over the family business and acting as a father figure to his
13 younger brother.  His wife describes how devotion to family is a quality they both
14 share – they help pay for their parents' mortgages while choosing to rent a small
15 apartment for themselves.  *See id.* at 11.  As collateral for bail, Mr. Ahn's brother,
16 mother, and in-laws are willing to post their residential homes, worth an estimated
17 total of close to $1 million in equity.  There is no way Mr. Ahn would risk causing
18 his family members to lose their properties by fleeing.

19      **H.    Mr. Ahn Is Not a Danger to the Community**

20      A special circumstance may also exist when "[t]here is no allegation that [the
21 respondent] is a danger to any community on the basis of violence or continuing
22 criminal conduct." *See Chapman*, 459 F.Supp.2d at 1026 (quotations omitted).  Mr.
23 Ahn has no record of violence – in fact, he has no criminal record at all.  He is a
24 full-time entrepreneur who has always made time to volunteer for charitable causes.
25 The letters of support speak with one voice in describing Mr. Ahn as a kind, gentle
26 individual with no aggressive tendencies.  Will Prescott, a former army officer and
27 business school classmate, offers a particularly personal and forceful account of Mr.
28 Ahn's non-violent personality: "Chris has been a frequent guest at my house and is

beloved by my three children, ages 5, 4, and 10 months.  I completely trust Chris around my family and would entrust him with the lives of my wife and children without a second thought."  *See* Exh. C at 44 (Prescott Letter).  These powerful letters speak volumes about Mr. Ahn's exemplary character and provide overwhelming evidence that he is not a danger.

The only evidence the government can point to in support of a finding of danger to the community is: (1) the underlying allegations in this extradition matter (for which Mr. Ahn is presumed innocent until found otherwise); (2) his service in the U.S. Marine Corps; (3) and his possession of a firearm in accordance with what the government concedes is a valid conceal-carry permit.  It would be unconscionable to find that Mr. Ahn is a danger to the community based on any of these factors.

First, the allegations of violence against Mr. Ahn are not only unproven, they are also not credible.  Mr. Ahn is accused of having forcibly restrained and beaten a North Korean official.  But, as indicated by medical records filed under seal, that would have been physically impossible for Mr. Ahn, whose his right hand was still healing from a fracture on the date of the incident.  *See* Sealed Exh. 1.  The medical records show that Mr. Ahn broke his hand in December of 2018 and was still injured in February.  More importantly, the records show that in March, just a couple of weeks after the Madrid incident, Mr. Ahn's hand was still healing but was *showing continued improvement*.  If Mr. Ahn had indeed violently restrained someone in between his February and March visits to the doctor, the injury to his hand would have reflected that.  Mr. Ahn is also accused of having entered the embassy "carrying knives, iron bars, machetes, and imitation handguns."  (Dkt. 1 at ¶ 6(c).)  But surveillance photos released by the press show that the person alleged to be Mr. Ahn has nothing in his hand but sunglasses as he walks calmly inside the embassy.  *See* Exh. F.  While the man in the photos appears to be wearing a small backpack, it is ridiculous to suggest that someone who was intending to conduct a surprise attack

on an embassy would keep his weapons zipped up in a backpack, out of his own reach.

Second, it is repugnant that anyone would try to use Mr. Ahn's years of service in the military to suggest he is a danger to the very community he pledged himself to serve. Mr. Ahn put his life and his own career goals on hold, and spent years away from a family he loves to protect this country. Moreover, while he served honorably in his role, Mr. Ahn was no grizzled front-line combatant: during his time as a Marine, he primarily held a desk-bound intelligence job and received no special combat instruction outside of basic training and pre-deployment training, common to all personnel deployed overseas. While some segments of the media have distorted his years of service to portray him as a disgruntled, dangerous, or even unstable "ex-marine," nothing could be further from the truth. As one of his fellow veteran friends puts it

> Chris always prided his service in the United States Marine Corps on saving lives. There was a difference and he always made a point of sharing that with his peers. Not all service at war was that of the trigger pulling class. Chris was an intellectual Marine. He solved problems with his mind. Ahn worked to help the people of Iraq and he took great pride in what he was able to accomplish. He is not and never has been a violent person. Christopher is and always will be a faithful and dutiful Marine. His life is predicated on honor and duty.

*See* Exh C at 33 (Bellavia Letter).

Finally, as the Court is aware, Mr. Ahn was licensed to carry a firearm at the time of his arrest. As was stated at the original detention hearing, he only began arming himself a few weeks prior to his arrest because he was warned by the FBI to take safety precautions against threats from North Korea. Mr. Ahn violated no laws by trying to protect himself and his family. This factor should have no bearing on whether the Court considers him a danger.

/ / /

/ / /

/ / /

## IV.   CONCLUSION

This case involves precisely the kind of special circumstances that have been recognized by the Ninth Circuit and other courts as justifying bail in an extradition matter.  Mr. Ahn is neither a flight risk nor a danger.  He is an honorable man who has earned the support of his friends, family, and the greater local Korean American community.  The Court should order that he be released.

DATED:  June 6, 2019                     Respectfully submitted,

Ekwan E. Rhow
Naeun Rim
Christopher J. Lee
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By:         */s/ Naeun Rim*
                    Naeun Rim
            Attorneys for Defendant Christopher Philip
            Ahn