# EXHIBIT A















# EXHIBIT B

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Honorable Jean P. Rosenbluth:

Hello. My name is Grace Ahn and I am the wife of Christopher Ahn. We were married in July of 2017, but have been together since May of 2004 when we were both only 23 years old. We met when I was taking a year off after graduating from UCLA and preparing to attend UCSB for teaching credential and Masters in Education. I have been an English teacher at West Covina High School for the last 13 years. I am currently also the English Language Development (ELD) Coordinator on campus.

In 1998, at the young age of 17, Christopher lost his father to cancer and had to take over the family business to provide for his immigrant mother, aging grandmother and a 14-year-old brother. I did not know him then, but I know his father's death is a significant source of his compassion and integrity. Chris has revealed to me that after his father's death, he vowed to live his life to honor his father, to do good work to make his father proud. And Christopher has lived up to that promise to the best of his abilities. I wish he didn't have to go through such a tremendous loss, but I believe firmly that this loss shaped him into the man that I not only love, but also respect.

Less than a year after we started dating, Christopher deployed to Fallujah and served his country honorably. After his service with the Marine Corps, he continued to serve the military community through his work with the Vets for Freedom, Warrior Legacy Foundation, Spirit of America and the Young Marines. Even while attending Darden School of Business, he devoted his time with the Darden Military Association for various humanitarian causes. Then returning home with an MBA in 2013, he reconnected with his former boss to start up Moku, a digital consulting firm. As Chief Strategy Officer, he worked day and night, quickly making the business a success.

I cannot be more proud of his valor and big heart to serve his family and country. But really, I have been the biggest beneficiary of his big heart. I do not recognize the man described in the allegations in the complaint.  I know in my heart Christopher would never do the things he is being accused of, and I trust that the evidence will show that he did not harm anyone.  He is not capable of violence. But I also know he would never run and hide from his responsibilities. He would want to clear his name through the proper process.  In the weeks before he was arrested,

Christopher was living with me and going about his usual routine.  He told me that the FBI had warned him about death threats, but it didn't even occur to him to flee.  He would never do that to me or his family.

Part of the reason I married Christopher is because everything he has done has always been for the love of country and family. The desire to support family drives him. Same goes for my dedication to my parents who immigrated to provide better lives for us. Christopher has been the main financial provider for the two of us because I financially support my parents. With Chris currently in detention, I had to move back in with my parents because I am not able to afford the mortgage on their home and maintain an apartment for myself. It may be difficult to comprehend, but our dedication to our parents is the reason why the court should be entirely confident that Christopher is not a flight risk. He values family too much; I would never leave my family. It is unthinkable to cause that much pain to our parents. Our home is here. Our hearts are here. Our lives are here. Chris was away numerous times during our 15 years together, but I always remained in California and he always returned home. This is where we want to build our lives together.

Christopher never sees value in creating conflict or causing pain. He is the first one the say sorry, first one to reach out, and first one to help the fallen. I remember last winter was particularly cold. He had become friendly with a homeless man always outside of our local Ralphs. One very cold night, we saw that man passed out and shivering violently. We tried to wake him up, but he was incoherent. So Christopher rushed home and brought several of our blankets to wrap him up in. Christopher asked the store for cardboard boxes and built a sort of wind blocker and left some money in his pocket. This is the real Christopher Ahn. He is a big ball of love, generosity, honor and service. He is a gentle soul. He has lived his entire adult life with a moral standard higher anyone else I know. I plead with the court to see all that is good in him and grant him bail. Thank you.

Sincerely,

Gracie Ahn

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthous
244 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Dear Honorable Jean P. Rosenbluth,

Thank you for your time. My name is Daniel Ahn, Christopher's younger brother. I hope
to introduce myself and share with you who my brother is and how much he means to
me. My brother and I grew up in a small family with my late Father, Mother and
Grandmother in southern california. I shared and slept in the same bed with my brother
until I reached middle school. I remember him making up bedtime stories, helping me
with homework, walking with me to the comic book store, we were inseparable. Growing
up, my mother and father were always working with my grandmother caring for us.
Seeing how hard they worked gave us perspective of how much they sacrificed and
loved us. As a child, my brother was my role model and my best friend. He taught me
from right and wrong, to live honorably and continues to help me in every way to this
day. I love him so much.

When I was born, I had several complications and went through numerous surgeries
into elementary school. My brother was always there by my side as my protector. He
always put me and others before himself as early as I can remember. He's been such a
positive role model in my life and shaped me to who I am today.

In 1998 my father passed away from cancer. My brother immediately took on the
responsibility and role of taking care of our family. Looking back, my brother was still a
boy. However at the time, I can remember feeling secure knowing my brother was
there. My brother became a father figure to me and within our household. He became
our families pillar of support and hope. He grew up fast helping my mother with our
families international business The Garment Broker. Helping my mother with everything
from business documents, phone calls to accompanying her on business meetings
overseas. It seemed all natural to me as a child, but looking back…he was a 16 year old
boy wearing a suit putting his family on his back. My brother showed me what being
selfless meant and how to live with respect and honor toward others. Shortly after he
graduated High School, my brother joined the US Marines. Together we've grown so
much with my brother, every step of our journey in life he's been there for us. Soon
after, my brother left to Iraq to serve his duty. Our family became even stronger with the
love and respect we had for each other. My brother showed us what being an American

was and what sacrifice truly meant. When he came back, the world seemed brand new and our eyes felt heavy with appreciation for the men and woman that sacrificed for our freedom before us.

My brother has always been a role model and shown me what hard work looked like. In 2009 my brother helped me with my online business, leading my operations, financial planning, helping me develop a business plan for growth. He's been there for me every step in my life, always making time for me. After my brother graduated from the University of Virginia, he immediately moved back home to support our family. I watched him continue to build his career working with Shell, Volcom Brand to Digital Consulting. He continues to never stop working, always putting my mother and family before him.

My brother has been financially supporting my mother with many things including basic utilities, mortgage bills, loan payments to medicine for her trigeminal neuralgia illness. My brother and I carry the responsibility of providing for my mother and grandmother. However as of lately I have not been able to support much at all. I am a small business owner. I run a small online fashion retail store, my company sells dresses and fashionable clothes for special occasions. In these recent years to this day, it has been a very difficult time. I'm not proud, however the reality of my business has been struggling deeply. I am currently working extremely hard to pay several business debts with little room to provide much of anything to support our family let alone myself.

While running my women's dress company, I recently started two new separate businesses which have taken up the majority of my time all together. One is an exciting new tech App I am building. It is now successfully launched and ready for download on Itunes and Google. The other is an online women's wig retail store. I provide hundreds of fashionable women's synthetic and real human hair wigs in a variety of styles and colors. I am working daily late in to the morning handling a total of three businesses on a daily basis leaving me almost no free time.

Being physically present at my mother's home has been a large responsibility my brother and I have been sharing. My mother suffers from a very painful disease trigeminal neuralgia and requires either one of us to be present and help with any frequent emergencies. This passed month, my mother collapsed from dizziness from her medication. My brother was able to take her to the emergency room and I was able to tend to my grandmother.

Basic important chores like preparing dinner and meals for my grandmother and mother

are our responsibility as my mother often feeling weak and very dizzy from her daily pain killer medicine. It's important my mother rest. My brother and I share daily chores such as doing laundry, cleaning the household, driving my mother to do errands, taking her to the hospital. Taking care my grandmother is another big part of our lives.

My grandmother is 97 years old and suffers from blindness and shows signs of memory loss which we requires us to monitor daily. We share the responsibility of taking care and monitoring my grandmother every day. My brother helps her with her daily hygiene from cleaning her teeth, walking her to the restroom, to giving her sponge baths. As she has gotten older, she often times may involuntary release herself in her bed. This has been a big task for our family, cleaning her sheets and cleaning my Grandmother. We love her so much as she's raised us since we were children, my brother and I do everything we can to be there for her.

A very big task is also at night there would be often times my grandmother wanders outside her room from insomnia. We make sure either my brother or I are at home monitoring physically on stretches of days my grandmother shows insomnia. We've went through several doctor prescriptions to help her sleep, which lead to many instances where she did not accept well. Her insomnia is something we have accepted as a routine chore we must monitor.

I don't live with my mother and often I work very late into the night meeting deadlines, anywhere up to 3am. It's been a very busy time for me with my three running business ventures. My brother is a giant support and presence at home taking on the majority load of helping while I am working. He is the reason our family has balance and is healthy.

My brother has always been someone I looked up to, not only because of his accomplishments but overall character. He genuinely is a real life teddy bear and has the biggest heart. He enjoys cooking food for friends, listening to reggae music and spending time with close friends and family. My brother dresses like he came from the beach wearing shorts and sandals all year long. He is one of the most down to earth kindest spirits I can say I know in my life. After his service in Iraq I've seen a calmness and peace through the years following to present day. He has shown me what life is about which is family, dedication to work and love for one another. To live by a simple code of honor, do right, and treat others with utmost respect. My brother is the most selfless person I know and I continue to learn through his example.

I hope you may consider him to come back to us, as I am 100% confident and promise

14

you there is no risk whatsoever. My brother is dedicated to our family and his purpose in life is to help and support the people he loves. He will never do anything to jeopardize our family. I hope you may allow my brother to come back to our home and continue to be there for us. We need him so much right now and I know my brother will never flee or cause any trouble whatsoever. I've only witnessed my brother express kindness to others with only respect. My brother is loved by so many people and I can assure you, my brother is not a danger to anyone and never will be. He is the kindest honorable man I know. I appreciate you taking the time to read my thoughts and who my brother is. He is my best friend, my brother and so much to so many people. Thank you so much.

Sincerely,
Daniel Ahn

5/13/2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

Dear Honorable Judge Rosenbluth,

I hope this letter finds you well. I'm writing this letter on behalf of Christopher Ahn in support for his bail application. My name is Jason Kim, 35 years old, a naturalized citizen of the greatest country in the world, a full time employee for over ten years at the same company Azurelite Inc and a full-time husband to my loving wife Jessica Kim. Christopher Ahn is my brother-in-law who has been with my older sister, Grace Ahn, for the past fifteen years.

I did not know Christopher from his younger days, but I do know that he lost his father, who was the breadwinner of the family, when Christopher was only seventeen years old. I know that losing his father was not only a physical loss, but it also greatly impacted the financial survival of his family - grandmother, mother and youngest brother. As the oldest son, he took it upon himself to become the new breadwinner. And while also attending college, he made the decision to serve his country by joining the Marine Corps. At the age of 24, when he was called upon for active duty in Iraq, he put his life on the line to served with the 5th Battalion 14th Marines. That was when my sister and he were dating. It got to see what a difficult time that was for both of them, but I also saw them battle through it together and come out stronger in the end. After fulfilling his duty as a Marine, he continued to be dedicated to worthy military causes. I noticed that it really matter to him to make a difference for that community. When he decide to attend Darden School of Business at the relatively late age of 30 something, I know he did so to become a better provider for my sister. Honorable Judge Rosenbluth, I do not bring up Christopher's misfortunes with his father for you to have pity or sympathy for him because I know tragedy can happen to anyone. I do not bring up his military service or his earning an MBA simply to list what he has accomplished in his life. Insead, I hope you would take a look at the past decisions he has made in life and how those reveal his genuine moral integrity. He never tried to avoid challenges or difficulties. He would face them and overcome them. Time and time again, he made decisions in life to be there for his family, community and country.

Although I can't say too much about his professional life, I can speak as to what kind of man he is to my sister. When Christopher and Grace finally got married in 2017, he became the loving, respectful and sacrificial husband my sister deserved. The love and mutual respect I see between them special, one that I assume comes when a couple has been through thick and thin together. As the brother, I am pleased to witness Christopher always putting Grace first, always thinking about her needs and never wanting to disappoint her. He is also very good to our parents. We all love him dearly because he is a kind man and so good to my sister. What also didn't surprise me

16

was that he still continued to be the "man of the house" for his mother and now ninety-eight-year-old grandmother whom he adores. What I mean by that is he is still the one they rely on for day-to-day needs as well as in any emergencies. He is the one they call when the garage door breaks, when his grandmother has wondered out of the house in her sleep, and especially when his mother is bedridden from her illness. That is the epitome of Christopher I know, someone who never neglects his duties, whether it be as a loving husband or a dependable son/grandson. As a son myself to immigrants parents, I know all to well the responsibility of taking care of your parents, especially when language is a big problem. Based on his relationship with family and friends, I can confidently state that he is not a flight risk because it is a priority for him to never bring shame or pain to his loved ones. I know he would never want to disappoint those people who believe in him and are supporting him now. In that same way, I am confident that he poses no threat to society. He is a man who upholds the law, and has no history of violence. Instead, he has dedicated his time to serving his country and community. I plead for you to take a closer look at who Christopher really is by the way he has led his life - always putting others before himself. As such, I have absolutely no doubt in my mind that he will show up to court when asked upon by you, a federal judge of the United States government.

Christopher Ahn is an honorable member of society, a loving husband and the most patriotic citizen of the United States of America I have come to know and love. I know Christopher is not a flight risk because he would never abandon his family to flee to save himself from these ridiculous claims made by the Spanish and North Korean government. Please provide Christopher with bail. Please send him home to my sister. Thank you for your consideration.

Sincerely,

Jason Kim

17

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
244 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Dear Honorable Judge Rosenbluth,

I am Christopher's Mother.

My son is the center of our family.  He has been the man of the house since his father died 21
years ago and is like a father to my younger son. He picked up the business his father left behind
when Christopher was only 17 years old.

I did not agree with his choice to join the marines after high school. I asked him "Why are you
going to the Marines?" and he responded, "I have lived too comfortably for my whole life. I
want to challenge myself so I can be stronger and help others." I didn't want to stand in the way
of my child. We talked over the phone and wrote each other letters during his training period as
much as possible. Once, he said he told his boss "My parents came to America empty-handed so
I could have a better life. I joined the Marine because I wanted to do something good for
America as a second generation Korean American." As a mother, I am so thankful he grew up to
be so responsible and mature.

While he is with the Marines, the Iraq war began. I never thought in a million years that a war
would start while my son was a Marine. Thankfully, his service period was over so I thought he
wouldn't have to go to the war.  But my son said he felt that his time to give back was not over,
and he would regret not serving during the war. I couldn't stop him, and I prayed that he would
come back safe. After coming from war, he got a stable job and became a responsible young
man. During his time away, taking care of the family business became too hard so it went under.

After 3 years of working, he decided to go to business school. He and his younger brother used
to help support me financially together, but that change when Daniel's internet business began
struggling. Chris is my primary financial supporter and has helped me with my loans, health
insurance, car insurance, utility bills, and taxes. I was diagnosed with stage 3 neuralgia and
needed money. I often went to the emergency room. During Chris's 37 years of existence, there
was not one time he complained or got in trouble at school and he was a good student. He was
the school secretary and the president of the Keyclub and has been leader of the household since
graduating from high school.

His grandmother turned 97 years old. She can't see and is suffering from Alzheimer's disease.
When grandmother leaves in the middle of the night, he goes and protects her. He cuts her
toenails and fingernails, cleans the bathtub, and holds her hand when he take her out.
Grandmother doesn't know when she'll pass away and keeps asking when her grandson will

18

come back. My son is not a coward. I swear on my life that my son will never run away or hide. I am proud of him and highly respect him. Dear Your Honor, please allow me to live with my son.

Sincerely,
We Young Ahn

5/13/2019

# RE: MATTER OF CHRISTOPHER P. AHN

**5/10/19**

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

**Dear Honorable Jean P. Rosenbluth:**

This letter is in support of my dear friend and business partner, Christopher Ahn. I met Chris through my best friend, as they went to Grad School together at Darden, at UVA. I've known Chris for many years and am shocked that he would be detained like this without bail.

Chris is an American patriot, a Marine, a husband and a devoted son to his mother and caretaker of his elderly grandmother. Chris and I work together side by side every day and has displayed absolutely no history or indication of violence. He has never displayed any threat to society. He consistently drives from DTLA to Chino to take care of his family. He provides medicine and healthcare to his grandmother and takes responsibility for many family matters for his mother. He is gentle, thoughtful and extremely kind. Since his detainment, I know that there is now a financial hardship for his family, that myself and a few others are trying to step in and help in any way we can.

I hope you can seriously reconsider bail for Chris, and a release from custody. There is no reason for him to flee. He has been a great business partner with many important responsibilities both in the business and towards his family.

I appreciate your consideration.

Sincerely,

**Daniel Kam**
▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮ / ▮▮▮▮▮▮▮ **cell**



May 14 2019


Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse 255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012


Judge Rosenbluth,

I met Christopher in 2009, during his last year of graduate school at the University of Virginia, when he began an internship with an apparel manufacturer named Volcom where I worked as the Director of eCommerce.

He was tasked with helping Volcom to evolve their retail business and given the strategic value of the eCommerce business, he was allocated to my team. We quickly developed a friendship which matured as we worked side-by-side for more than a year. His contributions were significant and had a material impact on the growth of the business.

I started a business in late 2012 and Christopher was my first call to join as a business partner. We worked side-by-side for what seemed like endless weeks and months to build a great people-focused organization. Throughout the growth of the business, I came to know his family well - both through the stories he would tell and through personal interaction. They were, and are, the center of his universe. He would drive for hours every week to travel from his apartment to spend time with his grandmother, mother and brother at their family home. He would take his elderly grandmother on walks, take her to run errands, do her laundry and spend whatever time he could with her.

With the loss of his dad as a kid, he was thrust into the role of the "man of the house" - one which he took very seriously. He would give his mom money from his paychecks to help with her mortgage and the care of his grandmother. Never once did he complain about this responsibility but instead felt

privileged to do it, being able to help those who needed it, which is no surprise to anyone that really knows Christopher.

Regardless of the challenge that he was faced with, he wouldn't ever complain, he would always look at the morally-correct bright side of things. That's to say he would always do things for the "right" reasons - one of the many reasons that I love him. He would regularly guide me on decision making with our business, focusing on being a great partner to our clients and always doing the right thing.

For as long as I've known him, he's talked fondly about his time as a Marine, how he loved serving his country and how that experience helped to solidify his focus on the things that mattered most in his life. He made many lifelong friends in the military and once his time was up, he focused on veterans affairs, working to better the lives of his fellow soldiers.

Christopher has lived a lot of life in his 30+ years. He's unlike any friend I've ever had because his friendship is unwavering - he would do anything needed to help out a friend while helping to ensure it's the right thing to do.

I don't have a single concern about him fleeing because of his passion for, and responsibility to, his family and friends. His life is here in the Los Angeles area and he wouldn't sacrifice that for anything. I also don't have a single concern about him behaving violently as he hasn't ever done so in as long as I've known him.

Sincerely,

Ben Noonan

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

Dear Honorable Jean P. Rosenbluth:

My husband and I are both graduates of UC Irvine and are working professionals living in Los Angeles, CA.  We have both known Christopher Ahn and his wife, Grace Ahn, for a very long time.  We have known Grace for more than 25 years through school and church and met Chris more than 15 years ago since they first started dating in college.

Making sure that your best friend is dating a great guy is a given and I for one wanted to make sure that Chris was the best person for my friend.  Getting to know him throughout the 15 plus years I've known him, there has never been a doubt in my mind that my best friend met someone whose heart was filled with unconditional love, who was honest and a person who stood up for what he believed in.  Chris comes from a close knit and loving family that consists of his mom, brother and grandma.  After losing his dad in high school to cancer, Chris has been the pillar of his family since a very young age.  He has been a confidant both emotionally and financially to his mom and has also been a caregiver to his grandma who is in her nineties and can barely hear and see.  Chris has been the main financial supporter for his mom and grandma when it comes to paying for their expenses whether it's their mortgage or something as small as their cell phone or internet bill. He has also been a father figure to his younger brother Daniel ever since high school.  Even though Chris was also young himself, he did everything his power to make sure that his brother was well taken care of and had a good role model to look up to.  Chris' love for others is not only displayed by the unwavering love he shows his family but is truly evident with his choice to serve in the United States Marine Corp to help and protect the citizens of the United States.  In my opinion, even putting your life at risk for people you love can be a hard decision so deciding to do that for millions of people you don't even know is not something that anyone can do.  Chris served in Iraq twice as a deputy chief of intelligence and not only helped to make detention facilities better but also utilized his skills to help stop human trafficking and terrorist activities.  Personally, he has always been willing to help us with anything he could.  Whether it was helping us move, cooking delicious home cooked meals, going volunteering with us for my birthday or just being a great listener and at times giving us sound advice, Chris has never hesitated to be there for us.

Like mentioned before, Chris is also an honest guy who stands up for things that he believes in.  This though does not mean that he is one of those my way or the highway type of guy.  He also knows the importance of respecting other's beliefs and being open minded to all.  For instance,

there have been conversations ranging from political to even the smallest things like TV shows or music or food where we've definitely not had the same opinion.  But even during times when the conversation became heated, Chris has always been one who is not confrontational but instead asks MANY questions to make sure that he is understanding the reasoning behind your beliefs instead of casting it aside and saying that you are wrong.

Being at the courthouse for his bail hearing, we know that one of the concerns that was brought up was the issue of violent character.  We have never known Chris to be a violent person.  Chris is a happy-go guy who is like a teddy bear inside.  He wears his Hello Kitty apron, a gift from Gracie, while he leads the prep for our weekly couples dinner together.  He's a guy who loves singing and brags about being part of the concert and show choir in high school.  He's the kind of guy who would rather be happy and joyful and helping others than wasting his time being otherwise.

We are also confident in knowing that if Chris is granted bail he is not a flight risk.  There is nothing more important to Chris than being near his loved ones and caring for them.  After the passing of his dad in high school, Chris has a deeper sentiment of what family means to him and he would not do anything to jeopardize anything when it comes to his family.  Knowing all the support his family and friends have given him, we can honestly say that Chris would not flee if he was out on bail.  Also, Chris is a man of integrity and would not go against the statutes of his bail.  Whatever limitations you put on him when granting his bail, not only will he be following it but his family and friends will keep him accountable in making sure that he abides by all rules set forth for his bail.

All in all, we have nothing but good things to say about Christopher Ahn.  We know you may think we are biased in saying that because we are his friends but in all honesty, just because you consider someone a friend doesn't mean that you would vouch for that person no matter what.  There are many people who you consider as friends who would rather stay out of situations and not be involved.  In the case of Chris though, we are writing this letter to you to let you know that we support him and know that he is a good person who has loving family and friends who want to see him out and at home defending himself against the charges filed.

Sincerely,

Helen & Edward Min



May 13 2019


Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse 255 E. Temple St.,
Courtroom 690, 6th Floor
Los Angeles, CA, 90012


Judge Rosenbluth,

I first met Christopher Ahn over dinner when our mutual friend was creating a
business called Moku Collective. Christopher, or Chris, and I instantly hit it off and
would be business partners for several years.  I'd never met someone like him before.
He was an intelligent, funny, goofy man who gave me the biggest bear hug I'd ever
received from someone I'd just met. I quickly learned that he had a strong bond to his
family, country and friends.

Chris served as the Chief Strategy Officer for our group. We spent most of our time
together trying to get new business for our growing company. Chris would stay up
into the wee hours of the night working to make sure that our presentations were as
prepared as possible. Without Chris's dedication to our business, the company would
have failed, leaving a dozen mouths hungry.

I'm sure others will tell you stories of serving with Chris in the Marines, but I didn't
get to see that side of him, other than knowing his time in the military strengthened
his love of country and sense of self. Meeting his fellow veterans at his wedding was
such a great chance to see another side of Chris.

When he was not working on getting Moku off the ground, he was frequently caring
for his grandmother and mom, two women he adored tremendously. He would shuttle
them around, cooking meals and taking them on errands. He also helped his brother
try to get his business off the ground. To this day I don't know how Chris managed to
get everything done for everyone, all the while falling further in love with his now
wife Grace.

It is his love for family that causes me to believe he is not a flight risk if awarded bail. As the leader of his family, we would not leave them behind. He is a kind, loving, non-violent man who needs to be reunited with his family and friends. I hope I get the chance to see him again and would work with him in a heartbeat if given the chance.

Sincerely,

**Mark Rubin**



5/13/2019

Re: Matter of Christopher Ahn

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse 255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

I have known Christopher Ahn for nearly 10 years. I was shocked and saddened by the news of his recent trouble. Chris has been an amazing friend, family member, and community member in the years that I have known him. I was introduced to Chris while I was on a trip to visit a friend who was in business school at the University of Virginia. I had taken a week off of work as a medical device sales representative and I felt a little out of place being a California kid visiting the east coast. Chris made me feel right at home and our friendship has remained constant for many years. We speak regularly about our business endeavors as well share highlights and lowlights from everyday life. We both care deeply about the well being of each other's family and I am lucky to call Chris a good friend.

Chris served his country honorably and after retirement from the military he has worked hard to provide for his family. He went back to school and received his MBA from the University of Virginia which he has used to help his family business sustain his elderly Grandmother, Mother, and younger brother. Chris continues to work hard everyday as an entrepreneur creating businesses as a consultant as well as bring new physical products to market. His family counts on him to help provide financial and emotional support to live everyday. Chris is a gentle person who I have always been happy to introduce to my friends or family members. He is wrapped deep in his community and has ties that will likely keep him in Southern California most of his life. It is my opinion that Chris will not flee because everything that is important to him is here, and he would never abandon his family. Chris is an asset to his community and has never been a threat. I am a better person for knowing Christopher Ahn and my family and friends all feel the same way.

Regards,
Mitchell Bialosky

27

**Honorable Jean P. Rosenbluth**
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

**Re: Matter of Christopher Ahn**

Dear Judge Rosenbluth:

I am writing to convey my support for the court to grant Chris Ahn's request for bail. Chris and I have been friends for nearly 10 years and were roommates for 2 years while in business school together at the University of Virginia. I have always known Chris to be of the highest character and principle and believe that he will honor the terms of his bail in this matter.

In the years that I've known Chris, he has consistently demonstrated deep concern and care for others, volunteering and raising money for the Wounded Warrior foundation, actively participating in community outreach and volunteer efforts, and going above and beyond for friends and acquaintances in their times of need. He genuinely cares for his fellow man or woman and finds ways to be of service whenever possible.

Most importantly, Chris loves his parents, brother and supportive wife, and strongly believe he will honor the terms of his bail and remain with the state or country as would be required to see this legal matter through to its eventual conclusions.

Chris is no danger, whatsoever, to his fellow citizen and I have always experienced Chris as being a kind, gentle and compassionate individual.

Sincerely,

Timothy Henson

United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

To Honorable Jean P. Rosenbluth:

I've known Chris Ahn since August of 2010, as we were both First Year students working our way to a MBA from the Darden School of Business at the University of Virginia. Beyond being classmates at Darden, I've also had the ability to continue my friendship with Chris and his wonderful wife Gracie since moving out to Los Angeles 2 years ago.

Immediately before the beginning of Second Year at Darden, I suffered a number of seizures and had to undergo a craniotomy to remove a large mass that had developed in my left frontal lobe. I'll never forget the overwhelming support of my fellow classmates, but none more so than Chris Ahn. Chris not only reached out to me independently to support me through my trauma, but he also rallied a large group of friends so that upon my return to campus after my 8 week bedrest, I would feel supported, safe and hopefully, a little less traumatized.

I think that our friendship became something even more meaningful after my move to Los Angeles. Chris and his wife took me under their wing, showing me around Koreatown and the wonderful treats within, and introduced me to a number of their friends, many of whom, have known Chris and Gracie for more than many moons. I've never had friends who have lasted a lifetime, and these closeknit relationships struck me. Additionally, Chris and I had conversations where we explored what it means to be a Korean in America (I'm half Korean myself) and he shared his insights, having been raised in much more of a Korean community here in Los Angeles than myself, and we went into the depths of our history as Asian Americans trying to understand what it means to fit in, if "fitting in" is truly something of value, how we've adapted and beyond. Family means everything to Chris, and I feel like he and Gracie both immediately opened their arms to me, which wasn't a surprise - if I was to find a few adjectives to describe him, I would use supportive, caring, and of course, hilarious.

From class, I know Chris to be curious. I know Chris to be an out of the box thinker, but always guided by the truths of this world which I think his experience in life has firmly grounded him within. I know Chris to be kind. I know Chris to always stand up for what he thinks is right - in terms of how people treat one another, in terms of business ethics, in terms of how his friends and family should always be supported.

I offer my full support behind Chris, and hope that this letter is clear in my opinion of him.

Sincerely,

Tina Glickman

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
244 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Dear Honorable Judge Rosenbluth:

I am currently serving as the head pastor at Halleluyah Korean Church in Walnut, California. It is an honor to write to support Christopher Ahn, and I thank you for the opportunity to do so. The Church and I are praying over Christopher Ahn and his mother every morning and evening.

I, Pastor Song JaeHo, have forged a relationship based on faith with Christopher Ahn's mother for quite some time now. I also attended Chris's most recent wedding. Christopher Ahn unfortunately lost his father at a young age and has been taking care of his mother through high school to graduate school. He also volunteered for Iraq war as a US marine for the country. Personally, when I think of Christopher Ahn, I think of his great responsibility and his reverence for his parents and sincere belief in God.

Christopher Ahn's maternal grandmother is also currently attending Halleluyah Korean Church. Chris's grandmother is 97 years old and is suffering from Alzheimer's disease. But the most pressing problem is that she will often leave in the middle of the night and wander, so she will need special care all times.

As Chris's mother lost her husband early on, she has been depending on her son. She has been dealing with stage 3 neuralgia, so she has been physically unwell to deal with finances such as car insurance, health insurance, mortgage, and her taxes. She has been relying on her son to help her with payments as well.

Another problem deals with how although emotional support is possible from Christopher Ahn's younger brother Daniel Ahn and the church family, help is still needed to lift the financial burdens. Christopher Ahn's mother has been dealing with much emotional distress and worry due to this case.

Your honor, please have empathy for Chris's mother and his 97-year-old grandmother's difficult situation. Christopher Ahn represents their emotional pillar.

I beg you to think about the void that will be left without Christopher Ahn, and I appeal to your graciousness and mercy.


Pastor Song JaeHo
5/14/2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Royal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

I went to Business School with Chris at the University of Virginia from summer 2010 to spring 2012.

I really got to know Chris during an organized school trip to Argentina. The purpose of the trip was to introduce us to Argentinian business practices by taking us on company tours, and to teach us about Argentinian people by having us interact in real situation with Argentine counterparts.

I remember being particularly impressed on this trip by Chris, and the respect and open mindedness he displayed for the different culture and people we were getting to know. Chris was undoubtedly the individual who went out of his way the most to engage with local residents, and the one most interested in understanding them.

As I got to know Chris better following this trip it became evermore apparent that Chris was someone who respected and empathized with others. Furthermore, Chris was a consistent source of support throughout those years, someone you could rely on to provide sound advice based on his own personal experience and struggles. I also remember Chris being a leader who would stand up for the less popular students, or opinions, if they were being attacked in class, and who would assume leadership roles that others were reluctant to take on.

Knowing Chris as I do, it is impossible for me to regard him as a danger to society or someone who would flee his beloved Country. I urge you to keep Chris' good nature, kindness, open mindedness, and strong moral integrity in mind through this process.

Best,

Joshua Shragie

# EXHIBIT C

**29 May 2019**

# HON JEAN P. ROSENBLUTH

Roybal Federal Building and United States Courthouse

255 E. Temple St., Courtroom 690, 6th Floor

Los Angeles, CA, 90012

Your Honor,

My name is David Bellavia. I served in the United States Army Infantry for six years. Serving in Iraq I have received the Silver Star, Bronze star and have been nominated for the Congressional Medal of Honor and the Distinguished Service Cross. I have known Christopher Ahn since 2007. We worked together in Washington DC, traveling across the country working for veterans and charity organizations that specialized in eliminated suicides. Together we passed legislation in statehouses and in Congress. We assisted in the post 9/11 GI Bill and helped veteran small business owners have access to secured loans.

We shared a DC apartment for almost two years.

Christopher Ahn is an American patriot. While my service focus on the violence of action needed to survive on the battlefield in Iraq, Chris always prided his service in the United States Marine Corps on saving lives. There was a difference and he always made a point of sharing that with his peers. Not all service at war was that of the trigger pulling class. Chris was an intellectual Marine. He solved problems with his mind. Ahn worked to help the people of Iraq and he took great pride in what he was able to accomplish. He is not and never has been a violent person. Christopher is and always will be a faithful and dutiful Marine. His life is predicated on honor and duty.

Chris received his Master's degree from the Darden School of Business at the University of Virginia. While his peers immediately put their degree to work to better themselves, Christopher joined me in helping veterans start businesses. He helped save struggling charities balance their books. Again, Christopher Ahn lives his life for his country, his community and his peers.

When our charity organization was struggling to make ends meet during the financial crisis of 2008, Chris took out a credit card and gave us $20,000. He covered payroll and travel. When a peer was struggling financially, he took their household bills and paid for their children's Christmas presents. When a friend of ours took his own life on Memorial Day, Chris flew to his hometown and attended their funeral. He also paid for three of his fellow Marines airfare and hotels. They didn't even know it was Chris was took care of this, as Christopher told them it was a donor of our organization. He did not want credit. He didn't want thanks. He did this all while he was in graduate school. Not an easy time and it was a heavy financial burden. Christopher is an outcome based man. If something needs to be done, he does it. The effect that it had on people who depended on him is always more important than his current financial situation

During the Iraq war there were many protests for and against our foreign adventures overseas. The political climate was polarizing and even though organizations like ours were non-partisan, we would enviably get sucked in to the vortex of the margins of the war debate. At times, during the conventions of 2008, our events devolved into a police presence where opposing sides became violent. Christopher Ahn would immediately take charge to stop this from escalating. At times, ending an event early. Or even cancelling future events to avoid these things from happening again. Many of his peers accused him of being too soft. I was one of them. We look back at it now as seeing Christopher's heart. His principles are clearly defined. He does not believe in hurting other people even if they are threatening his own well-being. I am not that man. I want to strike the rattle snake as it coiled, not after it bites me. In my most honest moments, I wish I had the heart and courage of Chris. He is what we should all want to be in this life. He lives in a Christ like approach to his fellow man. Loving friends and giving enemies the opportunity to see him as non-threatening. Even if it comes at a cost.

In 2009, our group had a chance to visit Iraq as civilians. Christopher did not want to witness violence. Even to cover a story or to be a part of combat in any way. He was done with that life

2

and would not be convinced otherwise. Christopher Ahn would never hurt, injure or threaten anyone in the twelve years that I have known him.

Chris is the sole provider for his mother and elderly grandmother. I can think of many times when he had to cancel trips or work extra jobs to be able to provide for his mother and grandmother. Having lost his father as a teenager, Chris became the man of the house before he was able to drive a car. His decision to join the Marine Corps was a heavy burden to them. One of the reasons he decided to not reenlist was the stress and the financial struggle it put on his family. His absence has provided unnecessary burden and stress on frail and unhealthy family members.

When we lived in DC, he would divide his check like it was a child support payment. This amount was for his rent, this amount for his bills and the remainder for his family.

I would be willing to mortgage my own freedom on the promise that Christopher Ahn will never flee. I know honor and I know men of integrity. This is the entire basis of my adult life. Christopher Ahn is one of the most decent and honorable men I have met. If Christopher called me today and said he needed me, I would set aside my life and do what I needed to do for him. Not just out of blind fidelity, out of guilt. The guilt based on the fact that I have witnessed him do this for me on far too many occasions. These are rare qualities in America today. These are rare qualities in men. America has far too many people with "hollow chests." People who say one thing and do another because it is the easier path. Christopher is a rare breed. He honors his word. He would rather die than bare false witness. And he will never dishonor his family, his nation or his own integrity. A man such as this, is worthy of equal trust and fidelity.

Christopher Ahn is the embodiment of an individual in a community. He loves this nation. He is proud of his culture. And he has risked his life to protect us from conflicts he disagreed with on principle because it was duty to serve.

Christopher Ahn is a not a danger to society. He is man of the highest honor and integrity. He is a man that I hold up as an example to my three children. Ahn is a true beacon of what we should all be to fix the issues we have in this society. He is thoughtful. Slow to anger. A thinker

3

and a scholar in a world of violence. His service in the Marine Corps, his dedication to the community, his family's reliance on his income are only a few of the many reasons he should be allowed bail to await his trial away from the confines of jail.

He is due his day in court. Christopher has risked so much to defend these very clear rights and his service and character should give you peace of mind that this man will not embarrass you or cause you to regret your most kind consideration. Thank you for your time. And thank you for considering this motion on behalf a beautiful human being, Christopher Ahn.

SINCERELY,

DAVID BELLAVIA

4

May 19, 2019

To:  The Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

Your Honor -

It is with hopeful heart that I write this letter in support of Mr. Christopher Ahn's bail application. I hope that my experiences with Chris will help you gain another positive impression in order to develop a fuller picture of the great man you have before you.

I take this opportunity to write on behalf of Chris with the highest degree of respect for your responsibilities and experience. My relationship with Chris goes back to September of 2009, when Chris was working as a military liaison with a non-profit called the Spirit of America (SOA). Even today, SOA supports requests from Marines in areas of strife for goods that will help local people. It is support that improves relations with locals and "wins hearts and minds." My Marine unit strove to provide genuine, sincere assistance to war-torn towns in the Nawa District of Helmand Province in Afghanistan. Without hesitation, I can affirm that we could not have succeeded without the dedication of individuals like Chris.

I would like to take the opportunity to provide insight into what I believe builds the character of a patriot like Chris. Like many who have had the pleasure of serving with Chris, I find the reported events which have led to his confinement to be shocking and out of character for the type of person who has been highly regarded and trusted throughout his military and civilian career. I only ask that Chris be given the opportunity to reunite with his family by using the last measure of trust we can possibly afford an individual who has served his Nation honorably, and who has risen from the ranks to become a successful businessman and no criminal record.

Your Honor, for Chris to have earned high levels of responsibility in the sensitive field of intelligence and work his way to senior strategy roles in business while earning a graduate degree at one of our Nation's top universities speaks volumes of his initiative, tenacity, conviction, and work ethic. For that alone I have been proud to support him in his endeavors. At the same time, his consistent dedication to working against human suffering, injustice, and oppression also speaks volumes to the values he holds in his heart. Chris truly embodies the best our Nation can offer in his dedication to his Faith, his Family, and his Fellow Man. He cannot possibly be a flight risk because he has so much to live for here in the United States. With a man of such conviction and dedication to others, it would tear Chris apart to leave family or friends behind.

37

I would offer another perspective on why Chris deserves bond and a small measure of freedom. I am a Marine Corps Reservist, and have held career positions in predictive analytics roles and in network engineering. While undoubtedly Chris has more immediate and practical reasons to remain in the United States, please consider the technological hurdles a person of Chris' public persona would have to overcome to successfully flee. Our world's electronic documentation systems, imagery systems, currency tracking, and transportation tracking systems are thorough enough to allow a high degree of confidence that Chris will remain in the United States. Surely there are mechanisms within the power of the Court to provide an alternative means of assuring the Chris will be present to defend himself, as a citizen presumed innocent deserves. Knowing Chris' sense of honor, he will want to ensure that the career he has built up since he became a Marine will be defended with his days in court. He simply will not be a danger to society, because he has dedicated his life to bettering society – both domestically and abroad.

Judge Rosenbluth, I humbly ask for your reconsideration of bond for Christopher Ahn. The gentleman I served with in Afghanistan impressed me so thoroughly, that after ten years of sporadic communication, I am willing to put my personal reputation and record of service to our Country on the line for him. For the sake of his family, for the sake of his well-being, and for the sake of showing leniency during this extremely difficult time in Chris' life, please grant Chris approval of his bail application. Should you have any questions, I am available at any time, night or day, to take your call.

Very Respectfully,

Rodolfo A. Quiles
Colonel
United States Marine Corps Reserve

Honorable Jean P. Rosenbluth                                          11 May, 2019
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Judge Rosenbluth,

My name is Wade Buick. I am writing you as a concerned citizen and former military officer regarding Christopher Ahn. As brief background I spent over 11 years in uniform serving in the U.S. Navy, 7 of those on active duty deploying to the Western Pacific, Kuwait, the Persian Gulf and Afghanistan. During that time I was also a resident of California living in San Diego. I continue to serve my community both professionally and personally through veteran mentoring and the hiring of returning citizens. I'm also a founding board member of two faith based non-profits. One provides care for orphaned children in Kiisi Kenya. The second is building a small retirement village for senior members of my local church. I currently run operations for a wholesale distributor of wood products in Bethlehem, PA.

I've known Chris Ahn for 9 years. We met during graduate school at the University of Virginia's Darden School of Business. Chris and I were in the same section during our first year of classes and were both members of the Darden Military Association, seeing each other every day. I immediately liked Chris for his honesty, authenticity and sincere regard for his fellow human beings. In class he often spoke passionately about serving others and our shared obligation as future business leaders to not only employ people but understand and care for the whole person. In an academic environment charged with competition Chris was always eager to lend a hand or ask for help. His genuine good nature made the people around him and the teams he worked in better.

Chris distinguished himself during 6 years serving in the Marine Corps leading Marines in Iraq in 2005 and 2006, performing critical intelligence aggregation and analysis. He exemplified the Marine Corps' servant-leader ethos by always taking care of his men and women ensuring their needs were met before his own while serving in a combat theater. This approach to leadership fueled his success and interest in many different pursuits. Before and after his time on active duty he was an entrepreneur, starting a family clothing business that anticipated the coming of the e-commerce era and thrived. He worked to support public servants who shared his view of service. He worked in the non-profit community to serve veterans and after business school he held roles of increasing responsibility as an executive, consultant and business owner. The theme throughout his career has always been service, kindness and regard for others.

**To provide more detail on Chris's conduct as a professional I have added screen captures of recommendations for Chris provided by co-workers, clients and supervisors from his LinkedIn profile in an attachment to this letter.

Like his professional and volunteer pursuits Chris has also sought to serve his family and loved ones. His startup clothing business provided employment for family members and friends. For many years he has cared for family members both financially and with his time, most notably his grandmother who relies on him deeply.

Chris's wife Grace, grandmother, family and life are in Los Angeles and have been since he was a boy. He will not flee the people he loves and cares for, and his integrity will guide him to stay and fight for his good name. Not only is Chris not a flight risk you couldn't drag him away. He didn't run from people trying to kill him in a combat theater, and he won't run from his day in court. It is for these same reasons that Chris would not hurt anyone or be a danger to society. Every fiber in his being is bent toward service, not aggression. Chris is a humble, kind, earnest man who has served his country, community, neighbor and family. He is not a danger or flight risk.

In closing if it was helpful I would be happy to speak with anyone in your department regarding my experiences with Chris Ahn including giving testimony regarding his character. Though I did not have the opportunity to serve or work with Chris I do consider him a close friend, know the content of his character and hold him in the highest regard.

Sincerely,

Wade W. Buick

40

**Attachment A**

## Recommendations

Ask for a recommendation    | Recommend Christopher |

**Received (6)**    Given (5)



**John Furnari**
Marketing Director at Riot
Games
October 31, 2017, John was a
client of Christopher's

Chris and I have worked together on strategic planning projects for a number of organizations. He brings a combination of rigor and practicality to the table that's invaluable to the process...and the outcome. At every turn, he comes from the place of "what is truly going to have an impact on the business?" And he knows how to dig deep to uncover answers that can be put in place to do just that.

If you are looking for an experienced professional to frame a business problem, and turn that challenge into opportunity, this is someone you want on your team. I certainly continue to. **See less**



**Jeremy Johnson**
Corporate SME - Rotating
Equipment at Tesoro
June 22, 2012, Jeremy was senior
to Christopher but didn't manage
directly

Chris consistently showed an exemplary ability to build teams and lead through example to achieve management goals.



**Ben Noonan**
Global eCommerce Executive
and Entreprenuer
December 16, 2011, Christopher
worked with Ben in the same
group

Christopher has the most well-rounded skill set of anyone I've ever worked with. He's got the executive experience to generate a top-down strategy and the operational experience to ensure that all tactical details are accounted for and executed to plan.

His private- and public-sector experience have provided him with an incredible ability to build consensus and motivate teams large and small. His leadership skills are second to none. **See less**



**Claire Meyer**
Department of Defense
April 12, 2010, Claire reported
directly to Christopher

Christopher is a truly gifted leader, who allows his subordinates the space and freedom to preform their duties, while anticipating and tackling issues as they arise.



**Joel Arends**
Attorney | Combat Veteran |
Problem Solver
April 23, 2008, Christopher
worked with Joel in the same
group

"Chris has been an incredible help to Vets for Freedom in California. His hard work, character and commitment have resulted in the creation of a robust California organization. Chris is to be commended for his leadership in California's VFF Chapter. Chris was instrumental in spearheading our San Diego National Hero's Tour event that was held on the deck of the U.S.S. Midway. We had incredible turnout and great talent show up for the concert because of Chris' hard work and ingenuity." **See less**



**Chris I.**
Bull Manure Farmer
March 8, 2007, Chris was senior to
Christopher but didn't manage
directly

Chris Ahn's deployment to Iraq was marked by outstanding performance. Although he worked outside of his military specialty, Chris's intelligence, versatility, and stamina enabled him to complete his duties in an exceptional manner. Chris continually demonstrated a level of maturity, work quality, leadership, and professionalism far beyond his peers. The quality of work he produced gained him immense respect from his unit. He interacted with Marines of much higher seniority, including both Officer and Staff Non-Commissioned Officer level, to produce mission critical reports on a daily basis. Chris's diligence and work ethic easily stand among the top performers that I came in contact with while deployed to Iraq. **See less**

William A. Prescott

███████████████

May 11, 2019

The Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

Re: Character Statement for Christopher Ahn

Dear Judge Rosenbluth:

I am writing to you to express my deep support and trust in my close friend, Christopher Ahn. I have known Chris since 2010 when we both started graduate school at the Darden School of Business at the University of Virginia. Like Chris, I am also a veteran and we were both members of the Darden Military Association. Prior to attending the University of Virginia, I served as a Captain in the United States Army after receiving my commission from the United States Military Academy at West Point.

During our time as students at Darden, Chris displayed an outstanding work ethic in tackling our studies but still made time to engage in volunteer work. Of the several volunteer activities I know he took part in, I worked directly with him on one, which was volunteering with Prudential Financial, Inc. to develop and expand their VETalent program, a program aimed at expanding job opportunities for veterans returning to the civilian workforce. Chris put in countless hours to the detriment of his studies to help improve and expand the program because he truly believed in the program's importance. Chris cared deeply for his fellow Marines and veterans that were not able to transition as successfully to the civilian sector as he had, and he wanted to offer his time, skills, and energy to help as many veterans as possible.

Of all my deep friendships I made during business school, I have kept in closest contact with Chris since graduation. Besides being veterans, Chris and I shared other commonalities as well. Like Chris, I came back to California to help my family business and to help care for my grandmother, who is now 98. We both shared an intense dedication to our respective families and a desire to care and provide for the generations that came before us and who provided us with so many opportunities. Despite Chris' many obligations to support his family, he was always willing to lend a helping hand to others even at a great inconvenience to himself. Once, when I was preparing to leave on a trip overseas with my family for two weeks, the person who

was supposed to stay at my house and care for my various pets cancelled at the very last minute. When I mentioned my frustration with the situation to Chris, he immediately offered to stay at my house and look after my pets for two weeks even though it meant that he had a long commute every day back and forth to Chino Hills to help care for his mother and grandmother. I accepted his offer and was able to enjoy my trip with my family knowing that Chris was caring for my interests at home.

Chris has been a frequent guest at my house and is beloved by my three children, ages 5, 4, and 10 months. I completely trust Chris around my family and would entrust him with the lives of my wife and children without a second thought. I have never known Chris to be a violent person or a danger to society. He is one of the brave few who was willing to sacrifice his life to defend the USA as a Marine including a deployment to Iraq at the height of hostilities there. It is unconscionable that his military training and his exercising of his constitutional rights is being used against him to try to paint him as a threat to society.

If granted bail, I am confident that Chris will not flee and that he will obey the law and follow any restrictions or rules that the court may impose as a condition of his release from detention. I am confident because I know that Chris is a man of his word and because of his love and devotion to his friends and family and that he understands the effect that his actions would have on his family if he were to flee.

Chris Ahn is a truly patriotic American, a selfless servant, a devoted family man, and an example for others to follow. I implore you to grant Chris bail while his case winds its way through the judicial system so that Chris can return home to continue to help support his family. Thank you for your consideration.

Respectfully,

*William A. Prescott*

William A. Prescott

Todd Conetta



13 May 2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA, 90012

Your Honor:

I am writing to you in support of Christopher Ahn's bail application. I have known Christopher (Chris) for the last nine years I can confidently attest to the quality of his character.

Chris and I first became acquainted as first-year students at the University of Virginia Darden School of Business. As veterans, we both joined the Darden Military Association (DMA), a formal "club" established to support career transitions for veterans and encourage comradery. Of the 12 or so DMA members from the Class of 2012, Chris was one of only two veterans that had served as an enlisted member for his entire military career. To his credit, Chris did not let this fact quiet his voice or reduce his influence. Instead Chris was a driving force for the legacy that the DMA Class of 2012 would leave. During our 18 months at Darden, the DMA engaged with multiple veterans' charities including Children of Fallen Patriots and the Wounded Warrior Project to determine how our group could support their missions. We also established relationships with military groups at other top-MBA programs to scale our impact. Chris took the reins on outreach and coordination, and was pivotal in the impact our team had during our time at Darden and the legacy we created for the DMA.

Darden brings together individuals from a large variety of backgrounds creating a diverse community. This aspect did not go overlooked by Chris who went above and beyond to help those outside of the DMA understand more about the military and a veteran's perspective. Whether public speaking engagements, DMA-sponsored outreach, or raising awareness within the DMA itself Chris took it on as a personal mission to bridge our classmates' understanding of military life and the veteran's perspective.

One final anecdote I would like to share with you highlights an interaction I had with Chris after graduation when Chris visited Washington, D.C. I was living across the Potomac in Arlington, Virginia and Chris reached-out seeking a place to stay. Happy to oblige, I hosted Chris for one night of his trip and the two of us grabbed food and a drink at a nearby pub. Over the meal we caught-up on a number of things, and during that conversation Chris shared with me a detail about his time at Darden that I had not been aware of. Despite his dedication and exceptional work ethic, Chris had struggled academically early on at Darden. He did not have the advantage of a lot of business experience that some of our classmates entered Darden. After a difficult first semester, Chris was offered the opportunity to cut his losses and leave the school no questions asked. Instead, Chris doubled-down on himself and his commitment to

graduating successfully. Working closely with the Dean of Students and professors that had shown a personal interest in Chris' success, Chris charted a path to right the ship. Over the next three semesters Chris pushed through the remaining "core" required courses, excelled in elective courses and graduated in May as part of the class of 2012. By forging productive relationships and through his own fantastic work ethic, diligence, and dedication to a goal, Chris was able to accomplish what some Darden staff had told him was likely not possible. For me, what truly set this academic turnaround apart was the fact that Chris didn't let his struggles impact the way that he interacted with others and the Darden community at-large. Chris never raised this at DMA meetings, nor had he raised it privately with me. All the amazing, selfless things Chris was doing for DMA and for our class at-large, he was doing while dealing with these very personal academic challenges. Sitting at this meal, two years after graduation, listening to Chris recount his situation really brought everything into perspective and highlighted for me, yet again, what an amazing person Chris is.

I know Chris only to be a person of upstanding character. Over the last nine years Chris constantly puts others before him. When we would discuss his family life, his loyalty and dedication to them was quickly made obvious. Chris is not a violent person and poses absolutely no risk to society if he is granted bail. Furthermore, Chris has proven that he will do the right thing, he is a man of integrity and poses no risk of flight. He loves this country, loves what America stands for, and would not turn his back on a justice system central to our nation's identity.

I request you take in consideration these qualities as you evaluate Christopher Ahn's application for bail.

Sincerely,

Todd Conetta

Ryan W. Fisher

May 13, 2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

Re:  Christopher Ahn

Your Honor,

The purpose of my writing is to briefly describe my relationship with Christopher Ahn, and provide reference to his outstanding character, in the interest of demonstrating that he is in no way a threat to society, nor the type of person who would flee.  I am a California resident currently living in Alameda, and am employed by Apple Inc., where I manage the iPad New Product Operations team.  Prior to my career at Apple, I served as an Explosive Ordnance Disposal Officer in the United States Army, and was honorably discharged in 2010.

I met Chris at the University of Virginia, where he and I attended the Darden Graduate School of Business.  Though Chris and I did not have any classes together during our first semester at Darden, we had the opportunity to meet through the Darden Military Association, where Chris held the role of VP of Community Affairs.  On first meeting Chris, it was immediately evident that he was (and is) an unwavering American Patriot, a proud but humble Veteran of the the United States Marine Corps, and a compassionate leader.  As Chris and I became close friends over our two years at Darden, these attributes became even more apparent through his actions; he worked tirelessly in coordinating volunteer activities for Veterans organizations and events, and was continuously brainstorming creative new ways to give back to the community, and to get more people involved along the way.  His positive energy and dedication to service were both impactful and an inspiration to others.

While it is impossible to fully portray Chris' character in a short letter, I do hope to provide a glimpse of the honorable and upstanding man that Chris is.  He is a selfless servant to his community and the United States, a loyal husband, devoted son, and a friend to many.  In closing, I humbly recommend the most favorable consideration for Chris' bail application, as he presents no threat nor flight risk.

Respectfully,

Ryan W. Fisher

47

May 16, 2019

Honorable Jean P. Rosenbluth
United States Magistrate Judge
Roybal Federal Building and United States Courthouse
255 E. Temple St., Courtroom 690, 6th Floor
Los Angeles, CA 90012

**RE: Bail Application for Christopher Ahn**

To Whom It May Concern:

Please accept this letter of support for Christopher Ahn as he seeks release on bail from the Court.

Many people will describe Chris as proud Marine, a war hero, an ardent patriot, a defender and advocate for freedom – for all people beyond the borders of our country. These are all accurate descriptions, and I wholeheartedly endorse them. However, to me, Chris is all of these things, but also a good friend. Today, I write to you as his friend and former colleague, respectfully requesting that you extend to him the kind of compassion that Chris has shown to others throughout his life.

I first met Chris when I was given the opportunity to work for the veteran's advocacy organization, Vets for Freedom, in 2007. Vets for Freedom was founded by veterans of the wars in Iraq and Afghanistan, and was therefore staffed – both volunteer and paid – primarily by veterans. With the exception of our Communications Director, who was married to an actively deployed Army Ranger, I was the only non-veteran who worked for the organization.

My career has been exciting, spanning from Capitol Hill to the White House, the Governor of California to the private sector. However, the most rewarding 2 years of my professional career came while working with the tremendous men and women who returned from war and continued to honor the service and sacrifice of their comrades through their work with Vets for Freedom. This is where I first met Chris. What Chris, and in fact all my veteran colleagues, did not know, is that I never felt his or their equal. Each of the men and women I worked with had sacrificed so much in service of our nation. I felt unworthy in their presence.

Despite this personal insecurity, Chris and I developed a friendship. He, the son of a Korean immigrant; me a Jewish twenty-something from West Texas, we bonded instantly over similar stories of our experiences with racism/anti-Semitism, and our unabashed love for our Country and our fellow citizens, regardless of some of their faults. Despite my lack of ever having worn the uniform, he treated me as an equal – as a brother – and consistently reminded me that the work we were doing on the home front was important to the men and women forward deployed. I admired him greatly.

Chris returned home from war in 2006, and before his family had the opportunity to get used to having him around, he deployed again. This time, voluntarily; this time to Washington, DC. Chris did this much to the disappointment of his family – especially his then girlfriend, now wife, Gracie. He did this with a sense of purpose that I didn't fully understand until mid-2008, when, after another long day of work we grabbed dinner together, and he opened up about his experience in Iraq, and why it was so important for him to honor the sacrifices of those he served with who never returned home. Vets for Freedom and

the issues we were advocating for became his mission. It was the only way he knew how to honor the memories of the friends he lost in combat.

So, he moved to Washington, shared an old apartment with a bunch of our colleagues in the suburbs of DC, traded in his uniform for a suit and tie; his rifle for his verbal eloquence, and worked tirelessly to advocate for Congressional support for those who were carrying on the fight overseas.

Although I only had the honor of working with Chris for a couple of years, several things became apparent almost immediately. And although distance and time have separated us over the years, our friendship has always remained strong, so I know these things remain true today.

- Chris Ahn is completely dedicated to his family. His wife, mother, and grandmother are everything to him, and he loves them all dearly.
- Chris Ahn fights for those who can't fight for themselves. His volunteer and charitable work speaks for itself. He always puts others before him – even in situations such as these that land him in trouble.
- Chris Ahn is passionate, yet non-violent. He may have been a warrior on the battlefield, but at home he is a kind and gentle man.
- Chris Ahn is not a flight risk. He is committed to setting the record straight and defending his name when given the chance. More so, he is committed to his family, to his community, and to his country, and would never leave them behind.
- Chris Ahn is smart and career oriented. He is highly educated and is a solid contributor to society – the complete opposite of a danger to it. He has spent his entire adult life protecting America, its citizens, and our way of life; and if given the opportunity for release, will continue being a positive member of the community he so dearly loves.

In summary, Chris should be considered for release from custody. His service and commitment to his family, to his community, and to our country have certainly earned him the right to continue to support his loved ones from home while he waits for his day in court.

I greatly appreciate the opportunity to speak on behalf of my friend, Christopher Ahn, and appreciate your consideration of this request.

Respectfully,

Josh Grodin

May 12, 2019

Honorable Jean P. Rosenbluth

United States Magistrate Judge

Roybal Federal Building and United States Courthouse

255 E. Temple St., Courtroom 690, 6th Floor

Los Angeles, CA, 90012

Dear Honorable Rosenbluth,

My name is Curtis Flood and I am writing to respectfully request that my friend and fellow veteran, Mr. Christopher Ahn, be granted bail.

I had the pleasure of being one of Chris' friends during our education at the University of Virginia's Darden School of Business from 2010-2012. During that time, Chris was very active in the Darden Military Association, an organization dedicated to the advancement of active duty, reserve and veteran members of the United States military. Chris was a compassionate leader of the group, well respected amongst his classmates, fellow veterans and the local community for his selfless acts and volunteering his time for charities. Chris either led or participated in several volunteering events during his time at Darden, including the following 1) Toys for Tots, the U.S. Marine Corps charity that raises toys during Christmas every year for disadvantaged children; 2) Habitat for Humanity, in which he helped reroof and replank an elderly woman's home in rural Virginia; and 3) Children of Fallen Patriots, a charity that grants scholarships to the children of slain service members in which he helped raise more than $20,000 through various events and sponsorship grants, including such notable corporate sponsors as Johnson & Johnson and Fidelity Investments. Chris was a proud ex-Marine and kept the Marine Corps code of integrity at all times: respect for human dignity, honor, personal responsibility and helping those who were in need.

The countless friends, family and complete strangers that have come in contact with Chris are better for it and we all hope that he will be granted bail at the soonest possible time. He is not a flight or public danger risk as he would never consider running from a problem and is likely eager to be vindicated. Chris' service to this country in its time of need can never be repaid but it should mark him as worthy of your utmost consideration in this matter.

Very Respectfully,

Lieutenant Curtis Flood, U.S.N.R. (HD)

# EXHIBIT D

**Korean Community Lawyers Association**
K. Freeman Lee
3550 Wilshire Blvd., Suite 1110
Los Angeles, CA 90010
██████████████████████

**Korean American Federation of Los
Angeles**
Dr. Laura Jeon
981 S. Western Ave., Suite 100
Los Angeles, CA 90006
info@kafla.org

**Orange County Korean American Bar
Association**
Chang Lim
PO Box 16691
Irvine, CA 92623
admin@ockaba.org

**Korean American Bar Association of San
Diego**
John Ahn
P.O. Box 122831
San Diego, CA 92112
██████████████████████

May 28, 2019

Dear Judge Rosenbluth,

We write this letter on behalf of the members of the Korean Community Lawyers Association (KCLA), Korean American Federation of Los Angeles (KAFLA), Orange County Korean American Bar Association (OCKABA), and Korean American Bar Association of San Diego (KABA-SD) in support of Christopher Philip Ahn. Each of our organizations represents members of the Korean-American community in California. We join in this letter to raise certain facts and circumstances regarding the North Korean regime, which we believe merit the Court's consideration as it adjudicates Mr. Ahn's case.

North Korea and its authoritarian regime, led by the dictator Kim Jong-Un, is one of the world's worst serial abusers of human rights. In 2014, the United Nations Human Rights Council issued a report on human rights in North Korea, finding that "crimes against humanity have been committed in the Democratic People's Republic of Korea, pursuant to policies established at the highest level of the State" including "extermination, murder, enslavement, torture, imprisonment, rape, forced abortions and other sexual violence, persecution on political, religious, racial and gender grounds, the forcible transfer of populations, the enforced disappearance of persons and the inhumane act of knowingly causing prolonged starvation."[1]

In considering the bail request of Mr. Ahn, we ask that the Court take into consideration the deplorable offenses perpetrated by North Korea and its leaders, and the inherent untrustworthiness of allegations premised on the self-interested testimony of officials from that regime. The regime has every incentive to level false accusations against those who work to help North Koreans escape tyranny and violence, in order to deter them from continuing such

---

[1]    United Nations, General Assembly Human Rights Council, *Report of the commission of inquiry on human rights in the Democratic People's Republic of Korea*, A/HRC/25/63 (7 February 2014), p. 14, ¶¶ 75-76, available at
https://www.ohchr.org/EN/HRBodies/HRC/CoIDPRK/Pages/ReportoftheCommissionofInquiry DPRK.aspx.

3582498.2

efforts. We do not believe that Mr. Ahn – or any American citizen – should be detained based on such accusations, nor should they be extradited to a country in which they may be exposed to violent reprisal by the regime.

While we are conscious that the United States has the diplomatic obligation to produce eligible fugitives under the terms of its extradition treaty with the Kingdom of Spain, we believe the unique circumstances of this case may implicate several bars to extradition, such as the bar against extradition for political offenses, and the bar against extradition of individuals who may face torture. We ask that the Court give due consideration to these issues in making its final determination on whether Mr. Ahn should be released on bail, and whether he should be extradited.


K. Freeman Lee
President
Korean Community Lawyers Association


Laura Jeon, Ph.D.
President
Korean American Federation of Los Angeles


Chang Lim
President
Orange County Korean American Bar
Association


John Ahn
President
Korean American Bar Association of San
Diego


3582498.2

53

# EXHIBIT E

United Nations



# General Assembly

A/HRC/25/63

Distr.: General
7 February 2014

Original: English

**Human Rights Council**
**Twenty-fifth session**
Agenda item 4
**Human rights situations that require the Council's attention**

# Report of the commission of inquiry on human rights in the Democratic People's Republic of Korea[*]

*Summary*

   The present report contains the main findings and recommendations of the commission of inquiry on human rights in the Democratic People's Republic of Korea. [**]

---

[*] The annexes to the present report are circulated as received, in the language of submission only.
[**] For detailed findings of the commission of inquiry, see document A/HRC/25/CRP.1.

GE.14-10866





Please recycle



# Contents

|  |  | *Paragraphs* | *Page* |
|---|---|---|---|
| I. | Introduction | 1–2 | 3 |
| II. | Mandate and methodology | 3–23 | 3 |
|  | A. Non-cooperation by the Democratic People's Republic of Korea | 9–11 | 4 |
|  | B. Methods of work | 12–20 | 4 |
|  | C. Legal framework and standard of proof for reported violations | 21–22 | 6 |
|  | D. Archiving and record-keeping of testimony | 23 | 6 |
| III. | Principal findings of the commission | 24–73 | 6 |
|  | A. Violations of the freedoms of thought, expression and religion | 26–31 | 7 |
|  | B. Discrimination | 32–37 | 8 |
|  | C. Violations of the freedom of movement and residence | 38–45 | 9 |
|  | D. Violations of the right to food and related aspects of the right to life | 46–55 | 10 |
|  | E. Arbitrary detention, torture, executions and prison camps | 56–63 | 11 |
|  | F. Abductions and enforced disappearances from other countries | 64–73 | 13 |
| IV. | Crimes against humanity | 74–79 | 14 |
| V. | Conclusions and recommendations | 80–94 | 15 |
| Annexes |  |  |  |
| I. | Correspondence with the Supreme Leader of the Democratic People's Republic of Korea and First Secretary of the Workers' Party of Korea, Kim Jong-un | | 22 |
| II. | Correspondence with China | | 26 |

# I.   Introduction

1.      In its resolution 22/13, adopted on 21 March 2013, the Human Rights Council established the commission of inquiry on human rights in the Democratic People's Republic of Korea. In resolution 22/13, the Council mandated the commission to investigate the systematic, widespread and grave violations of human rights in the State, with a view to ensuring full accountability, in particular, for violations that may amount to crimes against humanity.

2.      On 7 May 2013, the President of the Human Rights Council announced the appointment of Michael Kirby (Australia) and Sonja Biserko (Serbia), who joined the Special Rapporteur on the situation of human rights in the Democratic People's Republic of Korea, Marzuki Darusman (Indonesia) to serve as the members of the commission of inquiry. Mr. Kirby was designated to serve as Chair. The commission implemented the mandate entrusted by the States Members of the Human Rights Council, bearing in mind the decision of the Council to transmit the reports of the commission to all relevant bodies of the United Nations and to the Secretary-General for appropriate action.

# II.   Mandate and methodology[1]

3.      The mandate of the commission of inquiry is described in paragraph 5 of Human Rights Council resolution 22/13, in which the Council made specific reference to paragraph 31 of the 2013 report of the Special Rapporteur on the situation of human rights in the Democratic People's Republic of Korea.[2] Reading the two paragraphs together, the commission determined that it had been mandated to investigate the systematic, widespread and grave violations of human rights in the Democratic People's Republic of Korea including, in particular, the following nine specific substantive areas:

- Violations of the right to food

- The full range of violations associated with prison camps

- Torture and inhuman treatment

- Arbitrary arrest and detention

- Discrimination, in particular in the systemic denial and violation of basic human rights and fundamental freedoms

- Violations of the freedom of expression

- Violations of the right to life

- Violations of the freedom of movement

- Enforced disappearances, including in the form of abductions of nationals of other States

4.      The above list is not exhaustive. Where appropriate, the commission also investigated violations intrinsically linked to one of the nine areas.

---

[1]   For further information on the interpretation of the mandate and the Commission's methods of work, see A/HRC/25/CRP.1, sect. II.

[2]   A/HRC/22/57.

3

5.     The mandate further indicates that the inquiry should pursue three interlinked objectives:

(a) Further investigating and documenting human rights violations;

(b) Collecting and documenting victim and perpetrator accounts;

(c) Ensuring accountability.

6.     The commission paid specific attention to gender-based violations, particularly violence against women, and the impact of violations on particular groups, including women and children.

7.     Paragraph 5 of Council resolution 22/13 does not limit the temporal scope for the commission's inquiry to a particular period within the existence of the Democratic People's Republic of Korea.

8.     With regard to its geographic scope, the commission interpreted its mandate to include violations committed on the territory of the Democratic People's Republic of Korea, as well as those violations that involve extraterritorial action originating from the State, such as abductions from other countries. The commission also considered violations that causally enable, or are the immediate consequence of, violations in the Democratic People's Republic of Korea, and made findings regarding the extent to which other States carry relevant responsibility.

## A.     Non-cooperation by the Democratic People's Republic of Korea

9.     In its resolution 22/13, the Human Rights Council urged the Government of the Democratic People's Republic of Korea to cooperate fully with the commission's investigation, to permit the commission's members unrestricted access to visit the country and to provide them with all information necessary to enable them to fulfil their mandate. Immediately after the adoption of resolution 22/13, the Democratic People's Republic of Korea publicly stated that it would "totally reject and disregard" it. In a letter dated 10 May 2013, it informed the President of the Human Rights Council that it "totally and categorically rejects the commission of inquiry". Regrettably, this stance has remained unchanged, despite numerous attempts at engagement by the commission.

10.     The Democratic People's Republic of Korea did not respond to the commission's repeated requests for access to the country and to information on the human rights situation (see sect. III below).

11.     The Commission shared its detailed findings (A/HRC/25/CRP.1) with the Government of the Democratic People's Republic of Korea, and invited its comments and factual corrections. A summary of the most serious concerns, in particular the principal findings on crimes against humanity, was also included in a letter addressed to the Supreme Leader of the Democratic People's Republic of Korea, Kim Jong-un (see annex I). In the letter, the commission drew attention to the principle of command and superior responsibility under international criminal law. It urged the Supreme Leader to prevent and suppress crimes against humanity, and to ensure that perpetrators are prosecuted and brought to justice.

## B.     Methods of work

12.     Owing to its lack of access to the Democratic People's Republic of Korea, the commission obtained first-hand testimony through public hearings that were transparent, observed due process and protected victims and witnesses. More than 80 witnesses and

4

experts testified publicly and provided information of great specificity, detail and relevance, in ways that often required a significant degree of courage.

13.     Public hearings were conducted in Seoul (20 to 24 August 2013), Tokyo (29 and 30 August 2013), London (23 October 2013) and Washington, D.C. (30 and 31 October 2013).[3] The commission invited the authorities of the Democratic People's Republic of Korea to make representations at the public hearings, but received no reply.

14.     The commission and its secretariat conducted more than 240 confidential interviews with victims and other witnesses.

15.     In July 2013, the commission made a call for written submissions to all States Members of the United Nations and relevant stakeholders. At the finalization of the present report, 80 such submissions had been received.

16.     The commission conducted official visits to the Republic of Korea, Japan, Thailand, the United Kingdom of Great Britain and Northern Ireland and the United States of America.

17.     The commission sought access to China in order to conduct inquiries and to consult with officials of the Government and local experts. A working meeting was held in July 2013, at which that request was made. The commission requested access to parts of China bordering the Democratic People's Republic of Korea. On 7 November 2013, the commission transmitted a further request for an invitation to visit China. On 20 November 2013, the Permanent Mission of China in Geneva informed the secretariat that, given the State's position on country-specific mandates, especially on the Korean peninsula, it would not be possible to extend an invitation to the commission. In a follow-up letter dated 16 December 2013, the commission requested information on the status of citizens of the Democratic People's Republic of Korea and their children in China, forced repatriations to and related cooperation with the Democratic People's Republic of Korea, trafficking in persons and other issues relevant to the mandate of the commission (see annex II).

18.     The commission engaged with a number of United Nations entities and other humanitarian actors. It regrets that other such entities and actors were not in a position to provide relevant information. The commission expresses its gratitude to the Office of the United Nations High Commissioner for Human Rights (OHCHR) for its support. The commission benefited from the invaluable support of a number of non-governmental organizations that thoroughly document human rights violations in the Democratic People's Republic of Korea, despite the inadequate financial resources available to them.

19.     The most significant investigative challenge faced by the commission, aside from the inability to have access to the Democratic People's Republic of Korea, was the fear of reprisals by witnesses. Most of the potential witnesses residing outside the State were afraid to testify, even on a confidential basis, because they feared for the safety of family members and assumed that their conduct was still being clandestinely monitored by the authorities.

20.     The commission paid particular attention to the protection of victims and witnesses. It recalls that primary responsibility for protecting victims, witnesses and other persons cooperating with the commission rests with their States of residence and nationality. The commission therefore urges Member States to provide additional protection measures where necessary.

---

[3]  Video recordings and transcripts from all the public hearings are available on the website of the commission of inquiry at www.ohchr.org/EN/HRBodies/HRC/CoIDPRK.

## C.   Legal framework and standard of proof for reported violations

21.   In assessing the situation of human rights in the Democratic People's Republic of Korea, the commission relied chiefly on the binding legal obligations that the country voluntarily assumed as a State party to the International Covenant on Civil and Political Rights, the International Covenant on Economic, Social and Cultural Rights, the Convention on the Rights of the Child and the Convention on the Elimination of All Forms of Discrimination against Women. Where appropriate, the commission also considered relevant obligations of other States, including the prohibition of refoulement under international refugee law and international human rights law. Matters relating to crimes against humanity were assessed on the basis of definitions set out by customary international criminal law and in the Rome Statute of the International Criminal Court.

22.   The commission bases its findings on a "reasonable grounds" standard of proof. It concluded that there are reasonable grounds establishing that an incident or pattern of conduct had occurred whenever it was satisfied that it had obtained a reliable body of information, consistent with other material, based on which a reasonable and ordinarily prudent person would have reason to believe that such an incident or pattern of conduct had occurred.

## D.   Archiving and record-keeping of testimony

23.   All information gathered by the commission, including information pertaining to individual perpetrators, has been stored in a confidential electronic database. The commission has authorized OHCHR, acting as the residual secretariat of the commission, to provide access to the existing materials contained in the database to competent authorities that carry out credible investigations for purposes of ensuring accountability for crimes and other violations committed, establishing the truth about violations committed or implementing United Nations-mandated targeted sanctions against particular individuals or institutions. Access must only be granted to the extent that witnesses or other providers of information have given their informed consent and any protection and operational concerns are duly addressed.

# III.   Principal findings of the commission

24.   The commission finds that systematic, widespread and gross human rights violations have been and are being committed by the Democratic People's Republic of Korea.[4] In many instances, the violations found entailed crimes against humanity based on State policies. The main perpetrators are officials of the State Security Department, the Ministry of People's Security, the Korean People's Army, the Office of the Public Prosecutor, the judiciary and the Workers' Party of Korea, who are acting under the effective control of the central organs of the Workers' Party of Korea, the National Defence Commission and the Supreme Leader of the Democratic People's Republic of Korea.

25.   The commission emphasizes that the current human rights situation in the Democratic People's Republic of Korea has been shaped by the historical experiences of the Korean people. Confucian social structures and the experience of the Japanese colonial occupation have to some degree informed the political structures and attitudes prevailing in the country today. The division imposed on the Korean peninsula, the massive destruction

---

[4]   See also A/HRC/25/CRP.1, sect. IV.

caused by the Korean War and the impact of the Cold War have engendered an isolationist mindset and an aversion to outside powers that are used to justify internal repression. The particular nature and the overall scale of human rights violations in the State can be more easily understood through an appreciation of the nature of its political system, which is based on a single party led by a single Supreme Leader, an elaborate guiding ideology and a centrally planned economy.[5]

## A.   Violations of the freedoms of thought, expression and religion

26.     Throughout the history of the Democratic People's Republic of Korea, among the most striking features of the State has been its claim to an absolute monopoly over information and total control of organized social life. The commission finds that there is an almost complete denial of the right to freedom of thought, conscience and religion, as well as of the rights to freedom of opinion, expression, information and association.

27.     The State operates an all-encompassing indoctrination machine that takes root from childhood to propagate an official personality cult and to manufacture absolute obedience to the Supreme Leader (*Suryong*), effectively to the exclusion of any thought independent of official ideology and State propaganda. Propaganda is further used by the Democratic People's Republic of Korea to incite nationalistic hatred towards official enemies of the State, including Japan, the United States of America and the Republic of Korea, and their nationals.

28.     Virtually all social activities undertaken by citizens of all ages are controlled by the Workers' Party of Korea. Through the associations that are run and overseen by the Party, and to which citizens are obliged to be members, the State is able to monitor its citizens and to dictate their daily activities. State surveillance permeates the private lives of all citizens to ensure that virtually no expression critical of the political system or of its leadership goes undetected. Citizens are punished for any "anti-State" activities or expressions of dissent. They are rewarded for reporting on fellow citizens suspected of committing such "crimes".

29.     Citizens are denied the right to have access to information from independent sources; State-controlled media are the only permitted source of information in the Democratic People's Republic of Korea. Access to television and radio broadcasts, as well as to the Internet, is severely restricted, and all media content is heavily censored and must adhere to directives issued by the Workers' Party of Korea. Telephone calls are monitored and mostly confined to domestic connections for citizens. Citizens are punished for watching and listening to foreign broadcasts, including foreign films and soap operas.

30.     Strengthening market forces and advancements in information technology have allowed greater access to information from outside the country as information and media from the Republic of Korea and China increasingly enter the country. The State's monopoly on information is therefore being challenged by the increasing flow of outside information into the country and the ensuing curiosity of the people for "truths" other than those provided by State propaganda. Authorities seek to preserve their monopoly on information by carrying out regular crackdowns and enforcing harsh punishments.

31.     The State considers the spread of Christianity a particularly serious threat, since it challenges ideologically the official personality cult and provides a platform for social and political organization and interaction outside the realm of the State. Apart from the few organized State-controlled churches, Christians are prohibited from practising their religion and are persecuted. People caught practising Christianity are subject to severe punishments

---

[5]  See ibid., sect. III.

in violation of the right to freedom of religion and the prohibition of religious discrimination.

## B.   Discrimination

32.   The Democratic People's Republic of Korea presents itself as a State where equality, non-discrimination and equal rights in all sectors have been fully achieved and implemented. In reality, it is a rigidly stratified society with entrenched patterns of discrimination, although these are being modified to some extent by the transformative socioeconomic changes introduced by market forces and technological developments. State-sponsored discrimination in the Democratic People's Republic of Korea is pervasive, but is also shifting. Discrimination is rooted in the *songbun* system, which classifies people on the basis of State-assigned social class and birth, and also includes consideration of political opinions and religion. *Songbun* intersects with gender-based discrimination, which is equally pervasive. Discrimination is also practised on the basis of disability, although there are signs that the State may have begun to address this particular issue.

33.   The *songbun* system used to be the most important factor in determining where individuals were allowed to live; what sort of accommodation they had; what occupations they were assigned to; whether they were effectively able to attend school, in particular university; how much food they received; and even whom they might marry. This traditional discrimination under the *songbun* system was recently complicated by increasing marketization in the Democratic People's Republic of Korea and by the influence of money, including foreign currency, on people's ability to have greater access their economic, social and cultural rights. At the same time, significant segments of the population who have neither the resources nor favourable *songbun* find themselves increasingly marginalized and subject to further patterns of discrimination, given that basic public services have collapsed or now effectively require payment.

34.   Early reforms aimed at ensuring formal legal equality have not resulted in gender equality. Discrimination against women remains pervasive in all aspects of society. Indeed, it might even be increasing, as the male-dominated State preys on both economically advancing women and marginalized women. Many women, survival-driven during the famine of the 1990s, began operating private markets. The State imposed, however, many restrictions on female-dominated markets. Gender discrimination also takes the form of women being targeted to pay bribes or fines. There is recent evidence that women are beginning to object and to resist such impositions.

35.   The economic advances of women have not been matched by advances in the social and political spheres. Entrenched traditional patriarchal attitudes and violence against women persist in the Democratic People's Republic of Korea. The State has imposed blatantly discriminatory restrictions on women in an attempt to maintain the gender stereotype of the pure and innocent Korean woman. Sexual and gender-based violence against women is prevalent throughout all areas of society. Victims are not afforded protection from the State, support services or recourse to justice. In the political sphere, women make up just 5 per cent of the top political cadre and 10 per cent of central government employees.

36.   Discrimination against women also intersects with a number of other human rights violations, placing women in a position of vulnerability. Violations of the rights to food and to freedom of movement have resulted in women and girls becoming vulnerable to trafficking and increased engagement in transactional sex and prostitution. The complete denial of the freedoms of expression and association has been a large contributing factor to the generally unequal status of women vis-à-vis men. These limitations have, inter alia,

8

prevented women from collectively advocating for their rights as women have done elsewhere in the world.

37.    While discrimination exists to some extent in all societies, the Democratic People's Republic of Korea has practised a form of official discrimination that has had a very significant impact on individual enjoyment of human rights. Given the exceptional extent of State control, this official discrimination influences most aspects of people's lives. Discrimination remains a major means for the leadership to maintain control against perceived threats, both internal and external.

## C.   Violations of the freedom of movement and residence

38.    The systems of indoctrination and discrimination on the basis of social class are reinforced and safeguarded by a policy of isolating citizens from contact with each other and with the outside world, violating all aspects of the right to freedom of movement.

39.    In the Democratic People's Republic of Korea, the State imposes on citizens where they must live and work, violating their freedom of choice. Moreover, the forced assignment to a State-designated place of residence and employment is heavily driven by discrimination based on *songbun*. This has created a socioeconomically and physically segregated society, where people considered politically loyal to the leadership can live and work in favourable locations, whereas families of persons who are considered politically suspect are relegated to marginalized areas. The special status of Pyongyang, reserved only for those most loyal to the State, exemplifies this system of segregation.

40.    Citizens are not even allowed to leave their province temporarily or to travel within the country without official authorization. This policy is driven by the desire to maintain disparate living conditions, to limit the flow of information and to maximize State control, at the expense of social and familial ties.

41.    In an attempt to keep Pyongyang's "pure" and untainted image, the State systematically banishes entire families from the capital city if one family member commits what is deemed to be a serious crime or political wrong. For the same reason, the large number of street children migrating clandestinely to Pyongyang and other cities – principally in search of food – are subject to arrest and forcible transfer back to their home provinces, experiencing neglect and forced institutionalization on their return.

42.    The State imposes a virtually absolute ban on ordinary citizens travelling abroad, thereby violating their human right to leave the country. Despite the enforcement of this ban through strict border controls, nationals still take the risk of fleeing, mainly to China. When they are apprehended or forcibly repatriated, officials from the Democratic People's Republic of Korea systematically subject them to persecution, torture, prolonged arbitrary detention and, in some cases, sexual violence, including during invasive body searches. Repatriated women who are pregnant are regularly subjected to forced abortions, and babies born to repatriated women are often killed. These practices are driven by racist attitudes towards interracial children of Koreans, and the intent to punish further women who have left the country and their assumed contact with Chinese men. Persons found to have been in contact with officials or nationals from the Republic of Korea or with Christian churches may be forcibly "disappeared" into political prison camps, imprisoned in ordinary prisons or even summarily executed.

43.    Despite the gross human rights violations awaiting repatriated persons, China pursues a rigorous policy of forcibly repatriating citizens of the Democratic People's Republic of Korea who cross the border illegally. China does so in pursuance of its view that these persons are economic (and illegal) migrants. However, many such nationals of

9

the Democratic People's Republic of Korea should be recognized as refugees fleeing persecution or refugees *sur place.* They are thereby entitled to international protection. In forcibly returning nationals of the Democratic People's Republic of Korea, China also violates its obligation to respect the principle of non-refoulement under international refugee and human rights law. In some cases, Chinese officials also appear to provide information on those apprehended to their counterparts in the Democratic People's Republic of Korea.

44.     Discrimination against women and their vulnerable status in the Democratic People's Republic of Korea, as well as the prospect of refoulement, make women extremely vulnerable to trafficking in persons. Many women are trafficked by force or deception from the Democratic People's Republic of Korea into or within China for the purposes of exploitation in forced marriage or concubinage, or prostitution under coercive circumstances. An estimated 20,000 children born to women from the Democratic People's Republic of Korea are currently in China. These children are deprived of their rights to birth registration, nationality, education and health care because their birth cannot be registered without exposing the mother to the risk of refoulement by China.

45.     The Democratic People's Republic of Korea has repeatedly breached its obligations to respect the rights of its nationals who have special ties to, or claims in relation to, another country, in this case the Republic of Korea, to return there or otherwise to enjoy a facility to meet long separated families. The severe impediments put in place by the Democratic People's Republic of Korea to prevent contact and communication with family members in the Republic of Korea are a breach of the State's obligations under international human rights law. The restrictions are arbitrary, cruel and inhuman. This is particularly the case when previously agreed temporary reunions of separated families are cancelled for wholly unpersuasive reasons, especially given the advanced age of the persons concerned.

## D.    Violations of the right to food and related aspects of the right to life

46.     The rights to food, freedom from hunger and to life in the context of the Democratic People's Republic of Korea cannot be reduced to a narrow discussion of food shortages and access to a commodity. The State has used food as a means of control over the population. It has prioritized those whom the authorities believe to be crucial in maintaining the regime over those deemed expendable.

47.     Confiscation and dispossession of food from those in need, and the provision of food to other groups, follows this logic. The State has practised discrimination with regard to access to and distribution of food based on the *songbun* system. In addition, it privileges certain parts of the country, such as Pyongyang, over others. The State has also failed to take into account the needs of the most vulnerable. The commission is particularly concerned about ongoing chronic malnutrition in children and its long-term effects.

48.     The State was aware of the deteriorating food situation in the country well before the first appeal for international aid in 1995. State-controlled production and distribution of food had not been able to provide the population with adequate food since the end of the 1980s. The lack of transparency, accountability and democratic institutions, as well as restrictions on freedom of expression, information and association, prevented the adoption of optimal economic solutions over those in accordance with Party directives. The State has evaded structural reforms to the economy and agriculture for fear of losing its control over the population.

49.     During the period of famine, ideological indoctrination was used in order to maintain the regime, at the cost of seriously aggravating hunger and starvation. The concealment of information prevented the population from finding alternatives to the

collapsing public distribution system. It also delayed international assistance that, provided earlier, could have saved many lives. Despite the State's inability to provide its people with adequate food, it maintained laws and controls effectively criminalizing people's use of key coping mechanisms, particularly moving within or outside the country in search of food and trading or working in informal markets.

50.     Even during the worst period of mass starvation, the State impeded the delivery of food aid by imposing conditions that were not based on humanitarian considerations. International humanitarian agencies were subject to restrictions contravening humanitarian principles. Aid organizations were prevented from properly assessing humanitarian needs and monitoring the distribution of aid. The State denied humanitarian access to some of the most affected regions and groups, including homeless children.

51.     The State has consistently failed in its obligation to use the maximum of its available resources to feed those who are hungry. Military spending – predominantly on hardware and the development of weapons systems and the nuclear programme – has always been prioritized, even during periods of mass starvation. Nevertheless, the State still failed to feed the ordinary soldiers of its disproportionately large army. Large amounts of State resources, including parallel funds directly controlled by the Supreme Leader, have been spent on luxury goods and the advancement of his personality cult instead of providing food to the starving general population.

52.     The State has also used deliberate starvation as a means of control and punishment in detention facilities. This has resulted in the deaths of many political and ordinary prisoners.

53.     The commission found evidence of systematic, widespread and grave violations of the right to food in the Democratic People's Republic of Korea. While acknowledging the impact of factors beyond State control over the food situation, the commission finds that decisions, actions and omissions by the State and its leadership caused the death of at least hundreds of thousands of people and inflicted permanent physical and psychological injuries on those who survived.

54.     In the highly centralized system of the Democratic People's Republic of Korea, decisions relating to food, including its production and distribution, State budget allocation, decisions relating to humanitarian assistance and the use of international aid, are ultimately made by a small group of officials, who are not accountable to those affected by their decisions.

55.     While conditions have changed since the 1990s, hunger and malnutrition continue to be widespread. Deaths from starvation continue to be reported. The commission is concerned that structural issues, including laws and policies that violate the right to adequate food and freedom from hunger, remain in place, which could lead to the recurrence of mass starvation.

## E.   Arbitrary detention, torture, executions and prison camps

56.     The police and security forces of the Democratic People's Republic of Korea systematically employ violence and punishments that amount to gross human rights violations in order to create a climate of fear that pre-empts any challenge to the current system of government and to the ideology underpinning it. The institutions and officials involved are not held accountable. Impunity reigns.

57.     Gross human rights violations in the Democratic People's Republic of Korea involving detention, executions and disappearances are characterized by a high degree of centralized coordination between different parts of the extensive security apparatus. The

11

State Security Department, the Ministry of People's Security and the Korean People's Army Military Security Command regularly subject persons accused of political crimes to arbitrary arrest and subsequent incommunicado detention for prolonged periods of time. Their families are not informed of their fate or whereabouts. Persons accused of political crimes therefore become victims of enforced disappearance. Making the suspect disappear is a deliberate feature of the system that serves to instil fear in the population.

58.     The use of torture is an established feature of the interrogation process in the Democratic People's Republic of Korea, especially in cases involving political crimes. Starvation and other inhumane conditions of detention are deliberately imposed on suspects to increase the pressure on them to confess and to incriminate other persons.

59.     Persons who are found to have engaged in major political crimes are "disappeared", without trial or judicial order, to political prison camps (*kwanliso*). There, they are incarcerated and held incommunicado. Their families are not even informed of their fate if they die. In the past, it was common that the authorities sent entire families to political prison camps for political crimes committed by close relatives (including forebears, to the third generation) on the basis of the principle of guilt by association. Such cases still occur, but appear to be less frequent now than in past decades.

60.     In the political prison camps of the Democratic People's Republic of Korea, the inmate population has been gradually eliminated through deliberate starvation, forced labour, executions, torture, rape and the denial of reproductive rights enforced through punishment, forced abortion and infanticide. The commission estimates that hundreds of thousands of political prisoners have perished in these camps over the past five decades. The unspeakable atrocities that are being committed against inmates of the *kwanliso* political prison camps resemble the horrors of camps that totalitarian States established during the twentieth century.

61.     Although the authorities in the Democratic People's Republic of Korea deny the existence of the camps, this claim was shown to be false by the testimonies of former guards, inmates and neighbours. Satellite imagery proves that the camp system continues to be in operation. While the number of political prison camps and inmates has decreased owing to deaths and some releases, it is estimated that between 80,000 and 120,000 political prisoners are currently detained in four large political prison camps.

62.     Gross violations are also being committed in the ordinary prison system, which consists of ordinary prison camps (*kyohwaso*) and various types of short-term forced labour detention facilities. The vast majority of inmates are victims of arbitrary detention, since they are imprisoned without trial or on the basis of a trial that fails to respect the due process and fair trial guarantees set out in international law. Furthermore, many ordinary prisoners are, in fact, political prisoners, who are detained without a substantive reason compatible with international law. Prisoners in the ordinary prison system are systematically subjected to deliberate starvation and illegal forced labour. Torture, rape and other arbitrary cruelties at the hands of guards and fellow prisoners are widespread and committed with impunity.

63.     As a matter of State policy, the authorities carry out executions, with or without trial, publicly or secretly, in response to political and other crimes that are often not among the most serious crimes. The policy of regularly carrying out public executions serves to instil fear in the general population. Public executions were most common in the 1990s. However, they continue to be carried out today. In late 2013, there appeared to be a spike in the number of politically motivated public executions.

## F.   Abductions and enforced disappearances from other countries

64.     Since 1950, the Democratic People's Republic of Korea has engaged in the systematic abduction, denial of repatriation and subsequent enforced disappearance of persons from other countries on a large scale and as a matter of State policy. Well over 200,000 persons, including children, who were brought from other countries to the Democratic People's Republic of Korea may have become victims of enforced disappearance, as defined in the Declaration on the Protection of All Persons from Enforced Disappearance. More information would have to emerge from the Democratic People's Republic of Korea to provide a more precise estimate of the number of victims.

65.     For a nation State that seeks to live alongside others, the above-mentioned actions, in defiance of the sovereignty of other States and the rights of foreign nationals guaranteed under international law, are exceptional.

66.     The vast majority of abductions and enforced disappearances are linked to the Korean War and the organized movement of ethnic Koreans from Japan that started in 1959. However, hundreds of nationals of the Republic of Korea, Japan and other States were also abducted and disappeared between the 1960s and 1980s. In more recent years, the Democratic People's Republic of Korea abducted a number of its own nationals and nationals of the Republic of Korea from China.

67.     The Democratic People's Republic of Korea used its land, naval and intelligence forces to conduct abductions and arrests. Operations were approved at the level of the Supreme Leader. The vast majority of victims were forcibly disappeared to gain labour and other skills for the State. Some victims were used to further espionage and terrorist activities. Women abducted from Europe, the Middle East and Asia were subjected to forced marriages with men from other countries to prevent liaisons on their part with ethnic Korean women that could result in interracial children. Some of the abducted women have also been subject to sexual exploitation.

68.     A number of the forcibly disappeared travelled to the Democratic People's Republic of Korea voluntarily. Others were abducted through physical force or fraudulent persuasion. Subsequently, they were all denied the right to leave the country. They have also been subject to severe deprivation of their liberty and freedom of movement within the Democratic People's Republic of Korea, denied the right to recognition as a person before the law, and the right not to be subjected to torture and other cruel, inhuman or degrading treatment. All of the forcibly disappeared have been placed under strict surveillance. They have been denied education and employment opportunities.

69.     Ethnic Koreans from the Republic of Korea and Japan, forcibly disappeared by the Democratic People's Republic of Korea, have been discriminated against for their origins and background. They were categorized as "hostile" and forced to work in mines and farms in remote marginalized areas of the country. Many of them were likely to have been the first victims of the famine in the 1990s because of their lower social status.

70.     Non-Korean abductees were not able to integrate into social and economic life in the Democratic People's Republic of Korea as they were detained in tightly controlled compounds. They were denied the right to work, to leave their place of residence or to move freely in society, and they were unable to choose educational opportunities for themselves and their children.

71.     Family members abroad and foreign States wishing to exercise their right to provide diplomatic protection have been consistently denied information necessary to establish the fate and whereabouts of the victims. Family members of the disappeared have been subjected to torture and other cruel, inhuman or degrading treatment. They have been

13

denied the right to effective remedies for human rights violations, including the right to the truth. Parents and disappeared children have been denied the right to family life.

72.     Despite admitting to the abduction of 13 Japanese nationals by agents of the State, the Democratic People's Republic of Korea has never adequately disavowed the practice of international abductions. Since the 1990s, its agents have abducted a number of persons from Chinese territory, including nationals of China, the Republic of Korea and, in at least one case, a former Japanese national.

73.     The commission finds that almost all of the foregoing victims remain disappeared. Human rights violations continue against them and their families. The shock and pain caused by such actions is indescribable.

## IV.   Crimes against humanity

74.     In accordance with Human Rights Council resolution 22/13, the commission carried out its inquiry with a view to ensuring full accountability, in particular where these violations may amount to crimes against humanity. The commission is neither a judicial body nor a prosecutor. It cannot make final determinations of individual criminal responsibility. It can, however, determine whether its findings constitute reasonable grounds establishing that crimes against humanity have been committed so as to merit a criminal investigation by a competent national or international organ of justice.

75.     According to that standard, the commission finds that the body of testimony and other information it received establishes that crimes against humanity have been committed in the Democratic People's Republic of Korea, pursuant to policies established at the highest level of the State.[6]

76.     These crimes against humanity entail extermination, murder, enslavement, torture, imprisonment, rape, forced abortions and other sexual violence, persecution on political, religious, racial and gender grounds, the forcible transfer of populations, the enforced disappearance of persons and the inhumane act of knowingly causing prolonged starvation. The commission further finds that crimes against humanity are ongoing in the Democratic People's Republic of Korea because the policies, institutions and patterns of impunity that lie at their heart remain in place.

77.     Persons detained in political and other prison camps, those who try to flee the State, Christians and others considered to introduce subversive influences are the primary targets of a systematic and widespread attack against all populations that are considered to pose a threat to the political system and leadership of the Democratic People's Republic of Korea. This attack is embedded in the larger patterns of politically motivated human rights violations experienced by the general population, including the discriminatory system of classification of persons based on *songbun*.

78.     In addition, the commission finds that crimes against humanity have been committed against starving populations, particularly during the 1990s. These crimes arose from decisions and policies violating the right to food, which were applied for the purposes of sustaining the present political system, in full awareness that such decisions would exacerbate starvation and related deaths of much of the population.

79.     Lastly, the commission finds that crimes against humanity are being committed against persons from other countries who were systematically abducted or denied

---

[6]   See also A/HRC/25/CRP.1, sect. V.

repatriation, in order to gain labour and other skills for the Democratic People's Republic of Korea.

# V.   Conclusions and recommendations

80.     Systematic, widespread and gross human rights violations have been and are being committed by the Democratic People's Republic of Korea, its institutions and officials. In many instances, the violations of human rights found by the commission constitute crimes against humanity. These are not mere excesses of the State; they are essential components of a political system that has moved far from the ideals on which it claims to be founded. The gravity, scale and nature of these violations reveal a State that does not have any parallel in the contemporary world. Political scientists of the twentieth century characterized this type of political organization as a totalitarian State: a State that does not content itself with ensuring the authoritarian rule of a small group of people, but seeks to dominate every aspect of its citizens' lives and terrorizes them from within.

81.     The Democratic People's Republic of Korea displays many attributes of a totalitarian State: the rule of a single party, led by a single person, is based on an elaborate guiding ideology that its current Supreme Leader refers to as "Kimilsungism-Kimjongilism". The State seeks to ensure that its citizens internalize this guiding ideology by indoctrinating citizens from childhood, suppressing all political and religious expression that questions the official ideology, and tightly controlling citizens' physical movement and their means of communication with each other and with those in other countries. Discrimination on the basis of gender and *songbun* is used to maintain a rigid social structure that is less likely to produce challenges to the political system.

82.     The State's monopolization of access to food has been used as an important means to enforce political loyalty. The distribution of food has prioritized those who are useful to the survival of the current political system at the expense of those deemed to be expendable. Citizens' complete dependence on the State led to one of the worst cases of famine in recent history. The authorities have only recently come to tolerate the fact that markets can no longer be fully suppressed. Instead of fully embracing reforms to realize the right to food, however, the Democratic People's Republic of Korea maintains a system of inefficient economic production and discriminatory resource allocation that inevitably produces more unnecessary starvation among its citizens.

83.     The key to the political system is the vast political and security apparatus that strategically uses surveillance, coercion, fear and punishment to preclude the expression of any dissent. Public executions and enforced disappearance to political prison camps serve as the ultimate means to terrorize the population into submission. The State's violence has been externalized through State-sponsored abductions and enforced disappearances of people from other nations. These international enforced disappearances are unique in their intensity, scale and nature.

84.     Today, the Democratic People's Republic of Korea finds itself surrounded by a world that is changing rapidly in political, economic and technological terms. These changes offer opportunities for incremental social change within the State. In response, the authorities engage in gross human rights violations so as to crack down on "subversive" influences from abroad. These influences are symbolized by films and soap operas from the Republic of Korea and other countries, short-wave radio broadcasts and foreign mobile telephones. For the same reason, the State

systematically uses violence and punishment to deter its citizens from exercising their human right to leave the country. Persons who are forcibly repatriated from China are commonly subjected to torture, arbitrary detention, summary execution, forced abortion and other forms of sexual violence.

85.     A number of long-standing and ongoing patterns of systematic and widespread violations, which were documented by the commission, meet the high threshold required for proof of crimes against humanity in international law. The perpetrators enjoy impunity. The Democratic People's Republic of Korea is unwilling to implement its international obligation to prosecute and bring the perpetrators to justice, because those perpetrators act in accordance with State policy.

86.     The fact that the Democratic People's Republic of Korea, as a State Member of the United Nations, has for decades pursued policies involving crimes that shock the conscience of humanity raises questions about the inadequacy of the response of the international community. The international community must accept its responsibility to protect the people of the Democratic People's Republic of Korea from crimes against humanity, because the Government of the Democratic People's Republic of Korea has manifestly failed to do so. In particular, this responsibility must be accepted in the light of the role played by the international community (and by the great powers in particular) in the division of the Korean peninsula and because of the unresolved legacy of the Korean War. These unfortunate legacies help not only to explain the intractability of the human rights situation but also why an effective response is now imperative.

87.     The United Nations must ensure that those most responsible for the crimes against humanity committed in the Democratic People's Republic of Korea are held accountable. Options to achieve this end include a Security Council referral of the situation to the International Criminal Court or the establishment of an ad hoc tribunal by the United Nations. Urgent accountability measures should be combined with a reinforced human rights dialogue, the promotion of incremental change through more people-to-people contact and an inter-Korean agenda for reconciliation.

88.     On the basis of its findings and conclusions, the Commission makes the recommendations below.

89.     The commission of inquiry recommends that the Democratic People's Republic of Korea:

        (a)     Undertake profound political and institutional reforms without delay to introduce genuine checks and balances upon the powers of the Supreme Leader and the Workers' Party of Korea; such changes should include an independent and impartial judiciary, a multiparty political system and elected people's assemblies at the local and central levels that emerge from genuinely free and fair elections; reform the security sector by vetting the entire officers' corps for involvement in human rights violations and by limiting the functions of the Korean People's Army to defending the nation against external threats; and dismantle the State Security Department and place the Ministry of Public Security under transparent democratic oversight. An independent constitutional and institutional reform commission, consisting of respected members of society in the Democratic People's Republic of Korea, should be constituted to guide this process and should be assisted by appropriate international experts;

        (b)     Acknowledge the existence of human rights violations, including the political prison camps described by the commission in the present report; provide international humanitarian organizations and human rights monitors with immediate access to the camps and their surviving victims; dismantle all political prison camps

16

and release all political prisoners; and clarify with full detail the fate of any disappeared persons who cannot be readily traced;

(c)     Reform the Criminal Code and Code of Criminal Procedure to abolish vaguely worded "anti-State" and "anti-People" crimes and to fully enshrine the right to a fair trial and due process guarantees articulated in the International Covenant on Civil and Political Rights; enforce existing provisions in the Criminal Code and the Code of Criminal Procedure that prohibit and criminalize the use of torture and other inhuman means of interrogation that are illegal under international law; reform the ordinary prison system so as to ensure humane conditions of detention for all inmates deprived of liberty; end reprisals against persons on the basis of guilt by association; and abolish immediately the practice of forcibly resettling the families of convicted criminals;

(d)     Declare and implement an immediate moratorium on the imposition and execution of the death penalty, followed without undue delay by the abolition of the death penalty both in law and in practice;

(e)     Allow the establishment of independent newspapers and other media; allow citizens to freely access the Internet, social media, international communications, foreign broadcasts and publications, including the popular culture of other countries; and abolish compulsory participation in mass organizations and indoctrination sessions;

(f)     Introduce education to ensure respect for human rights and fundamental freedoms; and abolish any propaganda or educational activities that espouse national, racial or political hatred or war propaganda;

(g)     Allow Christians and other religious believers to exercise their religion independently and publicly, without fear of punishment, reprisal or surveillance;

(h)     End discrimination against citizens on the basis of their perceived political loyalty or the sociopolitical background of their families, including in matters of access to education and employment; dismantle the neighbourhood watch (*inminban*), the secret resident registration file system, and all surveillance of persons and their communications that serve purposes of political oppression and/or are not subject to effective judicial and democratic control; and publicly acknowledge the extent of surveillance practices carried out in the past and provide citizens with access to their resident registration file;

(i)     Take immediate measures to ensure gender equality in practice, such as by providing equal access for women in public life and employment; eradicate discriminatory laws, regulations and practices affecting women; take measures to address all forms of violence against women, including domestic violence, sexual and gender-based violence by State agents and/or within State institutions; and respond immediately and effectively to trafficking in women, and address the structural causes that make women vulnerable to such violations;

(j)     Ensure that citizens can enjoy the right to food and other economic and social rights without discrimination; pay particular attention to the needs of women and vulnerable groups, such as street children, the elderly and persons with disabilities; promote agricultural, economic and financial policies based on democratic participation, good governance and non-discrimination; and legalize and support free market activities, internal and external trade and other independent economic conduct that provide citizens with a livelihood;

(k)     In the light of the past expenditures by the leadership, the military and security apparatus, realign priorities and dedicate the resources made available to

17

ensure, as necessary, freedom from hunger and other essential minimum standards for citizens, including those citizens serving in the armed forces;

(l)     Where necessary to ensure the right to food, seek international humanitarian assistance without delay; provide international humanitarian organizations with free and unimpeded access to all populations in need, including for the purposes of effective monitoring; and hold accountable State officials who illegally divert humanitarian aid for improper purposes;

(m)     Abolish the de facto prohibition on foreign travel imposed on ordinary citizens; decriminalize illegal border crossings and introduce border controls that conform to international standards; renounce orders to shoot and kill at the border; cease to regard citizens repatriated from China as political criminals or to subject them to imprisonment, execution, torture, arbitrary detention, deliberate starvation, illegal cavity searches, forced abortions and other sexual violence; and abolish the State's compulsory designation of places of residence and employment, as well as the requirement to obtain a permit for domestic travel outside a person's designated province;

(n)     Provide the families and nations of origin of all persons who have been abducted, or otherwise forcibly disappeared, with full information on their fate and whereabouts, if they have survived; allow those who remain alive, and their descendants, to return immediately to their countries of origin; and, in close cooperation with their families and nations of origin, identify and repatriate the physical remains of those who have died;

(o)     Allow separated families to unite, including by allowing citizens to travel or emigrate where they choose; and immediately provide such persons with facilities for unmonitored communications by way of mail, telephone, email and any other means of communication;

(p)     Prosecute and bring to justice those persons most responsible for alleged crimes against humanity; appoint a special prosecutor to supervise this process; ensure that victims and their families are provided with adequate, prompt and effective reparation and remedies, including by knowing the truth about the violations that have been suffered; launch a people-driven process to establish the truth about the violations; provide adults and children with comprehensive education on national and international law and practice on human rights and democratic governance; and seek international advice and support for transitional justice measures;

(q)     Take immediate steps to end all other human rights violations and to address the human rights concerns raised by the commission in the present report, as well as in successive resolutions of the General Assembly and the Human Rights Council, in the procedures of universal periodic review and in the reports of special procedures mandate holders and the treaty bodies;

(r)     Ratify without delay the International Convention for the Protection of All Persons from Enforced Disappearance, the Convention on the Rights of Persons with Disabilities, the Rome Statute of the International Criminal Court and the fundamental conventions of the International Labour Organization;

(s)     Accept immediately a field-based presence and technical assistance from the Office of the United Nations High Commissioner for Human Rights and other relevant United Nations entities to help to implement the above-mentioned recommendations.

90.     The commission of inquiry recommends that China and other States:

18

(a)	Respect the principle of non-refoulement and, accordingly, abstain from forcibly repatriating any persons to the Democratic People's Republic of Korea, unless the treatment there, as verified by international human rights monitors, markedly improves; extend asylum and other means of durable protection to persons fleeing the Democratic People's Republic of Korea who need international protection; ensure that such persons are fully integrated and duly protected from discrimination; stop providing information on activities and contacts of persons from the Democratic People's Republic of Korea living in China to the State Security Department and other security agencies in the Democratic People's Republic of Korea; and allow persons from the Democratic People's Republic of Korea free access to diplomatic and consular representations of any State that may be willing to extend nationality or other forms of protection to them;

(b)	Provide the Office of the United Nations High Commissioner for Refugees, and relevant humanitarian organizations, full and unimpeded access to all persons from the Democratic People's Republic of Korea seeking such contact;

(c)	Request technical assistance from the United Nations to help to meet the obligations imposed under international refugee law, and ensure the effective protection of persons from trafficking;

(d)	Adopt a victim-centric and human rights-based approach to trafficking in persons, including by providing victims with the right to stay in the country and access to legal protection and basic services, such as medical treatment, education and employment opportunities equivalent to those afforded to their own citizens;

(e)	Regularize the status of women and men from the Democratic People's Republic of Korea who marry or have a child with a Chinese citizen; and ensure that all such children may realize their rights to birth registration and Chinese nationality where applicable, and have access to education and health care without discrimination;

(f)	Take immediate measures to prevent agents of the Democratic People's Republic of Korea from carrying out further abductions from Chinese territory; prosecute and adequately punish apprehended perpetrators of abduction and demand the extradition of those giving such orders so that they may be tried in accordance with law. China should raise with the Supreme Leader of the Democratic People's Republic of Korea and other high-level authorities the issues of abductions, the infanticide of children entitled to Chinese nationality, forced abortions imposed on repatriated women and other human rights violations that target persons repatriated from China.

91.	The commission of inquiry recommends that the Korean people foster inter-Korean dialogue in a phased approach leading to an agenda for reconciliation. Inter-Korean dialogue could be furthered through such initiatives as friendly sporting events; academic and business interactions; scholarships and apprenticeships for young people from the Democratic People's Republic of Korea; student exchanges; exchanges between civil society organizations, including national Red Cross Societies; contacts between professional organizations and women's groups; and the development of "sister city" relationships and, eventually, the re-establishment of transport and communication links.

92.	The commission of inquiry recommends that States and civil society organizations foster opportunities for people-to-people dialogue and contact in such areas as culture, science, sports, good governance and economic development that provide citizens of the Democratic People's Republic of Korea with opportunities to exchange information and be exposed to experiences outside their home country. The

19

Democratic People's Republic of Korea and other States should remove applicable obstacles to people-to-people contact, including measures that criminalize travel and contact to the extent that these are not in accordance with relevant obligations under international human rights law.

93. The commission also recommends that States, foundations and engaged business enterprises provide more support for the work of civil society organizations to improve the situation of human rights in the Democratic People's Republic of Korea, including efforts to document human rights violations and to broadcast accessible information into each country. Eventually, and once conditions are deemed to be appropriate, such foundations and enterprises should join forces with the Governments concerned to coordinate efforts to adopt a coherent plan for the development of the country, creation of livelihoods for the population and the advancement of the situation of human rights.

94. With regard to the international community and the United Nations, the commission makes the following recommendations:

(a) The Security Council should refer the situation in the Democratic People's Republic of Korea to the International Criminal Court for action in accordance with that court's jurisdiction. The Security Council should also adopt targeted sanctions against those who appear to be most responsible for crimes against humanity. In the light of the dire social and economic situation of the general population, the commission does not support sanctions imposed by the Security Council or introduced bilaterally that are targeted against the population or the economy as a whole;

(b) The General Assembly and the Human Rights Council should extend the country-specific human rights monitoring and reporting mechanisms on the Democratic People's Republic of Korea that predate the establishment of the commission; these include the periodic reports of the Secretary-General and the United Nations High Commissioner for Human Rights, as well as the mandate of the Special Rapporteur on the situation of human rights in the Democratic People's Republic of Korea. Such mechanisms should be mandated to focus on ensuring accountability, in particular for crimes against humanity, and should report on the implementation of the commission's recommendations;

(c) The United Nations High Commissioner for Human Rights, with full support from the Human Rights Council and the General Assembly, should establish a structure to help to ensure accountability for human rights violations in the Democratic People's Republic of Korea, in particular where such violations amount to crimes against humanity. The structure should build on the collection of evidence and documentation work of the commission, and further expand its database. It should be field-based, supported by adequate personnel deployed to the region so as to enjoy sustained access to victims and witnesses. In addition to informing the work of human rights reporting mechanisms and serving as a secure archive for information provided by relevant stakeholders, the work of such a structure should facilitate United Nations efforts to prosecute, or otherwise render accountable, those most responsible for crimes against humanity;

(d) The High Commissioner should continue the engagement of OHCHR with the Democratic People's Republic of Korea, offering technical assistance and enhancing advocacy initiatives. The High Commissioner should facilitate the implementation of a strategy led by the Special Rapporteur and involving all concerned human rights mechanisms of the United Nations system to address, coherently and without delay, the special issue of international abductions and

20

enforced disappearances and related matters described in the present report. Member States should afford full cooperation to ensure the implementation of such a strategy;

(e)     The High Commissioner should periodically report to the Human Rights Council and other appropriate United Nations organs on the implementation of the recommendations contained in the present report;

(f)     The Human Rights Council should ensure that the conclusions and recommendations of the commission do not pass from the active attention of the international community. Where so much suffering has occurred, and is still occurring, action is the shared responsibility of the entire international community;

(g)     The United Nations Secretariat and agencies should urgently adopt and implement a common "Rights up Front" strategy to ensure that all engagement with the Democratic People's Republic of Korea effectively takes into account, and addresses, human rights concerns, including those collected in the present report. The United Nations should immediately apply this strategy to help to prevent the recurrence or continuation of crimes against humanity in the Democratic People's Republic of Korea. The strategy should contemplate the possibility of the Secretary-General referring the situation to the Security Council;

(h)     States that have historically friendly ties with the Democratic People's Republic of Korea, major donors and potential donors, as well as those States already engaged with the Democratic People's Republic of Korea in the framework of the six-party talks, should form a human rights contact group to raise concerns about the situation of human rights in the Democratic People's Republic of Korea and to provide support for initiatives to improve it;

(i)     States should not use the provision of food and other essential humanitarian assistance to impose economic or political pressure on the Democratic People's Republic of Korea. Humanitarian assistance should be provided in accordance with humanitarian and human rights principles, including the principle of non-discrimination. Aid should only be curbed to the extent that unimpeded international humanitarian access and related monitoring is not adequately guaranteed. Bilateral and multilateral providers of assistance should coordinate their efforts to ensure that adequate conditions of humanitarian access and related monitoring are provided by the Democratic People's Republic of Korea;

(j)     Without prejudice to all the obligations under international law that the Democratic People's Republic of Korea must immediately implement, the United Nations and the States that were parties to the Korean War should take steps to convene a high-level political conference. Participants in that conference should consider and, if agreed, ratify a final peaceful settlement of the war that commits all parties to the principles of the Charter of the United Nations, including respect for human rights and fundamental freedoms. States of the region should intensify their cooperation and consider following such examples as the Helsinki Process.

# EXHIBIT F



# EXHIBIT G

1

## ABBREVIATED CURRICULUM VITAE

**RIFÁ SOLER, José Mª**

Professor of Procedural Law

Public University of Navarre

## RELEVANT EXPERIENCE RELATING TO CRIMINAL PROCEDURE

### 1. - RESEARCH

- Multidisciplinary Research Group on "Public Law Studies" within the Public University of Navarre, since 2008.
- European Cross-border Study Network, made up of the Faculties of Bayonne of the University of Pau and of the Lands of the Adour; University of the Basque Country; and Public University of Navarre: On illegal traffic and clandestine immigration of persons (ETIC), 2009-2019. Data available at: http://www.inmigracionclandestina.eu/

### 2. - CRIMINAL PROCEDURAL LAW PUBLICATIONS OF SPECIAL INTEREST

- "Derecho Procesal Penal" (Law of Criminal Procedure), University Manual, of a doctrinal nature. Editorial Iurgium, Madrid, 2000, 542 pages.
- "Comentarios a la Nueva Ley de Enjuiciamiento Civil" (Comments on the New Civil Procedure Act), Coordinator and author of the commentary on the following articles: 293 to 295, 335 to 381, 385 and 386. Editorial Iurgium, Madrid, 2000.
- "Derecho Procesal Penal" (Law of Criminal Procedure), University Manual, Director, edited by the Publications Fund of the Government of Navarre, Pamplona 2006, 2nd edition 2011; 3rd edition 2016.
- "Actos de investigación, actos de instrucción y actos de prueba" (Investigation acts, acts of investigation and acts of evidence) published in the collective work

1

"Estudios sobre prueba penal" (Studies on criminal evidence), Editorial Wolters Kluwer España- La Ley, Madrid 2009, p. 117 to 168.

- "El testigo protegido y el agente infiltrado" (The protected witness and the undercover agent) published in the collective work "Estudios sobre prueba penal" (Studies on criminal evidence), Editorial Wolters Kluwer España- La Ley, Madrid, 2011, p.317-36.

- "Entrada y Registro en lugar cerrado" (Entry and Register in closed place) published in the collective work published in the collective work "Estudios sobre prueba penal" (Studies on criminal evidence), Editorial Wolters Kluwer España- La Ley, Madrid, 2013, p. 47 to 130.

- "Proceso de ejecución y Registro de la Propiedad" (Process of execution and Land Register), Editorial Wolfs Kluwer España - La Ley, Las Rozas (Madrid), 2013, Monograph, p. 318.

- "El proceso penal práctico" (The practical criminal process), Editorial La Ley, Madrid, 10th edition, 2017, 2132 pages, as co-author and Director. The editions correspond to years 1986, 1987, 1987, 1990, 1993, 1997, 2003, 2005, 2009 and 2016.


3.- OTHER PUBLICATIONS AND DOCTRINE ARTICLES

- The criminal proceedings, 1986, Librería Bosch, Barcelona. As co-author and director of the work.

- Legal Encyclopaedic Dictionary, collective work, 4 volumes, Editorial Civitas, Madrid 1995.

- The State's asset liability for the abnormal functioning of the Administration of Justice and due to judicial error; RGD 1995, nº 613-614, p. 11-233.

- Criminal Procedure Laws, annotated, and its case-law, 1986, Bosch, Casa Editorial.

- Notes on the Criminal Procedure Act and complementary rules, Spanish and bilingual edition (Spanish-Catalan).

- Annex to the Laws of Criminal Procedure and its case-law, Bosch, Casa Editorial, Barcelona, 1988.

- "Current problems of criminal justice", published in the collective work of the University of Granada in 1994.

3

- "The State's asset liability for the abnormal functioning of the Administration of Justice and due to judicial error"; Published in the Revista General del Derecho nº 613-614, de 1995, pages 11.233 and below
- "The provisional execution and the precautionary measures" published in the collective work: "Comments on the Draft Criminal Procedure Act" (Madrid).
- "Procedural guarantees: the prosecution witness according to the ECHR" published in the collective work: "Towards an international justice" Directorate of the Legal Service of the State, Madrid, 2000.
- Sources, means of evidence, appreciation and valuation of the evidence", published by the Ministry of Justice, Centre for Legal Studies, I-2003, Madrid, 2003.
- "The new forms of fast prosecution introduced by Act 38 / 02", published in The Book of Homage to Professor Font, Volume II, Ministry of Justice, the Centre of Legal Studies, Madrid, 2004, p. 1727-1784.
- "Reflexions on the right to evidence in the criminal proceedings" published in the Ibero-American Journal of Procedural Law No. 10, September 2007.

4.- <u>COMMUNICATIONS AND CONFERENCES RELATING TO CRIMINAL PROCEDURE</u>

- "The criminal procedural reform" organized by the Bar Association of Reus, May 1989.
- Paper on "The civil liability derived from traffic accidents" at the sessions on the Traffic Law, organized by the Legal Practice School of Lérida, 1991.
- Communication and moderation in the "Seminars on current problems of criminal justice" organized by the University of Granada, June 1993. Published by the Publications Service of the University of Granada in 1994, under the same title.
- Paper on "The house search" at the Rule of Law and Freedom Course, organized by the University of Castellón, October 1994.
- Presentation on "The State's Patrimonial liability for the abnormal functioning of the Administration of Justice and by judicial error" at the continuous training course for Court Clerks, organized by the Ministry of Justice, Barcelona, October 1995. Published in the General Review of Law No. 613-614, 1995, p. 11.233 and below

3

- Paper on "Popular Criminal Justice: the Jury", at the University of the Sea; University of Murcia. August 1997.
- Proposals to the Ministry of Justice on the Draft of the new Criminal Procedure Act, 1997.
- Paper on "The figure of the undercover agents as a subject of protection", at the I International Procedural Law Seminars, organized by the University of Malaga, Malaga 1999.
- Paper on "The ius postulandi" at the "XIV Legal Week of Marbella", organized by the University of Malaga, in 1999.
- Paper on "The counter-claim in the new Civil Procedure Act", at the New Civil Procedure Act Seminar, organized by the High Court of Justice of Catalonia, Territorial Training Plan, Lloret de Mar, in May 2000.
- Communication on: "Procedural guarantees: the prosecution witness according to the ECHR" presented to the XXI study sessions of the Directorate-General of the State Legal Service, on: "Toward an international justice" in Madrid, 2000.
- Paper on: "The Public Prosecutor's intervention in the Civil Procedure Act and in the special declaratory proceedings" given at the Legal Studies Centre of the Administration of Justice, at the sessions on: "The new Civil Procedure Act", Madrid, March 2001.
- Paper on: "The civil execution Process" at the sessions on Procedural Law, organized by the Regional Government of Castilla y León, Valladolid, October 2003.
- Paper on: "The Insolvency Act: procedural aspects" ", in "Seminar on the Insolvency Act" organized by the Registry Studies Service of the Basque Country, Bilbao 2003.
- Paper on: "The declaration of insolvency" at the seminar on "The new insolvency law" organized by the University of Zaragoza and the Government of Aragon, February 2005.
- The President of the table and of the debate at the XX Ibero-American Procedural Law sessions, held at the University of Malaga, October 2006, on the Bill of the Jurisdictional Cooperation Code for Ibero-America.
- Paper on: "Freedom of expression and parallel trials" at VII Malacitana Legal Week, organized by the University of Malaga and the Central Military Court, November 2007.

- Paper on: "Problems currently arise in the criminal proceedings of minors" at Extraordinary Workshop on "The Criminal Justice" at the International University of the Sea, Águilas, July 2008.
- Paper on: "The valuation of the expert opinion" at the European Judicial Experts Congress, held at the Faculty of Law, ESADE, University Ramón Lull, Barcelona, October 2008.
- Paper on "New measures to make the Justice more agile" at the Law Faculty of the University of Zaragoza, November 2011.
- Paper on "The investigation phase and Tribunal of guarantees in the Draft of the Criminal Procedure Code" at Workshop on the new Code of Criminal Procedure, General Judicial Council-High Court of Navarre, October 2013.
- Paper on "Design of the future criminal proceedings" at the Sessions on the preliminary draft Code of Criminal Procedure, Royal Academy of Legislation and Jurisprudence of Murcia, April, 2014.
- Paper on "The research phase in the Draft Code of the Future Criminal Procedure Code" at the National sessions on Reform of the Criminal Process" Faculty of Law of the University of Granada, May 2014.
- Paper on "Limitation Measures of Fundamental Rights: special reference to the secret of the communications and the right to privacy and own image"; at the Congress on the new criminal proceedings without criminal procedural code, University of Santiago de Compostela, November 2017.

## 5.- COURSES AND SEMINARS GIVEN.

- "Current panorama of the criminal proceedings" (Law Faculty of the University of Barcelona, academic course 1984-1985.
- "The evidence in the civil proceedings" Law Faculty of Lérida, academic course 1989-1990.
- "The reform of the criminal process" Law Faculty of Lérida, academic course 1992-1993.
- Participation in the meeting of Professors and Tenured Lecturers of Procedural Law, held in Murcia on "The new Civil Procedure Act in its first year in force" (Murcia, 2001.

- Course on: "Constitutional Guarantees in the various judicial orders" and within it: "Constitutional guarantees in the civil proceedings: their judicial protection" organized by the General Council of the Judicial Branch, in Olite (Navarre), in November 2002.
- Course on "Execution and Interim Measures" and within this: "General provisions of the forced execution and provisional execution" organized by the Legal Studies Centre, Ministry of Justice, Madrid June 2002.
- Seminars on "The evidence in the criminal proceedings" and within it: "A proposal of general theory of the evidence in the criminal proceedings" organized by the Legal Studies Centre, Ministry of Justice, Madrid in June 2003.
- Course on: "Towards a fast and effective criminal Justice" and within this: "Jury Court: a future perspective" organized by the International University of the Sea, University of Murcia, Águilas (Murcia), July 2003.
- Participation as speaker in the IV Film and Law Seminar, organized by the Faculty of Legal Sciences of the Public University of Navarre, 15 October 2012; Paper: "The prosecution in the criminal proceedings"
- Participation as speaker in the V Film and Law Seminar, organized by the Faculty of Legal Sciences of the Public University of Navarre, 14 October 2013; Paper: "The role of the lawyer in the consolidation of the Rule of Law"

6.- OTHER MERITS OF SPECIAL RELEVANCE.

- Director of doctoral thesis and reports for the obtaining of degree and end of degree projects, and end of master's degree projects.
- Member of numerous Tribunals and Commissions evaluating the doctoral theses and for the authorisation of university teaching places.
- Keynote speech on "The Reform of the Administration of Justice" in the solemn academic act of the XVII Graduation of the Faculty of Law of Lérida, 1989.
- Participation as Spanish expert in procedural law before the High Court of London, in the case KIO International. Report issued and included in the process before the jurisdiction of the United Kingdom.
- Legal Consultant of the Government of Andorra, during the 1992-1995 legislative periods.

- Keynote speech at the solemn ceremony opening of the academic course 1997-1998 at the Public University of Navarre, under the title of "The Jury Trial" published separately by the Publications Department of the Public University of Navarre.
- Legal Consultant for the Ministry of Foreign Affairs and Institutional Relations of the Government of Andorra for the 2008 legislative period.
- President of the Technical Commission drawing up the preliminary draft Code of the Civil Procedure of Andorra, appointed by the Council of Ministers of the Government of Andorra, on 26 September 2012, approved by law, on 8 October 2018.

Barcelona, on 16 May 2019.

José Mª Rifá Soler

-------------------------OOOOOO-------------------------

## ABBREVIATED CURRICULUM VITAE

**RICHARD GONZÁLEZ, Manuel**

Tenured Lecturer

Public University of Navarre

Member of the Board of Directors of Asociación de Probática y Derecho Probatorio (Association of Forensic Evidence and Probative Law).

## RELEVANT EXPERIENCE RELATING TO CRIMINAL PROCEDURE

1. TRAINING

   - Graduate in Law with Extraordinary Degree Award, University of Barcelona
   - PhD in Law Cum Laude, University of Barcelona.
   - Research Intern in the Catalan Regional Government in Barcelona.

2. TEACHING

   - Lecturer in procedural law in the University of Barcelona, in the Abat Oliva University in Barcelona and in the Public University of Navarre.
   - Director of PhD theses.

3. RESEARCH

   - Deputy Director and Member of the Editorial Board of the Revista de Cuadernos de Probática y Derecho Probatorio (Journal of Forensic Evidence and Probative Law).
   - Research stays in the University of Pau (France), Norwich Law School (United Kingdom), the Max-Planck Institute in Hamburg (Germany), UNIDROIT (Institute for the Unification of Private Law) Rome (Italy), European Institute for Advanced Legal Studies (IALS) of the London University (London),

1

London School of Economics (London, United Kingdom), European Court of Human Rights (Strasbourg) and Oxford University (United Kingdom).

■ Researcher in state and European funded projects. Among others:

    o Director of **the Public Law Studies Research Group** of the Public University of Navarre.

    o Researcher of the Res Research Project: 228/2008-2306 on **"The consumer protection arbitration in the framework of the Foral Act 7/2006 of 20 June on the defence of consumers and users".**

    o Head researcher in Navarre of the cross-border project: **"Human trafficking and clandestine immigration in the European Union"** between the Public University of Navarre, the University of the Basque Country and the University of Pau-Bayonne (France).

4. PRESENTATIONS

■ Speaker at the Procedural Law Seminars and Conferences at various universities, as well as in activities organized by the Spanish General Council of the Judiciary.

5. PROFESSIONAL EXPERIENCE IN THE SECTOR

■ Lecturer in procedural law in the University of Barcelona, in the Abat Oliva University in Barcelona and in the Public University of Navarre.

■ **Substitute Judge of the Provincial Court of Barcelona between the years 1998-2004 both in the civil jurisdiction and criminal jurisdiction.**

■ **Legal Adviser:**

    o **Consultant in the Spanish Delegation of the United Nations for the 24th Session of the Working Group III "On Line Dispute Resolutions" of the United Nations Commission on the Unification of International** Trade Law (UNCITRAL) held in Vienna between 14 and 18 November 2011, under the appointment of the Permanent

2

Representative Ambassador to the International Organizations in Vienna.

o **Consultant of the Spanish Delegation of the United Nations** for the 24th Session of the Working Group III **"On Line Dispute Resolutions"** of **the United Nations Commission on the Unification of International Trade Law (UNCITRAL)** held in New York between 21 and 26 May 2012, under the appointment of the Permanent Representative Ambassador to International Organizations in New York.

6. PUBLICATIONS

■ Author of monographs, civil and criminal procedure manuals and scientific works published in the journals specialising in Procedural Law both in civil proceedings and criminal proceedings, as well as international proceedings, with the following fields of specialization:

   o Criminal law.
   o Fundamental procedural rights.
   o Forensic investigation and evidentiary law.
   o Appeals and procedural nullification.
   o Electronic evidence and new technologies applied to the process.
   o International judicial cooperation in criminal matters.

■ Author of dozens of doctrinal works in procedural law:

   o **"El Proceso Penal Práctico" (Practical Criminal Process),** Madrid, 7th Edition, with Prof. Rifá Soler
   o **"Derecho Procesal Penal" (Criminal Procedure Law),** 3rd edition, 2018 with Rifá Soler and Iñaki Riaño Pamplona, 2006.
   o **"La identificación del imputado mediante la comparación de perfiles de ADN" (The identification of the accused by comparing**

3

**DNA profiles) in "LA** PRUEBA JUDICIAL. "Desafíos en las Jurisdicciones civil, penal, laboral y contencioso-administrativa" (Challenges in the civil, criminal, employment and judicial review proceedings). Co-Director of the work. ABEL LLUCH, X., PICO JUNOY, J., and RICHARD GONZÁLEZ MANUEL. Editorial La Ley, Madrid, 2011.

o **"Limitaciones a la oralidad en la práctica de la prueba pericial en el proceso civil" (Limitations on the oral proceedings in the expert evidence in the civil proceedings).** Oral and writing in an efficient Civil process. T. II. University of Valencia, 2008.

o **"Requisitos y límites de la intervención de los modernos sistemas de comunicación electrónica" (Requirements and limits of the interventions of the modern electronic communication systems).** In **Derecho y nuevas tecnologías.** Work Coordinated by HERRAN ANA I., EMALDI A. and ENCISO M. University of Deusto, 2010.

o **"Tratamiento procesal de la nulidad de actuaciones" (Procedural treatment of the nullification of proceedings),** Pamplona 2008.

o **"La competencia del Ministerio Fiscal para la investigación de actos delictivos. Diligencias preliminares y competencias de instrucción en el procedimiento de menores" (The competence of the Public Prosecutor for the investigation of criminal acts. Preliminary proceedings and investigation competences in the juvenile proceedings)** In Estudios sobre Prueba Penal. Volume I. Madrid, 2010.

o **"Corporal interventions and expert evidence in the criminal proceedings" in the Estudios sobre Prueba Penal (Studies** on Criminal Evidence). Volume II Madrid, 2011.

o **"Análisis crítico de las instituciones fundamentales del Proceso Penal" (Critical Analysis of the fundamental institutions of the Criminal Process).** Aranzadi, 2011.

o **"La obtención, análisis y prueba de muestras biológicas obtenidas del lugar, del cuerpo del delito o mediante la intervención sobre**

4

sobre el sospechoso o imputado" (The obtaining, analysis and evidence of biological samples obtained from the site, from the body of the crime or through the intervention on the suspect or accused) Chapter XVI of the work: "Derecho Probatorio Contemporáneo. Prueba científica y técnicas forenses" (Contemporary Evidentiary Law. Scientific evidence and forensic techniques) Medellín, 2012.

o   "Reflexiones sobre la práctica y valor de la prueba científica en el proceso penal (a propósito del asunto de los niños desaparecidos en Córdoba" (Reflections on the practice and value of the scientific evidence in the criminal proceedings (for the issue of the children missing in Córdoba)). Legal Review la Ley No. 7930, 25 September 2012.

o   "Preguntas y respuestas sobre la prueba de análisis y cotejo de ADN" (Questions and answers on the evidence of DNA analysis and comparison) Journal IURIS no. 83 January 2013.

o   "Análisis crítico de la jurisprudencia del Tribunal Constitucional sobre la revisión de los hechos probados en la segunda instancia del proceso penal" (Critical analysis of the case-law of the Constitutional Court on the revision of the facts proved in the second instance of the criminal proceedings). Diario la Ley, no. 8014. 1 February 2013.

o   "La Cooperación internacional en los procedimientos penales en materia de trata de seres humanos" (The International cooperation in the criminal proceedings in the field of people trafficking) In Globalización y Derecho: desafíos y tendencias (Globalization and Law: challenges and trends). University of Deusto, Bilbao 2013.

o   "La prueba de la culpabilidad ateniendo al nuevo paradigma propuesto por la neurociencia" (The proof of guilt according to the new paradigm proposed by the Neuroscience) in Neurociencia, Neuroética y bioética, Publications of the Universidad Pontificia de Comillas, Madrid 2014.

5

- o "La Pericia científica en el proceso penal. Especial atención al cotejo e identificación mediante ADN" (The scientific expert evidence in the criminal proceedings. Special attention to the cross-checking and identification through DNA), in Tratado de Pericia Judicial. Coordinator ABEL LLUCH X., La Ley Madrid 2014.

- o "Especialidades procesales en la investigación y enjuiciamiento del delito de trata de seres humanos" (Procedural specialities the investigation and prosecution of the crime of people trafficking).

- o "El fenómeno de la prostitución. Cooperación francoespañola en la lucha contra la trata de seres humanos" (The phenomenon of prostitution. Spanish-French cooperation in the fight against people trafficking). Aranzadi 2015.

- o "Admisibilidad, eficacia y valoración de las pruebas neurológicas en el proceso penal" (Admissibility, effectiveness and valuation of the neurological evidence in the criminal proceedings. Revista IURIS no. 206, January 2014.

- o "Los procedimientos electrónicos de resolución alternativa de conflictos (on-line dispute resolution)"; Revista Jurídica LA LEY Number 8360, 2014.

- o "Requisitos para la toma de muestras de ADN del detenido e impugnación de las que constan en la base de datos policial de ADN según el Acuerdo del Tribunal Supremo de 24 de septiembre de 2014 en esta materia" (Requirements for the taking of DNA samples from the detainee and challenging those recorded in the police database of DNA according to the Supreme Court Agreement of 24 September 2014 in this matter); Revista Jurídica La Ley, nº 8445, 2014.

- o "Comentario a la STS, Sala Segunda, de lo Penal, 734/2014 de 11 de noviembre de 2014" (Commentary of the Supreme Court Judgement, Criminal Chamber Two, 734/2014 of 11 November 2014). First issued by the Supreme Court on the requirement for legal assistance for the detainee for the provision of consent to

6

obtain DNA samples (**Supreme Court Agreement 24 SEPTEMBER 2014**). Revista Jurídica La Ley, Number 8535, 2015.

o **"Comentario a la STSJ MADRID de 13 Mayo 2016 (SALA DE LO SOCIAL nº 407/2016, LA LEY 87620/2016) sobre los requisitos y límites de la INVESTIGACIÓN preprocesal y la prueba pericial sobre dispositivos electrónicos de la empresa usados por el empleado" (Commentary on the High Court of Justice Judgment MADRID, 13 May 2016 (EMPLOYMENT CHAMBER no. 407/2016, LA LEY 87620/2016) on the requirements and limits of the Pre-procedural INVESTIGATION and the expert evidence on company electronic devices used by the employee).**

o **"Nulidad de la prueba por la intromisión virtual en domicilio. Una breve reflexión sobre la observación policial ilícita de la intimidad personal y familiar" (Nullity of the evidence due to virtual intrusion at home. A brief reflection on the illegal police observation of the personal and family privacy).** Diario La Ley, nº 8759, 11 May 2016.

o **"Conductas susceptibles de ser intervenidas por medidas de investigación electrónica. Presupuestos para su autorización" (Conducts capable of being intervened by electronic investigation. Cases for authorisation).** Diario la Ley, Nº 8808, Tribunal Section , 21 July 2016. REF. D-292, Editorial LA LEY. Cyber Law Section

o **"Investigación y prueba mediante medidas de Intervención de las comunicaciones, dispositivos Electrónicos y grabación de imagen y sonido" (Investigation and evidence through intervention measures for the communications, Electronic devices and image and sound recordings),** Ed. La Ley. Madrid 2017, 422 pages.

o **"Análisis crítico sobre la naturaleza y características de la prueba pericial electrónica en el proceso jurisdiccional" (Critical analysis on the nature and characteristics of the electronic expert evidence in the jurisdictional process),** in La prueba civil Aspectos problemáticos, Ed. Revista Jurídica de Catalunya, Barcelona 2017.

7

- o **"Licitud y validez de la prueba obtenida por particulares en el proceso penal: Comentario a la STS 116/2017 de 23 de febrero que declara la validez de la "lista falciani" para fundar una condena por delito fiscal"** (Lawfulness and validity of the evidence obtained by private individuals in the criminal proceedings: Commentary on the Supreme Court Judgment 116/2017 de 23 February which declared the validity of the "Falciani list" for a tax offence conviction). Diario La Ley, Nº 8946, Doctrine Section, 22 March 2017. 21 pages.

- o **"La investigación y prueba de hechos y dispositivos electrónicos"** (The investigation and proof of facts and electronic devices). Revista General de Derecho Procesal nº 43/2017, number 43, September 2017).

- ■ Preparation of legal opinions:

  - o **Legal Consultant for the Andorran Minister of External and Insititutional Affairs for the Government of Andorra** by appointment of the Minister, on 15 June 2009 up to 2011.

  - o **"Principles that support the implantation and development of the European Area for Justice and Freedom de movement" requested and performed on behalf of the** Embassy of the Principality of Andorra in Spain in 2009. REF. OTRI: 2009003052.

  - o **"The procedural procedure of the clandestine immigration according to the International Treaties"** requested and performed on the order from the Embassy of the Principality of Andorra in Spain in 2009. REF. OTRI: 2009003052.

  - o **"The procedures for the expulsion of immigrants in Spanish, French and Andorran Law"** requested and performed on behalf of the Embassy of the Principality of Andorra in Spain, in 2008. REF. OTRI: 2009003052.

8

- o **"The validity of the Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes against Humanity for the case of Peru, for the purpose of clarifying whether said convention is applicable to offences committed prior to 9 November 2003, date when said treaty entered into force with regards to Peru"** and **"If it is possible to apply the criminal classifications against human rights (genocide, forced disappearance and torture) to acts committed before its incorporation and entry into force, in the Peruvian Criminal Code of 1991"** requested and performed on the order of the Ministry of Defence of Peru and delivered in August 2010.

- ■ Participation in the **Legal Development Commission.** Member of the Commission preparing the Code of Civil Procedure of Andorra, under the appointment of the Government of Andorra on 17 October 2012. The result of the commission was the "Codi de Procediment Civil d'Andorra Llei 24/2018" on 18 October published in the Official Gazette of the Principality of Andorra.

9

# EXHIBIT H

# TRANSLATION

**LEGAL OPINION**

ISSUED BY:

D. José María Rifà Soler, Doctor of Law, Procedural Law Professor in the Public University of Navarra. Attorney in Law (C/Ganduxer nº 59.6.3º. CP: 08021-Barcelona. Spain. (barcos00@gmail.com) (Phone: +34. 934144949).  AND
D. Manuel Richard González, Doctor of Law, Tenured Professor in Procedural Law in the Public University of Navarra. Former Deputy Magistrate in the Provincial Court of Barcelona. Attorney in Law (C/ Dalies nº 4. CP 08840. Viladecans. Barcelona. Spain. (manuelrichardg@gmail.com) (Phone: +34 936475030).

BY REQUEST OF: Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C. 1875 Century Park East, 23rd Floor. (Los Angeles, California 90067-2561)

TO ANSWER THE QUESTIONS STATED BELOW.

The Experts issuing this report declare, pursuant to the provisions of Section 335 of the Spanish Civil Procedure Act, that they are experts in the legal science for which they have been asked to enter this opinion, and that they promise that they have acted as objectively as possible, taking into consideration elements that may both benefit and be in the detriment of either party.

For the proposed ends and purposes, this document contains an opinion based in law and justified based on the knowledge and analysis of the legislation and case law of Spanish Courts on the matters addressed in the report. We have also used legal and other kinds of documents contributed by the parties requesting the Opinion, related to the legal case pursued before the United States District Court for the Central District of California regarding the extradition of MR. CHRISTOPHER PHILIP AHN.

QUESTIONS SUBMITTED TO OUT LEGAL OPINION WITH BRIEF PRELIMINARY ANSWER TO EACH OF THEM.

**1. Describe Spanish law on bail in criminal proceedings. Specifically explain what circumstances the decision on bail should be grounded on.**

ANSWER: An investigated party in Spain has the right to pretrial release while their case is pending, because the presumption of innocence prevails until declared guilty in judgment. The freedom of the investigated party can only be limited, and provisional arrest may only be ordered in exceptional cases set forth in the Act, which must be asserted and proven by the prosecution and explained by the Judge. These cases refer to the existence of risk of flight, possible destruction of evidence, risk to the victim, or risk of the crime occurring again (Section 503, Criminal Procedure Act [LECrim]). Should these circumstances not exist, pretrial release should be ordered, and it may be conditioned upon the prior payment of bail, to be set taking into consideration the personal and family situation of the investigated party. The bail may not be so high, in economic terms, that it keeps the investigated party from gaining their freedom due to a lack of economic resources. Therefore, the amount of the bail, if ordered, should adapt to the investigated party's economic capabilities.

1

**2. Describe Spanish law on bail in extradition proceedings. Specifically explain what circumstances the decision on bail should be grounded on.**

ANSWER: The personal situation of an individual subjected to extradition proceedings is pretrial release while the extradition proceedings are being conducted. This is set forth in Section 8,3 of Law 4/1985 regulating passive extradition. This rule is based on the "*favor libertatis*" [favor freedom] principle granted to the investigated party, who shall only be placed in provisional arrest in cases where there is a risk of flight proven by relevant facts and not by mere suspicions. The pretrial release of the individual subject to the extradition proceedings may be conditioned upon the provision of a bail. However, this is not a necessary requirement, as the Court may order the payment of a bail or other security devices, such as the prohibition to leave the country or the obligation to appear before Court when requested.

**3. State your opinion on the basis of the judicial documents you have been able to review on the probability of bail being granted to a defendant in a similar case in Spanish criminal proceedings.**

ANSWER: In this case, a Spanish court would very likely render judgment in favor of Mr. AHN being put on pretrial release, due to: 1.- The lack of danger to the victims of the facts. 2.- The impossibility to destroy evidence. 3.- The impossibility for the crime allegedly committed to happen again, given its nature and where it took place. 4.- The lack of a risk of flight, based on the existence of strong social and family ties in the community where Mr. AHN lives, which is fully proven by the facts in the case. Additionally, the extended time the extraditions proceedings may take should also be taken into account. In these circumstances, it would be neither admissible nor necessary for the investigated party to be placed in provisional arrest for some facts they have not yet been convicted for. Additionally, it should be considered that Spanish Law (LECrim Sections 502, 503, 504) very clearly sets forth that provisional arrest shall only be for the minimum and essential time, and so long as no other, less burdensome, security device can be ordered. LECrim Section 502.2: "*Provisional arrest shall only be adopted when objectively necessary, pursuant to the provisions set forth in the following sections, and when no other, less burdensome, measures for the right to freedom exist, through which the same purposes may be achieved as with provisional arrest.*" The opinion given is not affected by the type and nature of the crimes Mr. AHN is accused of" in the provisional arrest record issued by Magistrate's Court No.5 of the National Court of Spain. This is as such because, in spite of the fact that the crimes the party is being charged with may be considered serious, this is not a criterion considered in Spanish Law. Additionally, the investigated party is charged with the crimes temporarily and, for the moment, they are not a formal charge for Mr. AHN who, so long as he has not been convicted, has the right, pursuant to Spanish law, to remain free.

**4.  State your opinion on the basis of the judicial documents you have been able to review on the probability of bail being granted to a defendant in a similar case in Spanish extradition proceedings.**

ANSWER: A Spanish court's decision regarding Mr. AHN's personal situation, taking into consideration the law and case law, should be for him to be placed on pretrial release while the extradition proceedings are being conducted, ordering the appropriate security devices to guarantee his appearance in court when called. This is as such because the ordinary rule, especially in extradition proceedings, establishes that provisional arrest can only be ordered when a risk of flight is proven, pursuant to Section 8.3 of Law 4/1985 of Passive Extradition. In Spain, the application of these rules to Mr. AHN's case would determine the need for his

2

freedom, so long as the facts and circumstances occurring in the case do not suggest any risk of flight whatsoever that might justify the subjection to a situation of provisional arrest that could cause irreparable harm to the investigated party who, let us not forget, we must consider to be and treat as though he were innocent until proven guilty. Indeed, no risk of flight has been proven. On the contrary, his background and personal behavior, perfectly described both by his military, academic and personal records, and by the declarations made by several people who know Mr. AHN, confirm the existence of strong social ties. Lastly, it is worth noting that there is no material evidence whatsoever that allows us to charge Mr. AHN with authorship of the facts subject-matter of accusation in Spain, a country that he left freely and legally, without breaking any orders or limitations in this regard, to return to his place of residence. It should therefore be noted that, at this time, it has not been proven that Mr. AHN has broken any laws or committed any crimes in Spain, and he is simply subject to judicial investigation. It is, therefore, evident that Mr. AHN is not a fugitive, but rather an American citizen subject to investigation in a different country. In this case, such a country is Spain. This being the case, the most basic rules of justice would determine, in Spain, that Mr. AHN should have the right to defend himself in the extradition proceedings from pretrial release while the extradition proceedings are being conducted, ordering, where applicable, the appropriate security devices, such as appearance, removal of passport or, if applicable, the application of a bail.

The answers given to the questions asked are based on the thorough study of Spanish Law and Case Law on the matter of provisional arrest, especially in Extradition proceedings. To these ends, this Legal Opinion contains the full analysis of each of the questions asked. To these ends, and for all effects and purposes of correctly understanding tis content, this Opinion is structured based on the following outline: First, the legal regulations with regards to provisional arrest and extradition in Spain are addressed. Second, the legal and other documents contributed by the requestors of the Report are addressed. Third, each of the questions asked by the requestors of the Opinion are answered more completely and in greater detail based on all the information that has been quoted, explained and analyzed in the first two sections.

## I. LIST OF DOCUMENTS EXAMINED TO ISSUE THIS OPINION

— April 12, 2019 Complaint for provisional arrest with a view towards extradition
— April 11, 2019 Spanish arrest warrant issued by Judge De La Mata
— Miscellaneous declarations by relatives, partners and people who know Mr. AHN with regards to his family, personal, social and work situation.

## II. REGULATION AND LEGAL PRACTICE IN SPAIN ON THE MATTER OF PROVISIONAL ARREST AND EXTRADITION.

Firstly, we should offer some brief references that make it possible to understand the operation of the criminal prosecution system in Spain, in order to perfectly understand what is explained below.

1° <u>Legal regulation of the criminal process in Spain</u>: 1° Spanish Constitution of 1978 (CE). Mainly Section 24. (Spanish version: https://www.boe.es/buscar/act.php?id=BOE-A-1978-

3

31229). 2º Criminal Procedure Act of 1882 (LECrim). (English Version https://www.legislationline.org/documents/section/criminal-codes/country/2/Spain/show) (Spanish version: https://www.boe.es/buscar/act.php?id=BOE-A-1882-6036). 3º On the matter of passive extradition, Law 4/1985 of March 21. (Spanish version: https://www.boe.es/buscar/act.php?id=BOE-A-1985-4816)

2º In the Spanish Justice System, the Supreme Court is the highest Court that knows of the application of procedural and substantive Law in justice proceedings. However, in matters of the basic Rights recognized in the Spanish Constitution, it is the Constitutional Court that knows of the extent, scope and limits of Constitutional rights. For this reason, we cite Judgments passed by the Constitutional Court related to the right to freedom applied in decisions regarding provisional arrest. All resolutions of the Spanish Constitutional Court can be found at: https://www.tribunalconstitucional.es/. You may also find any resolutions by ordinary Spanish Courts at the following address: http://www.poderjudicial.es/search/indexAN.jsp.

3º In the criminal procedure system in Spain, the investigation into crimes is conducted by Examining Magistrates through a procedure known as Investigative Due Diligence. In the case of the proceeding asking for Mr. AHN's provisional arrest, prior Due Diligence 1396/2019. It is worth noting that the purpose of this phase of investigation is to clear up the facts and the people who may have participated in them. However, this investigation may end without the Prosecutor filing any charges, or with the Judge concluding that there was no crime, or that the investigated parties are not the perpetrators. This is why people under investigation in Prior Due Diligence are just that, investigated parties, but not accused (Section 779 LECrim).

## 1.- General principles regarding provisional arrest in Spain

The law and case law establish that, in Spain, the regular situation for the investigated party, in legal terms, is pretrial release, not provisional arrest. Therefore, the starting point of the legal reasoning in this matter is that the investigated party must be free while the legal proceedings take place and until a resolution or judgment is passed resolving the merits of the case subject-matter of the criminal proceedings and, at the same time, the prison or freedom situation.

Thus, the investigated party may only be provisionally arrested in exceptional situations where this situation of deprivation of freedom is justified to guarantee the normal development of the legal proceedings and, especially, to ensure the presence of the investigated party before court when the trial or hearing of the proceeding is to take place. In this way, the "*favor libertaris*" in favor of the investigated party prevails, as it is considered that their right to presumption of innocence governs so long as they have not been proven guilty. If it were not done in this way, a sort of pre-trial attributing the investigated party the initial position of guilty would occur.

Therefore, the case of deciding on the personal situation of the investigated or accused parties must always proceed preferably applying the basic right to freedom.[1] In this regard, Section

---

[1] "Together with the principles of legality and predictability, it is also work noting the exceptional nature inherent to provisional arrest, as opposed to freedom as a general rule (STC 147/2000, of may 29 (LAW 8830/2000), FJ 5). This nature entails the prevalence of *favor libertaris* or *in dubio pro libertate* [when in doubt, favor freedom], statements that, in short, mean that the regulations governing provisional arrest must be construed and applied restrictively and in favor of the basic right to freedom limited by these rules, which should result in the choice and application, when in doubt, of the rule that limits freedom the least  (SSTC 88/1988

4

502 of the LECrim provides that: "*2. Provisional arrest shall only be adopted when objectively necessary, pursuant to the provisions set forth in the following sections, and when no other, less burdensome, measures for the right to freedom exist, through which the same purposes may be achieved as with provisional arrest.*" And Section 528 of the LECrim clearly provides that: "*Provisional arrest shall only last so long as the reasons that have caused it subsist. The inmate or detained party shall be set free in any state of the case that declares their innocence. All the Authorities that take part in a proceeding shall be obliged to extend the detainment and provisional arrest of the accused or prosecuted parties as little as possible.*" Procedural rules expressly recognizing the need for any measure for restricting freedom without the existence of a conviction must be ordered restrictively when the legal requirements mentioned below come together.

## 2.- Legal criteria to order provisional arrest in Spain

Provisional arrest is an exceptional measure that may only be adopted when certain circumstances provided for in Law occur concurrently (LECrim Sec. 503). The circumstances are as follows:

**2.1. It shall be requested by the prosecution, as the Judge cannot order this measure *ex officio* (LECrim Sec. 505).**

**2.2. The prison sentence entailed by the crime under investigation, which shall eventually be tried must, in general, exceed 2 years of jail time (LECrim Sec. 503.1.1).**

**2.3. There must be sufficient evidence for it to be presumed that the investigated party could have committed the crime (*fumus boni iuris*) (LECrim Sec. 503.1.1).**

This is to say, the procedure shall include rational proof (evidence) that allow for the investigated party to be considered a suspected perpetrator of the facts subject-matter of the criminal proceedings. This proof must point to the existence in the case of objective (regarding the facts) and subjective (regarding the victim) circumstances[2].

In any case, the appreciation of "*fumus boni iuris*" or appearance of legal standing, requires the existence of sufficient reason to consider that the investigated party could have committed the crime (LECrim Sec. 503.1.2) and it must be coordinated with, according to the TV, the presumption of innocence recognized in CE Sec. 24, which also governs for this precautionary measure of pretrial release.[3]   For this reason, any resolution that orders

---

(LAW 858/1988), of May 9, FJ 1; 98/2002, of April 29 (LAW 4510/2002), FJ 3; 81/2004 (LAW 12396/2004), of May 5, FJ 5; and 95/2007 (LAW 23072/2007), of May 7, FJ 4)" STC  Room Two, Judgment 210/2013 of Dec. 16 2013, Rec. 2501/2012. Reporting Judge: González Rivas, Juan José. LAW 208391/2013.

[2] It is in this sense that the Constitutional Court of Spain passed sentence in their Judgment No. 8/2002 of January 14, which provides as follows: "Assuming the existence of rational proof that the crime has been committed and that its goal was the achievement of constitutionally legitimate goals in accordance with the nature of the measure., this consideration being deserved only by those who refer to "the coming together of certain relevant risks that originate in the accused party and are projected onto the normal development of the proceeding or the application of the decision, as well as, in general, on society" (SSTC 128/1995, of July 26 [RTC 1995\128], F. 3; and 14/2000, of January 17 , F. 4, for all). Particularly, these risks to be prevented would be those of subtraction from the action of Application of Justice, obstruction of criminal justice or the repetition of a crime (including, but not limited to, STC 33/1999, of March 8, F. 3)."

[3] "… The presumption of innocence operates at the center of the proceeding as a rule of judgment; it also constitutes a rule of treatment, pursuant to which the accused party has the right to receive the consideration and treatment of someone who has not committed or participated in crimes. With regards to a rule of judgment, the presumption of innocence demands for provisional arrest not to be ordered except in situations where the accusatory claim has a reasonable basis. This is to say, where there is rational proof of criminality as, otherwise,

5

provisional arrest must be fully justified, taking into consideration the specific circumstances of the case which allow for the adoption of the decision regarding the investigated party's freedom situation[4].

## 2.4. There should exist one or more circumstances in the case that allow the Judge to consider that there is a danger to the good end of the proceedings, for the victim, or for society in general (*periculum in mora*).

These circumstances, contained in LECrim Section  503, refer to possible dangers and risks that may arise with regards to the proceeding of the persons affected by the crime in the event that the investigated party is on pretrial release. In this regard, the Constitutional Court of Spain has determined that, for provisional arrest to be ordered, objective data must be taken into consideration, such as the seriousness of the crime and the possible sentence, but the following should also be considered: "*on a case by case basis, the personal circumstances of the person under provisional arrest and of the case at hand*" (STC 138/2002 of June 3).

Before beginning with the presentation of the circumstances set forth in the Law so as to weigh the existence of a procedural risk, it should be noted that the LECrim contains no criterion that may be equated to "*social alarm.*" This was a legal criterion repealed in Spanish Criminal Procedural Law that would allow the adoption of provisional arrest to take care of an alleged need to "*calm or appease*" society at large by ordering this measure in cases where the crime, by its nature (generally murders or crimes committed that became very public), had produced a social alarm that it was considered should be deactivated by ordering the provisional arrest measure. As we said, this criterion was expressly repealed, so at present it is not admissible, in any case whatsoever, to order the arrest regardless of the type of crime or its social or public incidence[5].

Therefore, provisional arrest may only be ordered when the above-explained criteria occur concurrently, while trying to avoid any of the dangers or risks set forth in the law, in LECrim Section 503, set forth below:

---

a proceeding whose subject-matter could disappear would be guaranteed, at the cost of freedom, no less..." (SSTC 108/84, of November 26, and 129/95, of July 26). See also SSTC 177/98 of September 14; 67/1997 of April 7.

[4] "the constitutional legitimacy of provisional arrest, as a precautionary measure limiting the right to freedom adopted in the framework of criminal proceedings, demands, as an assumption, the existence of rational proof that a crime was committed and, as a goal, the achievement of constitutionally legitimate goals in accordance with the nature of the measure. Therefore, the motivation of all court resolutions passed on the adoption of this measure or its maintenance should be the consideration of the specific circumstances that, according to their legal assumption and constitutionally legitimate purpose, allow to make a decision on it (for all, STC 60/2001, of February 26, F. 3)" STC 138/2002 of June 3.

[5] "The Record... adds only the argument of "the undeniable social alarm produced by the commission of this type of crime," although this statement is not explained further. However, the generic social alarm, called upon as such, does not adequately justify the adoption or maintenance of the precautionary measure considered. Indeed, as we mentioned in STC 66/1997, of April 7 (RTC 1997\66), F. 6, and repeated in SSTC 98/1997, of May 20 (RTC 1997\98), F. 9, and 47/2000, of February 17, F. 5, "notwithstanding the corresponding trial that may be deserved by the ends of mitigation of other social alarms that include other contents–the social alarm that occurs during social disturbances, for example–and other sources–the flight of the accused of his pretrial release–, a judgment that is not currently relevant to go into, the truth is that the generic social alarm supposedly caused by a crime constitute the contents of an exclusive end of the sentence–general prevention–and (under penalty of its appeasement being at risk of being, in fact, alarming because of the breach of basic legal warranties and principles), it assumes a prior judgment of unlawfulness and guild of the corresponding legal entity following a proceeding surrounded by full guarantees of impartiality and defense" STC 23/2002 of January 28.  STC 8/2002 of January 14 reads in the same sense. And, especially, STC Full Session 47/2000 of February 17.

6

*1° To ensure the presence of the accused in the proceedings when it may be rationally inferred that there is a risk of flight (LECrim Sec. 503.1.3.a).*

The Law establishes the criteria to be considered in order to assess this danger. They are as follows: the nature of the fact, the severity of the sentence, the family, work and economic situation, and how soon the oral proceedings will be held. It will also be considered whether any legal entity has given at least two warrants for their summons and search in the two prior years. These criteria, which would be assessed together, must exist and be assessed and justified by the court taking into consideration the investigated party's personal situation. The Constitutional Court of Spain has declared it thus: *"... while avoiding the risk of flight is one of the legitimate purposes for provisional arrest, its consideration demands that Courts weigh the personal circumstances of the individual subject to such arrest, especially if this data is known to the legal entity and contributed as allegations by the petitioner [for all SSTC 128/1995, of July 26, (F. 4); 33/1999, of March 8, (F. 7); 14/2000, of January 17, (F. 4)]"* STC 169/2001 of July 16.

*2° To avoid the concealment, alteration or destruction of the sources of evidence (LECrim Sec. 503.1.3.b).*

This danger shall be assessed taking into consideration the ability of the investigated party to gain access, on his own or through third parties, to sources of evidence, or to influence other accused parties, witnesses or experts, or who may be so.

*3° To keep the investigated party from acting against the victim's assets (LECrim Sections 503.1 and 503.1.3.c).*

*4° To avoid the risk of commission of other crimes, for which the circumstances surrounding the fact will be taken into consideration, as well as the severity of the grimes that may be committed (LECrim Sec. 503.2).*

*5° When the investigated party has a criminal record that has not been canceled, and which cannot be canceled, arising from a conviction for a willful offense (LECrim Sec. 503.1.1).*

**2.5. The decision on the arrest or pretrial release of the investigated party shall be made in a resolution (record) motivated pursuant to the legal criteria set forth.**

The resolution ordering provisional arrest must justify the existence of reasons for it to be ordered, so long as the ordinary situation is that of pretrial release pursuant to the constitutional principle of presumption of innocence. It is, therefore, not possible to order provisional arrest without reason, taking into consideration only the severity or other circumstances of the crime. In this sense, for example, the Constitutional Court has declared that, even if the Court has entered judgment in a case of felony, it must in all cases: *«.... weigh other standards, such as ties, family burdens, etc. that may credit the absence of danger of flight of the accused...»* (STC 62/1996, of April 15). This is to say, any decision regarding arrest or pretrial release shall be made on a case-by-case basis, expressly related to the investigated party subjected to the measure[6].

---

[6] "Decisions regarding the adoption and maintenance of provisional arrest must be expressed in a justified court resolution. For the reasoning to be considered sufficient and reasonable, it must be the result of the consideration of the interests at play (the freedom of the person whose innocence is presumed, on the one hand; the Administration of criminal justice and the avoidance of further criminal acts on the other hand), and this consideration must not be arbitrary, in the sense that it should result in accordance with the rules of normal logical reasoning and especially to the ends that justify provisional arrest [SSTC 128/1995, of July 26 (RTC

7

**3.- Pretrial release as the ordinary situation of the investigated party.**

If we take into consideration what is set forth in the two previous subsections, the result is that, in the event that an accusation is filed against an individual, the ordinary situation would be to order their pretrial release subject to securities set forth in the Law to ensure the presence of the investigated party before court when called to any effect (LECrim Sec. 529). This shall be the case when the sentence requested is under two years of prison. Should the sentence requested exceed two years, it may be ordered, but only when, **in addition, all legal requirements described above occur concurrently.**

Pretrial release may be conditioned upon certain obligations ordered by court. These may be as follows:

1º The obligation to appear periodically on the days established to these ends, usually the 1st and 15th day of each month or when requested by the court.

2º The surrender of certain documents, such as the driver's license or passport, with the resulting prohibition to leave the country (LECrim Sec. 529 bis and 530s).

3º The payment of a bail (LECrim Sec. 531 *et seq.*)

The adoption or any condition or obligation shall be determined by the circumstances of the specific case, but the measure of appearance before court shall prevail. Therefore, the investigated party may remain on pretrial release with no need to pay a bail. This shall be the case when there is no risk of failure to appear by the investigated party. In this regard, the Constitutional Court has declared that the pretrial release situation does not require the payment of bail when there is no risk of flight or failure to appear by the accused, or such risk has disappeared. This was resolved in a case in which, after remaining on provisional arrest, an investigated party's situation was reviewed, as the Constitutional Court deemed that, if there was no justifiable risk, then pretrial release could not be conditioned upon the payment of a bail: "*recording as sole legitimate purpose pursued with the maintenance of the unconditional provisional arrest situation that of ensuring the normal development of the proceedings, the disappearance of this risk, observed by the legal entity, cannot imply a change in precautionary measure through the demand of bail, but rather by putting the accused on pretrial release. This is because, in any other case, should the bail not be paid, the situation of deprivation of freedom created by provisional arrest would lack the final end that, constitutionally, legitimizes it*" STC 14/2000 of January 17.

The amount of the bail shall be set taking into consideration the nature of the crime, the social status and the background of the prosecuted party, and all other circumstances that may influence their greater or lesser interest to get out of reach of the legal authority (LECrim Sec. 531). In any case, the bail set by the court shall take into consideration the socioeconomic circumstances of the investigated party, it being barred from setting a bail so high that its payment is impossible, which would mean, in practice, that provisional arrest measures are adopted according to the individuals' economic ability.

---

1995\128), F. 4 b), and 47/2000, of February 17, F. 2]. The criteria for sufficiency and reasonableness of the justification deemed by this Court to be relevant for the prosecution include, firstly, the nature and severity of the crime charged and the sentence being considered, and, secondly, "the specific and personal circumstances of the accused," the procedural moment when the measure is adopted being relevant, to these effects (SSTC 37/1996, of March 11 [RTC 1996\37], F. 6, 62/1996, of April 16 [RTC 1996\62], F. 5)" STC 146/2001 of June 18.

8

104

### 3.- Legal extradition system in Spain, taking into consideration especially the precautionary measures that may be adopted in extradition proceedings.

The extradition system in Spain is based on the distinction between: 1º Extradition in the European legal area. 2º Extradition with countries with no International Treaty. 3º Extradition with countries with an International Treaty. The legal regulation is contained in Law 23/2014 of November 20, of mutual recognition of criminal resolutions in the European Union; Sections 824 to 833 regulating active extradition; and Law 4/85 of March 21 regulating passive extradition. Lastly, extradition between Spain and the United States of America is regulated in the Instrument set forth in Section 3(2) of the Extradition Agreement between the European Union and the United States of America dated June 25, 2003, for the application of the Spain Extradition Treaty with the United States dated May 29, 1979, and the Supplementary Extradition Treaty of January 25, 1975, February 9, 1988, and March 12, 1996, made ad referendum in Madrid on December 17, 2004.

To the ends and purposes of this Opinion, the procedure followed in Spain regarding the personal situation of the extradition request by another country contained in Law 4/1985 of March 21 is especially interesting. Therefore, the aim is not to analyze matters regarding the extradition proceedings.

With regards to the personal situation of the investigated party pending extradition proceedings, Article XI of the Instrument developing the Spain Extradition Treaty with the United States sets forth that: "*AA. In case of urgency a Contracting Party may apply to the other Contracting Party for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. This application may be made either through the diplomatic channel or directly between the respective Ministries of Justice.../... D. A person arrested upon such an application shall be set at liberty upon the expiration of 45 days from the date on which the embassy of the country requesting extradition is informed through the diplomatic channel of the arrest, and an extradition request has not been received.*"

Naturally, the decision regarding the provisional arrest of the investigated party required by another State falls to national courts. In the case of Spain, the court of competent jurisdiction is the National Court based in Madrid and, specifically, the Main Examining Magistrate, pursuant to Sec. 88 of the LOPJ (Organic Law of the Judiciary Branch). The applicable legislation is Law 4/1985 of March 21, which provides that the Spanish Judge may order the detention and provisional arrest when requested by the requesting State. Now, Section 8 of the above-mentioned Law provides that: " *3. The Judge may, at any time and in consideration of the circumstances of the case, order that the arrested party be set free, **adopting one or more of the following measures to avoid his flight***: surveillance at home, order to not be absent from a specific place without authorization from a Judge, order to appear periodically before the authority designated by the Judge, removal of passport, and payment of bail. Noncompliance with these measures shall result in provisional arrest within the term set forth in the previous subsection*."

As you can see, the special legislation for extradition provides for the risk of flight as the only criterion applicable so as to order the provisional arrest measure with regards to the investigated party. The Constitutional Court of Spain has declared it so in several resolutions.

Firstly, in ATC 158/2000 of June 15, in which it establishes that: "*Section 8.3 of Law 4/1985 of Passive Extradition determines that the purpose of freedom on bail of an individual requested in an extradition request is solely that of avoiding their flight. This precept does not take into consideration other possible purposes, such as serving a sentence, as the purpose of the extradition proceedings is not to determine whether or not there exists criminal liability, but rather the aspiration of the requiring State that an individual be handed over to it so as to prosecute them or have the sentence or safety measure executed, which meets the formal and material warranties set forth in the provisions referenced in Section 13.3 of the Constitution.*"

SSTC 71/2000 and 5/1998 of January12; and STC 207/2000 of July 24, which state as follows, also render judgment to the same effects: "*It is true that the precautionary deprivation of freedom in this cases is, given its material effects, identical to the deprivation of freedom admissible in a criminal proceeding, but it maintains certain points of difference that should be highlighted. Thus, a legal proceeding is produced exclusively at resolving on the international jurisdictional aid request in which extradition consists. It does not take into consideration the existence of criminal liability, but rather the fulfillment of the warranties set forth in the extradition rules and, therefore, the implication of the arrested party in the facts motivating the request for extradition are not considered, and the provision of rational proof of criminality is not demanded, and the material and procedural rules on provisional arrest set forth in the LECrim are not applicable in block, although paragraph three of Section 10 of the LEP refers, subsidiarily, to the precepts corresponding to it regulating the maximum limit of provisional arrest and the rights corresponding to the detained party. Moreover, its adoption, maintenance and duration are expressly regulated in the LEP and exclusively directed at avoiding the flight of the individual subject to extradition–Section 8.3–LEP. Lastly, the decree is made about an individual who is unwilling to appear before the Courts summoning them, whether or not they are of their nationality, as, to these ends, they have fled from their territory or refuse to go back to it.*"

This means that the only purpose of the provisional arrest during the extradition proceedings in Spain is preventing the flight of the investigated party, without the need of attending to other circumstances in connection with the crime, especially when the extradition is based not on a conviction but on a court investigation. In consequence, the person wanted for extradition must be released when there is no risk of flight. This is the case heard very recently by the Court of Appeals of the National Court of Spain, which upheld an appeal filed by the former Peruvian Judge César José Hinostroza, who is wanted by the Peruvian authorities for the alleged commission of the serious crimes of criminal organization, influence peddling and transactions prohibited for public officers. In that case, Judge DE LA MATA of the National Court ordered the provisional arrest that the Court of Appeals has now revoked due to understanding that the risk of flight of the investigated party "*has diminished*" and thus he is released provisionally with the obligation of appearing before the Court on the specific days stated in the resolution. The aforementioned resolution is from April 11, 2019, which is why it does not appear in the digest, but the article published by the agency Europa-Press can be consulted (see the article and its contents: https://www.europapress.es/nacional/noticia-audiencia-nacional-deja-libertad-ex-juez-hinostroza-pese-peticion-peru-le-reclama-cohecho-20190411173711.html»

# III. ANALYSIS OF THE DOCUMENTATION PROVIDED BY THE PARTY REQUESTING THE OPINION: JUDICIAL

# DOCUMENTS AND OTHER DOCUMENTS AND SOCIAL AND PERSONAL DATA OF MR. CRISTOPHER PHILIP AHN.

Professors RIFA and RICHARD, legal experts who sign this legal opinion, have examined the judicial and personal documentation furnished by the requesting parties to the contents and legal significance of which we make reference below. We must state that only the facts that, in our opinion, have legal value and relevance for the purposes of the questions that we are asked and that we answer below are highlighted.

## 1. Judicial documentation

### 1.1 April 12, 2019 Complaint for provisional arrest with a view towards extradition.

We have examined the complaint upon request of Mr. AHN who, as stated in the document, is wanted in Spain for different crimes allegedly committed by Mr. AHN and others in Madrid (Spain) on April 22, 2019. It is an account of the crimes that are the grounds for the claim of Justice DE LA MATA of the National Court of Spain for the immediate arrest of Mr. AHN that was carried out under the presumption that, if he knew of the existence of the arrest warrant, he would probably escape.

We are not requested to make an analysis of the contents or grounds of the complaint that is not the object of this legal opinion. However, the following must be stated: — that the arrest warrant is based on crimes allegedly committed by Mr. AHN that shall be judged when and as appropriate; — that the alleged participation of Mr. AHN in the acts is based on personal declarations and identification in the videography and not on actual evidence; — that Mr. AHN is not allowed to voluntarily appear before the court, which puts him in a position of defenselessness due to having to defend himself in the situation of provisional arrest; — that the class and nature of the crimes of which Mr. AHN is accused in the provisional arrest warrant issued by the Examining Magistrate No. 5 of the National Court of Spain are not relevant criteria in Spain to determine the provisional arrest, while only the existence of the criteria and circumstances contained in section 503 of LECrim, especially the risk of flight, is relevant.

### 1.2 April 11, 2019 provisional arrest warrant issued by Justice De La Mata, Central Examining Magistrate No. 5 of the National Court of Spain.

We have examined the provisional arrest warrant issued by the Central Examining Magistrate No. 5 of the National Court of Spain and we were able to see that it is a resolution issued amid the pretrial investigation proceedings, set forth in sections 774 *et seq.* of LECrim. Therefore, the resolution has a provisional decision on the alleged responsibility of Mr. Kahn [sic] in certain acts that are under investigation and the reality and authorship of which are not yet known.

## 2. Social and personal documentation of Mr. AHN.

The following documents furnished by the defense of Mr. AHN are examined:

2.1 Declaration of Mr. BEN NOONAN, a friend and partner of Mr. AHN who talks about the career and personal conduct of Mr. AHN. In this document, there is a declaration from Mr. NOONAN in which the following is stated: 1° His ties to his country, his community, friends

11

and partners. The ties are express and kept for a prolonged period of time, which determines a line of conduct in Mr. AHN's personality. 2º His personal commitment with his family, who lives in the area of Los Angeles (California).

2..2 Declaration of Mr. CURTIS FLOOD. Army Officer and colleague and friend of Mr. AHN. In the declaration, the social and solidary activities of Mr. AHN and the social impact that the conduct of Mr. AHN has had on his colleagues and society as a whole are stated.

2.3 Declaration of Mr. DANIEL AHN. Brother of Mr. AHN, who talks about the family situation and how the help and support of the investigated party, Mr. AHN, has been and is crucial for the wellbeing of the family. He especially makes reference to specific and exceptional gestures of Mr. AHN in looking after his family in the worst circumstances. There are especially two phrases written by Mr. DANIEL AHN that stand out: «*My brother is dedicated to our family and his purpose in life is to help and support the people he loves. **He will never do anything to jeopardize our family***».

2.4 Declaration of Mr. DANIEL KAM. Partner of Mr. AHN, who makes a declaration regarding his exemplary conduct and his business and family ties to the community in which he lives.

2.5 Declaration of Mrs. GRACE AHN. The wife of Mr. AHN explains the facts that mark the life experience of her husband, making special reference to his moral, social and family commitment.

2.6 Declaration of Mr. JOSH GRODIN. Colleague of Mr. AHN in the Veterans Association, who mentions the work that he carried out in that area. From this declaration, it is remarkable the certainty and personal support of the declarant for Mr. AHN, with whom he declares to have shared only 2 years of work. Even so, the declaration is overwhelmingly favorable for the investigated party, Mr. AHN.

2.7 Declaration of Mr. MITCHELL BIALOSKY. Friend of Mr. AHN. He highlights his personal values as follows: «*Chris is an asset to his community and has never been a threat*».

2.8 Declaration of RODOLFO QUILES. Army Colonel who met Mr. AHN on matters related to the support of the army to the local communities in which they are located. This declaration is especially important because it comes from a high-ranking army officer who exceptionally values the conduct of Mr. AHN. Moreover, in a resolute manner, he offers to clarify any doubt that there may be in connection with his declaration.

2.9 Declarations of RYAN W. FISHER, TOD CONETTA, WADE W. BUICK, WILL PRESCOTT, all of them individuals with proved good social conduct and colleagues of Mr. AHN at the DARDEN Military Association. All of them praise the conduct, character and diligence of Mr. AHN in his personal career and make reference to his integrity and ties to his family and community.


**3. References to real properties of the AHN family that they are willing to offer for the purposes of bond.**

We are also given references to different real properties of the AHN family that could be offered as collateral or bond for the pretrial release of Mr. AHN.

From the aforementioned declarations and documents, it is derived that:  — Mr. AHN has maintained an impeccable conduct throughout his whole life; — he has a completely normal and healthy work, personal and family environment; — he is the brother, husband, son and grandson of people that he cares about and that care about him. The amount of people from his family and social sphere that have spoken about Mr. AHN's personality and conduct is very telling. All these declarations overwhelmingly show the lack of danger or flight risk that might exist if Mr. AHN were released before the trial.

12

Thus, there is no sign or suspicion that may indicate that Mr. AHN could be a danger for the development of the court proceedings or that he might escape justice. All of that is clearly derived from the analysis of the examined documentation. It is not often that a jurist has the opportunity to think about facts as the ones offered in this case, which show a personal profile so far removed from what may be deemed as a danger for the development of the court proceedings. Therefore, no danger or risk is observed. Thus and taking into account that the purpose of the security measures in extradition proceedings is only to prevent flight risk, we consider that, in Spain, Mr. AHN would be released before the trial pursuant to the interpretation of section 503.3.a of LECrim and 8.3 of Extradition Act No. 4/1985.

# IV. QUESTIONS ASKED BY THE PARTIES REQUESTING THE LEGAL OPINION.

The expert witnesses signing this opinion will answer below the questions asked by the parties requesting this Legal Opinion, in a direct and synthetic manner, based on the law and case law in effect in Spain that has been stated in the previous paragraphs.

## 1. Describe Spanish law on bail in criminal proceedings. Specifically explain what circumstances the decision on bail should be grounded on.

1.1.- The pretrial release with or without bond or bail is the ordinary situation for the investigated party in Spain. The provisional arrest requires proving the stated circumstances of: danger of the investigated party not appearing at trial or hearing; risk of destruction of evidence; danger for the victim; or risk of repetition of crime.

1.2.- The situation of pretrial release is the ordinary situation and is grounded on the constitutional and legal principles in effect in Spain. It is the responsibility of the prosecution to prove that the legal circumstances expressed in section 503 of LECrim, which require the investigated party to be under provisional arrest while the case is pending, exist.

1.3.- Pretrial release in Spain does not require the prior posting of a bond or bail, and the release of the investigated party may be ordered without a bond or bail posted. The court may order other security measures such as the obligation of appearing before the court on specific days or when called upon, or the surrender of passport.

1.4.- The court may also order the pretrial release subject to the prior posting of bond or bail. It shall order so according to the circumstances of the case and, especially, the risk of the investigated party not appearing at court as per the criteria set forth in section 503.3.a of LECrim, which are the following: "*the nature of the act, the seriousness of the penalty that may be imposed to the investigated party or defendant, the family, work and economic situation of the latter, as well as the imminence of the oral proceedings*".

1.5.- CONCLUSION: An investigated party in Spain has the right to pretrial release while the case is pending because he or she is innocent until proven guilty. This release may only be limited by provisional arrest in the exceptional cases set forth by law that must be claimed and proved by the prosecution and substantiated by the Judge. The pretrial release may be subject to the prior posting of bail or bond, which shall be set according to the personal and family situation of the investigated party. In any case, the bond or bail may not be of an amount that

13

would prevent the investigated party from being released due to his or her economic situation. This means that the bond or bail, if ordered, must be adapted to the economic capacity of the investigated party.

## 2. Describe Spanish law on bail in extradition proceedings. Specifically explain what circumstances the decision on bail should be grounded on.

2.1.- The procedural treatment of the situation of a person subject to an extradition proceeding in Spain is regulated by Law 4/1985, which establishes that the risk of flight is the only reason for which a person pending extradition may remain under provisional arrest. This is also the interpretation based on case law given by the Constitutional Court of Spain.  The risk of flight must be proven by the prosecution and assessed by the court and must be grounded on facts entailing that the risk is real and exists.

2.2.- The initial situation of provisional arrest initially ordered upon request of the country that is asking for the extradition is subject to the subsequent revision and eventual modification pursuant to section 8.3 of Act No. 4/1985. Therefore, the court may, at any time and based on the circumstances of the case, order the release of the person subject to an extradition proceeding when there is no risk of flight or when the social and personal circumstances of the investigated party that entail that there will not be an escape are proven.

2.3.- Section 8.3 of Act No. 4/1985 establishes alternative measures that the court may order to substitute the measure of provisional arrest. The circumstances are as follows: "*home monitoring, order of not leaving a specific place without the authorization from the Judge, order of periodically appearing before the authority designated by the Judge, surrender of passport and posting of a bond or bail.*".

2.4.- Thus, the court may consider the pretrial release of the investigated party subject to extradition proceedings ordering, or not, the posting of a bond or bail. This means that the pretrial release does not require the prior posting of a bond or bail, but the court may order other security measures such as the measures aforementioned and set forth in section 8 of Act No. 4/1985 of appearance before the court or surrender of passport with prohibition of leaving the country.

2.5.- CONCLUSION: The decision of pretrial release on bond or bail of the persons subject to extradition proceedings is an ordinary situation provided for in Act No. 4/1985 that shall be grounded on the "*favor libertatis*" that the investigated party is afforded. The court may adopt this decision or another less burdensome decision, such as the prohibition of leaving the country or the obligation of personally appearing before the court when compelled to do so.

## 3. State your opinion on the basis of the judicial documents you have been able to review on the probability of bail being granted to a defendant in a similar case in Spanish criminal proceedings.

3.1.- Section 503 of LECrim establishes the assessed cases of risk or danger for society, the victims or the proceedings that may arise if the investigated party is released. Briefly, these risks are the following: risk of flight, danger for the victims or their family, destruction of evidence, repetition of crime. For the purposes of ordering the pretrial release with or without

14

bond or bail, the Judge must consider, always upon request of the prosecution, the existence of any of these risks. The decision must be grounded on the circumstances of the case.

3.2.- In this case, there is no danger of repetition of the crime since Mr. AHN has no criminal records; there is no danger of destruction of evidence or danger for the victims, since they were singular acts that took place in Spain and cannot be repeated due to their own nature. Thus, the only danger that may exist and therefore must be assessed is the risk of flight of Mr. AHN.

3.3.- In light of the circumstances in this case, it is derived that the investigated party, Mr. AHN, has not fled at any time, and has acquiesced all requests made by the authorities. In the case of Spain, Mr. AHN entered and left the country legally, without violating any order from the authorities. In the United States, Mr. AHN has answered when required to do so by the authorities. Thus, he has kept a coherent conduct that he has no reason to thwart if he is released. Therefore, there is no risk of flight.

3.4.- Precisely, from the social and family circumstances observed, it is derived that Mr. AHN lives in an absolutely normal environment. This is the kind of assessment referred to in section 503.3.a) of LECrim when it is established that the following shall be taken into account: "…*the family, work and economic situation of the latter, as well as the imminence of the oral proceedings…*". Thus, the Law values, when deciding the release of the investigated party, that the person lives in a normal family environment with moral, personal and economic responsibilities. It is meant as a guarantee that the investigated party will appear when summoned by the court, which will happen when, as in the case of Mr. AHN, there are strong ties of moral, family and economic dependence. Certainly, upon examining the set of facts and declarations provided, it is hard to think that Mr. AHN might put his own family in danger, who depend on him for the most part, by abandoning it and escaping. In this sense, there is a word used judicially in Spain that is "*ties*". This word makes reference to the strong relationship that people have with their home, family and community. We understand that these ties exist in this case.  On the other hand, it must be taken into account the pendency of an extradition proceeding that may last for a long time, which would make it illogical for Mr. AHN to remain under provisional arrest without a judgment of conviction having been issued and without being able to work in the meantime in order to attend to the needs of his family.

3.5.- CONCLUSION: In our opinion, in this case, a Spanish court would most probably decide in favor of the pretrial release of Mr. AHN based on the strong social and family ties in the community in which he lives, derived from the facts stated in this case. In addition, it must be taken into account that the extradition proceeding may last for a long time, during which time it would not be admissible nor necessary for the investigated party to remain under provisional arrest in connection with acts for which he has not yet been judged. In view of the foregoing and pursuant to the law and the case law of the Spanish courts, we understand that Mr. AHN should be released while the proceedings are pending, ordering the appropriate security measures such as appearance, surrender of passport or, if appropriate, posting of bond or bail. The opinion given is not affected by the class and nature of the crimes Mr. AHN is accused of in the provisional arrest record issued by Magistrate's Court No.5 of the National Court of Spain. This is as such because, in spite of the fact that the crimes the party is being charged with may be considered serious, this is not a criterion considered in Spanish Law. Additionally, the investigated party is charged with the crimes temporarily and, for the moment, they are not a formal accusation for Mr. AHN who, so long as he has not been convicted, has the right, pursuant to Spanish law, to remain free.

15

**4. State your opinion on the basis of the judicial documents you have been able to review on the probability of bail being granted to a defendant in a similar case in Spanish extradition proceedings.**

4.1.- The personal situation of the persons subject to extradition proceedings is determined by the provisions of the International Treaty and the provisions of Act No. 4/1985 on Passive Extradition. Specifically, this matter is addressed in section 8.3 of Act No. 4/1985, which regulates how the procedural situation of the persons wanted by other countries must be resolved.

4.2.- The personal situation of Mr. AHN that has been proved by the facts and documents that we have examined entitles him, in Spain, to remain free pending the extradition proceedings.

4.3.- It is so derived from the application of section 8.3 of Act No. 4/1985 to the facts and circumstances in connection with the case of Mr. AHN, which prove the absence of any risk of flight. It must be taken into account that, pursuant to Spanish law, the only reason for the provisional arrest of persons pending extradition proceedings is the risk of flight which, in the case of Mr. AHN, does not seem to exist. In fact, it is relevant that Mr. AHN is actually under investigation for acts that may be crimes. However, it is a court investigation that may end without the investigated party being formally accused. Thus, Mr. AHN has not committed at the moment any criminal offense in Spain. In that regard, it is relevant that Mr. AHN has left Spain free and legally without there being any order or mandate whatsoever preventing him to do so. Therefore, there is no doubt that his right to the presumption of innocence and right to freedom must prevail while the extradition proceedings are still pending.

4.4.- A person with the references and background of Mr. AHN, with clear ties to the community and a business activity on which his family depends, would probably be released based on the application of the law to all the facts present in his case.

4.5.- CONCLUSION: A Spanish court's decision regarding Mr. AHN's personal situation, taking into consideration the law and case law, should be for him to be placed on pretrial release while the extradition proceedings are being conducted, ordering the appropriate security devices to guarantee his appearance at court when called. This is as such because the ordinary rule, especially in extradition proceedings, establishes that provisional arrest can only be ordered when a risk of flight is proven, pursuant to Section 8.3 of Law 4/1985 of Passive Extradition. In Spain, the application of these rules to Mr. AHN's case would determine the need for his freedom, so long as the facts and circumstances occurring in the case do not suggest any risk of flight whatsoever that might justify the subjection to a situation of provisional arrest that could cause irreparable harm to the investigated party who, let us not forget, we must consider to be and treat as though he were innocent until proven guilty. Indeed, no risk of flight has been proven. On the contrary, his background and personal behavior, perfectly described both by his military, academic and personal records, and by the declarations made by several people who know Mr. AHN, confirm the existence of strong social ties. Lastly, it is worth noting that there is no material evidence whatsoever that allows us to charge Mr. AHN with authorship of the facts subject-matter of accusation in Spain, a country that he left freely and legally, without breaking any orders or limitations in this regard, to return to his place of residence. It should therefore be noted that, at this time, it has not been proven that Mr. AHN has broken any laws or committed any crimes in Spain, and he is simply subject to judicial investigation. It is, therefore, evident that Mr. AHN is not a fugitive, but rather an American citizen subject to investigation in a different country. In this case, such a country is Spain. This being the case, the most basic rules of justice would

16

determine, in Spain, that Mr. AHN should have the right to defend himself in the extradition proceedings from pretrial release while the extradition proceedings are being conducted, ordering, where applicable, the appropriate security devices, such as appearance, removal of passport or, if applicable, the application of a bail.

This is our opinion, which we issue in Barcelona (Spain) on June 4, 2019.


Mr. Manuel Richard González                    Mr. José María Rifà Soler

17

# CERTIFICATION



**AMERICAN LANGUAGE SERVICES**

*Making the World Smaller*

# CERTIFICATION OF TRANSLATION
## AFFIDAVIT FOR TRANSLATION OF SAID DOCUMENT

American Language Services, a company specializing in the translation of documents, certifies the following:

- American Language Services has retained a professional translator for the attached Spanish into English document.  The document is referred to as:

### "LEGAL OPINION 4.06.2019 - RICHARD RIFA"

- I affirm that such translation has been prepared by a duly qualified translator, who has confirmed that such translation is, to the best of their knowledge and belief, a true and accurate translation in English of the corresponding Spanish document.

- I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct. Notwithstanding the foregoing affirmations, no liability is assumed for errors and omissions in the translation of the attached document.

- Executed on this Fifth day of June, 2019, at Los Angeles, California.


REUBEN TRUJEQUE
AMERICAN LANGUAGE SERVICES


1849 SAWTELLE BLVD. SUITE 600        LOS ANGELES, CALIFORNIA 90025
TEL (310) 829-0741 FAX (310) 829-3222
translation@alsglobal.net
www.alsglobal.net

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**              GOVERNMENT CODE § 8202

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], not Notary)

1. _____
2. _____
3. _____
4. _____
5. _____
6. _____

_____     _____
Signature of Document Signer No. 1         Signature of Document Signer No. 2 (if any)

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of ___LOS ANGELES_____

Subscribed and sworn to (or affirmed) before me
on this __5th____ day of ___June_____, 20_19_,
by      *Date*            *Month*              *Year*

(1) __REUBEN TRUJEQUE_____

(and (2) _____ ),
                    *Name(s) of Signer(s)*

proved to me on the basis of satisfactory evidence to
be the person(s) who appeared before me.

RAMON DELGADO JR.
Notary Public - California
Los Angeles County
Commission # 2282039
My Comm. Expires Apr 16, 2023

*Place Notary Seal and/or Stamp Above*

Signature _____
                    *Signature of Notary Public*

──────────────── OPTIONAL ────────────────

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

                        "LEGAL OPINION 4.06.2019 - RICHARD RIFA"
Title or Type of Document: _____

                        See attached                              17
Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

©2017 National Notary Association

# ORIGINAL

**DICTAMEN JURÍDICO**

QUE EMITEN:

D. José María Rifà Soler, Doctor en Derecho Catedrático de Derecho Procesal en la Universidad Pública de Navarra. Abogado (C/Ganduxer nº 59.6.3º.CP: 08021-Barcelona. España. (barcos00@gmail.com) (Telf. +34. 934144949). Y
D. Manuel Richard González, Doctor en Derecho, Profesor Titular de Derecho Procesal en la Universidad Pública de Navarra. Ex-Magistrado Suplente en la Audiencia Provincial de Barcelona. Abogado (C/ Dalies nº 4. CP 08840. Viladecans. Barcelona. España. (manuelrichardg@gmail.com) (Telf. +34 936475030).

A PETICIÓN DE: Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C. 1875 Century Park East, 23rd Floor. (Los Angeles, California 90067-2561)

PARA CONTESTAR A LAS PREGUNTAS QUE SE RELACIONAN A CONTINUACIÓN.

Los Peritos que emiten este informe manifiestan, conforme con lo previsto en el art. 335 de la Ley de Enjuiciamiento civil Española, que son expertos en la ciencia jurídica sobre la que se ha solicitado que emitan el presente dictamen y que prometen haber actuado informando con la mayor objetividad posible, tomando en consideración tanto lo que pueda favorecer como lo que sea susceptible de causar perjuicio a cualquiera de las partes.

Al fin propuesto, el presente documento contiene una opinión fundada en derecho y justificada con base en el conocimiento y análisis de la legislación y la jurisprudencia de los Tribunales españoles en las materias sobre las que versa el informe. También se ha dispuesto de documentación judicial y de otra clase aportada por los solicitantes del Dictamen, relacionada con la causa judicial seguida ante la United States District Court for the Central District of California por la extradición de D. CRISTOPHER PHILIP AHN.

PREGUNTAS QUE SE SOMETEN A NUESTRO DICTAMEN JURÍDICO CON BREVE RESPUESTA PRELIMINAR A CADA UNA DE ELLAS.

**1. Describe Spanish law on bail in criminal proceedings. Specifically explain what circumstances the decision on bail should be grounded on.**

RESPUESTA: Un investigado en España tiene el derecho a estar en libertad provisional en tanto se desarrolla su causa porque prevalece su presunción de inocencia hasta que no se le declare culpable en una sentencia. La libertad del investigado sólo puede quedar limitada y acordarse la prisión provisional en los casos excepcionales previstos en la Ley que deben ser alegados y probados por la acusación y razonados por el Juez. Estos supuestos se refieren a la existencia de riesgo de fuga, posible destrucción de pruebas, riesgo para la víctima o la reiteración del delito (art. 503 LECrim). En el caso que no existan estas circunstancias debe acordarse la libertad provisional que puede quedar condicionada a la previa prestación de fianza que se fijará teniendo en cuenta la situación personal y familiar del investigado. La fianza no puede ser de tal cuantía económica que impida al investigado acceder a la libertad por falta de recursos económicos. Por tanto, la fianza, si se acuerda, debe adaptarse a la capacidad económica del investigado.

1

**2. Describe Spanish law on bail in extradition proceedings. Specifically explain what circumstances the decision on bail should be grounded on.**

RESPUESTA: La situación personal del sometido a un procedimiento de extradición es la de libertad provisional en tanto que se sustancia el procedimiento de extradición. Así se prevé en el art. 8,3 de la Ley 4/1985 que regula la extradición pasiva. Esta norma se fundamenta en el «*favor libertatis*» que se reconoce al investigado, que sólo deberá permanecer en prisión provisional en el caso de existir un riesgo de fuga acreditado por hechos relevantes y no por meras sospechas. La libertad provisional del individuo sometido al procedimiento de extradición podrá condicionarse a la prestación de una fianza. Pero, este no es un requisito necesario, ya que el tribunal puede acordar una fianza u otras medidas de garantía como la prohibición de abandonar el país o la obligación de comparecer ante el tribunal cuando se le requiera.

**3. State your opinion on the basis of the judicial documents you have been able to review on the probability of bail being granted to a defendant in a similar case in Spanish criminal proceedings.**

RESPUESTA: En el presente caso un tribunal español muy probablemente resolvería en favor de la libertad provisional del Sr. AHN atendiendo a: 1° La inexistencia de peligro para las víctimas de los hechos. 2° La imposibilidad de destruir pruebas. 3° La imposibilidad de reiterar el presunto delito cometido atendiendo a su lugar de comisión y a su naturaleza. 4° Inexistencia de riesgo de riesgo de fuga, que se fundamenta en la existencia de un fuerte arraigo social y familiar en la comunidad en la que vive el Sr. AHN, lo cual está plenamente acreditado por los hechos obrantes en la causa. Además debe tenerse en cuenta el largo tiempo durante el que se puede prolongar el procedimiento de extradición. En esas circunstancias no sería procedente ni necesario que el investigado se hallara en prisión provisional respecto de unos hechos por los que no ha sido juzgado. Además, debe tenerse presente que la Ley española (arts. 502, 503, 504 LECrim) establece con absoluta claridad que la prisión provisional sólo se prolongará el tiempo mínimo imprescindible y siempre que no pueda acordarse otra medida de garantía menos gravosa. Art. 502.2 LECrim: «*La prisión provisional sólo se adoptará cuando objetivamente sea necesaria, de conformidad con lo establecido en los artículos siguientes, y cuando no existan otras medidas menos gravosas para el derecho a la libertad a través de las cuales puedan alcanzarse los mismos fines que con la prisión provisional*». La opinión dada no queda afectada por la clase y naturaleza de los delitos que se imputan al Sr. AHN en el auto de prisión provisional emitido por el Juzgado de Instrucción nº 5 de la Audiencia Nacional de España . Esto es así, porque a pesar que los delitos que se imputan puedan ser considerados graves este no es un criterio que se acoja en la Ley española. Además, la imputación de los delitos citados es provisional y no suponen, por el momento,  una acusación formal para el Sr. AHN que en tanto no sea juzgado tiene el derecho, conforme con la legislación española a permanecer en libertad.

**4. State your opinion on the basis of the judicial documents you have been able to review on the probability of bail being granted to a defendant in a similar case in Spanish extradition proceedings.**

RESPUESTA: La decisión de un tribunal español con relación a la situación personal del Sr. AHN atendiendo a la ley y a la jurisprudencia debiera ser la de su puesta en libertad provisional en tanto se tramita el procedimiento de extradición acordando las medidas de garantía que sean adecuadas para garantizar su comparecencia ante el tribunal cuando sea llamado. Esto es así porque la regla ordinaria, especialmente en los  procedimientos de extradición, determina que

2

sólo pueda acordarse prisión provisional cuando se acredite un riesgo de fuga conforme está previsto en el art. 8.3 Ley 4/1985 de Extradición pasiva. La aplicación de estas normas al caso del Sr. AHN determinaría en España la necesidad de su puesta en libertad en tanto que de los hechos y circunstancias obrantes en la causa no se desprende riesgo de fuga alguno que pudiera justificar el sometimiento a una situación de prisión provisional que puede ocasionar un perjuicio irreparable al investigado que, no olvidemos, debemos considerar y tratar como inocente en tanto no se demuestre lo contrario. Efectivamente, no se acredita ningún riesgo de fuga. Al contrario, sus antecedentes y su propia conducta personal perfectamente descrita tanto por sus registros militares, académicos y personales como por las declaraciones efectuadas por diversas personas que conocen al Sr. AHN acreditan un fuerte arraigo social. Finalmente, debemos destacar la inexistencia de ninguna evidencia material que permita atribuir al Sr. AHN la autoría de los hechos objeto de acusación en España. País que abandonó libre y legalmente, sin quebrantar ninguna orden o limitación a ese respecto, para volver a su lugar de residencia. Nótese, por tanto, que en el momento presente no se ha acreditado que el Sr. AHN haya quebrantado ninguna ley o cometido ningún delito en España, estando sujeto simplemente a una investigación judicial. Es evidente, por tanto, que el Sr. AHN no es un fugitivo, sino simplemente un ciudadano Americano sometido a investigación en otro país. En este caso España. Siendo así las más elementales reglas de justicia determinarían en España que el Sr. AHN debería tener el derecho de poder defenderse en el procedimiento de extradición desde la libertad provisional en tanto se sustancia el procedimiento de extradición acordado, en su caso, las medidas de garantía que sean adecuadas como la comparecencia, la retirada del pasaporte o, en su caso, la fijación de una fianza.

Las respuestas dadas a las preguntas planteadas se fundamentan en el estudio riguroso de la Legislación y la Jurisprudencia dictada en España en materia de Prisión provisional, especialmente en los procedimientos de Extradición. A ese fin, el presente Dictamen Jurídico contiene el completo análisis de cada una de las preguntas planteadas. A ese fin, y a los efectos del correcto entendimiento de su contenido este Dictamen se estructura con base en el siguiente esquema: En primer lugar, se atiende  a la regulación legal de la prisión provisional y la extradición en España. En segundo lugar, se atiende a los documentos judiciales y de otra naturaleza aportados por los peticionarios del Informe. En tercer lugar, se proceden a contestar de forma más extensa y completa cada una de las preguntas planteadas por los solicitantes del Dictamen con base en todo lo citado, expuesto y analizado en los dos primeros apartados.

# I. LISTA DE DOCUMENTOS EXAMINADOS PARA EMITIR EL PRESENTE DICTAMEN

— Querella del 12 de abril de 2019 solicitando la prisión provisional con base en la petición de extradición (April 12, 2019 Complaint for provisional arrest with a view towards extradition
— Auto de prisión provisional emitido el 11 de abril de 2019, por el Juzgado Central de Instrucción nº 5 de la Audiencia Nacional de España (April 11, 2019 Spanish arrest warrant issued by Judge De La Mata)
— Varias declaraciones de familiares, socios y personas conocedoras del Sr. AHN sobre su situación familiar, personal, social y laboral.

3

## II. REGULACIÓN Y PRACTICA LEGAL EN ESPAÑA EN MATERIA DE PRISIÓN PROVISIONAL Y EXTRADICIÓN.

En primer lugar debemos ofrecer algunas breves referencias que permitan comprender el funcionamiento del sistema de enjuiciamiento penal en España a efectos de poder comprender perfectamente lo que se explica a continuación.

1º Regulación legal del proceso penal en España: 1º Constitución Española de 1978 (CE). Principalmente el art. 24. (Spanish version: https://www.boe.es/buscar/act.php?id=BOE-A-1978-31229). 2º Ley de Enjuiciamiento Criminal de 1882 (LECrim). (English Versionhttps://www.legislationline.org/documents/section/criminal-codes/country/2/Spain/show) (Spanish version: https://www.boe.es/buscar/act.php?id=BOE-A-1882-6036). 3º En materia de extradición pasiva Ley 4/1985 de 21 de marzo. (Spanish versión: https://www.boe.es/buscar/act.php?id=BOE-A-1985-4816)

2º En el Sistema de Justicia Español el Tribunal Supremo es el más alto Tribunal que conoce de la aplicación de la Ley procesal y sustantiva en los procedimientos de justicia. Pero, en materia de los Derechos fundamentales reconocidos en la Constitución Española, es el Tribunal Constitucional el que conoce de la extensión, alcance y límites de los derechos Constitucionales. Es por ello que se citan Sentencias del Tribunal Constitucional que tratan sobre el derecho a la libertad que se aplica en las decisiones sobre prisión provisional. Todas las resoluciones del Tribunal Constitucional español se pueden consultar en: https://www.tribunalconstitucional.es/. También puede obtenerse cualquier resolución de los Tribunales ordinarios españoles en la siguiente dirección: http://www.poderjudicial.es/search/indexAN.jsp.

3º En el sistema de proceso penal en España la investigación de los delitos se realiza por los Jueces de Instrucción, mediante un procedimiento que se denomina de Diligencias de Investigación. En el caso del procedimiento en el que se pide la prisión provisional del Sr. AHN Diligencias previas 1396/2019. Es importante destacar que esa fase de investigación tiene por objeto esclarecer los hechos y las personas que pudieran haber participado en los mismos. Pero, esa investigación puede acabar sin que se formule ninguna acusación por parte del Fiscal o bien que el Juez entienda que no hay delito o bien que los investigados no son los responsables. Es por ello que las personas investigadas en las Diligencias Previas son eso; investigados, pero no acusados (art. 779 LECrim).

## 1.- Principios generales sobre la prisión provisional en España

La ley y la jurisprudencia establecen que en España la situación ordinaria del investigado judicialmente es la de libertad provisional no la de prisión provisional. De modo que el punto de partida del razonamiento judicial en esta cuestión es que el investigado debe estar en libertad mientras que se sustancia el procedimiento judicial y hasta que se dicta una sentencia o resolución que resuelve sobre la cuestión de fondo objeto del procedimiento penal y al mismo tiempo sobre su situación de prisión o libertad.

Conforme con lo dicho únicamente podrá adoptarse la prisión provisional del investigado en supuestos excepcionales en los que se justifica esta situación de privación de libertad para garantizar el normal desarrollo del procedimiento judicial y, especialmente, para asegurar la presencia del investigado ante el tribunal en el momento en el que vaya a celebrarse el juicio o la vista oral del procedimiento. De modo que prevalece el llamado «favor libertaris» en favor del investigado por considerar que rige su derecho a la presunción de inocencia en tanto no se

4

demuestre lo contrario. Si no se hiciera así se estaría produciendo una especie de juicio previo en el que se atribuiría al investigado la posición inicial de culpable.

Es por ello que en el supuesto de decidir sobre la situación personal de los investigados o acusados debe procederse siempre aplicando con preferencia el derecho fundamental a la libertad[1]. A este respecto el art. 502 LECrim dispone que: «*2. La prisión provisional sólo se adoptará cuando objetivamente sea necesaria, de conformidad con lo establecido en los artículos siguientes, y cuando no existan otras medidas menos gravosas para el derecho a la libertad a través de las cuales puedan alcanzarse los mismos fines que con la prisión provisional*». Y el art. 528 LECrim dispone claramente que: « *La prisión provisional sólo durará lo que subsistan los motivos que la hayan ocasionado. El detenido o preso será puesto en libertad en cualquier estado de la causa en que resulte su inocencia. Todas las Autoridades que intervengan en un proceso estarán obligadas a dilatar lo menos posible la detención y la prisión provisional de los inculpados o procesados*». Normas procesales en la que se reconoce expresamente la necesidad de que cualquier medida de restricción de libertad sin la existencia de una condena debe acordar de forma restrictiva cuando concurran los requisitos legales a los que nos referimos a continuación.

## 2.- Criterios legales para acordar la prisión provisional en España

La prisión provisional es una medida excepcional que sólo se puede adoptar cuando concurran unas circunstancias que están previstas en la Ley (art. 503 LECrim). Estas son las siguientes:

**2.1. Deberá solicitarla la acusación, ya que no puede el Juez acordar esta medida de oficio (art. 505 LECrim).**

**2.2. La pena de prisión que conlleva el delito que se investiga y, eventualmente, se va a juzgar debe, con carácter general, ser superior a 2 años de cárcel (art. 503.1.1 LECrim).**

**2.3. Deben existir evidencias suficientes que permitan presumir que el investigado ha podido cometer el delito (fumus boni iuris) (art. 503.1.1 LECrim).**

Es decir, deben constar en el procedimiento indicios (evidencias) racionales que permitan considerar al investigado presunto responsable de los hechos objeto del procedimiento penal. Estos indicios se deben concretar en la existencia en la causa de circunstancias objetivas (relativas a los hechos) y subjetivas (relativas a la persona afectada)[2].

---

[1] «Junto a los principios de legalidad y previsibilidad, importa destacar también el carácter excepcional inherente a la prisión provisional, por oposición a la libertad como regla general (STC 147/2000, de 29 de mayo (LA LEY 8830/2000), FJ 5). Tal característica comporta la primacía del favor libertatis o in dubio pro libertate, formulaciones que, en definitiva, vienen a significar que la interpretación y la aplicación de las normas reguladoras de la prisión provisional deben hacerse con carácter restrictivo y a favor del derecho fundamental a la libertad que tales normas restringen, lo cual ha de conducir a la elección y aplicación, en caso de duda, de la norma menos restrictiva de la libertad (SSTC 88/1988 (LA LEY 858/1988), de 9 de mayo, FJ 1; 98/2002, de 29 de abril (LA LEY 4510/2002), FJ 3; 81/2004 (LA LEY 12396/2004), de 5 de mayo, FJ 5; y 95/2007 (LA LEY 23072/2007), de 7 de mayo, FJ 4)» STC  Sala Segunda, Sentencia 210/2013 de 16 Dic. 2013, Rec. 2501/2012. Ponente: González Rivas, Juan José. LA LEY 208391/2013.

[2] En este sentido se pronuncia el Tribunal Constitucional de España en su Sentencia nº 8/2002 de 14 de enero en la que establece lo siguiente: «presupuesto la existencia de indicios racionales de la comisión de la acción delictiva y que su objetivo sea la consecución de fines constitucionalmente legítimos y congruentes con la naturaleza de la medida, mereciendo tal consideración únicamente aquellos que remiten a «la conjuración de ciertos riesgos relevantes que, teniendo su origen en el imputado se proyectan sobre el normal desarrollo del proceso o la ejecución del fallo, así como, en general, sobre la sociedad» (SSTC 128/1995, de 26 de julio [RTC 1995\128], F. 3; y 14/2000, de 17 de enero, F. 4, por todas). En particular, esos riesgos a prevenir serían los de sustracción a la acción

5

En cualquier caso, la apreciación del «fumus boni iuris» o apariencia de buen derecho, requiere la existencia de motivos bastantes para estimar que el investigado haya cometido el delito (art. 503.1.2 LECrim) y debe compatibilizarse, según el TC, con la presunción de inocencia reconocida en el art. 24 CE, que también rige para ésta medida cautelar de privación de libertad provisional[3]. Es por ello que cualquier resolución que acuerde la prisión provisional debe estar plenamente fundamentada apreciando las circunstancias concretas que se hallan en la causa y que permitan adoptar la decisión sobre la situación de libertad del investigado[4].

## 2.4. Deben existir una o más circunstancias en la causa que permitan al Juez considerar que existe un peligro para el buen fin del procedimiento, para la víctima o bien para la sociedad en general (periculum in mora).

Estas circunstancias, que se contienen en el art. 503 LECrim, se refieren a posibles peligros y riesgos que pueden darse respecto al procedimiento o las personas afectadas por el delito en el caso que el investigado se halle en situación de libertad provisional. A este respecto el Tribunal Constitucional de España ha determinado que para acordar la prisión provisional deben valorarse datos objetivos como la gravedad del delito y posible pena, pero también deben valorarse: «*individualizadamente circunstancias personales del preso preventivo y del caso concreto*» (STC 138/2002 de 3 de junio).

Antes de iniciar la exposición de las circunstancias previstas en la Ley a efectos de ponderar la existencia de riesgo procesal debemos señalar que no se contiene en la LECrim ningún criterio que pueda equipararse a la: «*alarma social*». Este era un criterio legal que se derogó en la Ley procesal penal española que permitía la adopción de la prisión provisional atendiendo a una presunta necesidad de «*calmar o apaciguar*» a la sociedad en su conjunto acordando ésta medida en los casos en los que el delito, por su naturaleza (generalmente homicidios o delitos cometidos con una gran publicidad) habían producido una alarma social que se entendía debía ser desactivada acordando la medida de prisión provisional Como decimos este criterio fue derogado expresamente, de modo que en el momento presente no cabe, en ningún caso, acordar la medida de prisión sea cual fuere la clase de delito o la incidencia social o pública del mismo[5].

---

de la Administración de Justicia, la obstrucción de la justicia penal o la reiteración delictiva (entre otras, STC 33/1999, de 8 de marzo, F. 3)».

[3] «… La presunción de inocencia opera en el seno del proceso como una regla de juicio; constituye a la vez una regla de tratamiento, en virtud de la cual el imputado tiene el derecho a recibir la consideración y el trato de no autor o no partícipe en hechos de carácter delictivo. En cuanto regla de juicio, la presunción de inocencia exige que la prisión provisional no recaiga sino en supuestos donde la pretensión acusatoria tiene un fundamento razonable; esto es, allí donde existan indicios raciales de criminalidad, pues, de lo contrario, vendría a garantizarse, nada menos que a costa de la libertad, un proceso cuyo objeto pudiera desvanecerse…» (SSTC 108/84, de 26 noviembre, y 129/95, de 26 julio). Vid también SSTC 177/98 de 14 septiembre; 67/1997 de 7 de abril.

[4] « la legitimidad constitucional de la prisión provisional, en tanto que medida cautelar limitativa del derecho a la libertad adoptada en el marco de un proceso penal, exige como presupuesto la existencia de indicios raciales de la comisión de un delito y como objetivo, la consecución de fines constitucionalmente legítimos y congruentes con la naturaleza de la medida. Por ello, toda resolución judicial que se pronuncie sobre la adopción de esta medida o su mantenimiento ha de tener como objeto de motivación la ponderación de las circunstancias concretas que, de acuerdo con su presupuesto legal y su finalidad constitucionalmente legítima, permitan tomar una decisión sobre la misma (por todas, STC 60/2001, de 26 de febrero, F. 3)» STC 138/2002 de 3 de junio.

[5] «El Auto …. añade solamente el argumento de «la indudable alarma social que produce la comisión de este tipo de delitos», aunque sin desarrollar esta afirmación. Mas la genérica alarma social, así invocada, no justifica adecuadamente la adopción o mantenimiento de la medida cautelar que se contempla. En efecto, como dijimos en la STC 66/1997, de 7 de abril (RTC 1997\66), F. 6, y reiteramos en las SSTC 98/1997, de 20 de mayo (RTC 1997\98), F. 9, y 47/2000, de 17 de febrero, F. 5, «con independencia del correspondiente juicio que pueda merecer la finalidad de mitigación de otras alarmas sociales que posean otros contenidos –la alarma social que se concreta en disturbios sociales, por ejemplo– y otros orígenes –la fuga del imputado o su libertad provisional–, juicio en el

6

En su virtud, la prisión provisional únicamente podrá acordarse cuando concurran los criterios expuestos anteriormente y al mismo tiempo se intente evitar alguno de los peligros o riesgos que prevé la ley en el art. 503 LECrim y que se exponen a continuación:

*1º Asegurar la presencia del imputado en el proceso cuando pueda inferirse racionalmente riesgo de fuga (art. 503.1.3.a LECrim).*

La Ley establece cuales son los criterios a tener en cuenta para valorar este peligro. Estos son los siguientes: la naturaleza del hecho, la gravedad de la pena, la situación familiar, laboral y económica, así como a la inminencia de la celebración del juicio oral. También se tendrá en cuenta si se hubieren dictado al menos dos requisitorias para su llamamiento y busca por cualquier órgano judicial en los dos años anteriores. Estos criterios, que se valorarán conjuntamente, deben existir y ser apreciados y razonados por el tribunal atendiendo a la situación personal del investigado. Así lo ha declarado el Tribunal Constitucional de España: *«… si bien conjurar el riesgo de fuga es uno de los fines legítimos de la prisión provisional, su apreciación exige de los Tribunales la ponderación de las circunstancias personales del sometido a la misma, máxime si estos datos son conocidos por el órgano judicial y aportados como alegaciones por el recurrente [por todas SSTC 128/1995, de 26 de julio, (F. 4); 33/1999, de 8 de marzo, (F. 7); 14/2000, de 17 de enero, (F. 4)]»* STC 169/2001 de 16 de julio.

*2º Evitar la ocultación, alteración o destrucción de las fuentes de prueba (art. 503.1.3.b LECrim).*

Este peligro se valorará atendiendo a la capacidad del investigado para acceder por sí o a través de terceros a las fuentes de prueba o para influir sobre otros imputados, testigos o peritos o quienes pudieran serlo.

*3º Evitar que el investigado pueda actuar contra bienes de la víctima (art. 503.1 y 503.1.3.c LECrim).*

*4º Evitar el riesgo de comisión de otros hechos delictivos para lo que se atenderá a las circunstancias del hecho, así como a la gravedad de los delitos que se pudieran cometer (art. 503.2 LECrim).*

*5º Cuando el investigado tuviere antecedentes penales no cancelados, ni susceptibles de cancelación, derivados de condena por delito doloso (art. 503.1.1 LECrim).*

**2.5. La decisión sobre la prisión o libertad provisional del investigado debe acordarse en una resolución (auto) motivado atendiendo a los criterios legales que se han expuesto.**

La resolución en la que se acuerde la prisión provisional debe razonar la existencia de motivos para acordarla, en tanto que la situación ordinaria es la de la libertad provisional conforme con el principio constitucional de presunción de inocencia. No es posible, por tanto, acordar la prisión provisional sin motivación atendiendo únicamente a la gravedad u otras circunstancias del delito. En este sentido de modo ejemplar el Tribunal Constitucional ha declarado que

---

que ahora no es pertinente entrar, lo cierto es que la genérica alarma social presuntamente ocasionada por un delito constituye el contenido de un fin exclusivo de la pena –la prevención general– y (so pena de que su apaciguamiento corra el riesgo de ser precisamente alarmante por la quiebra de principios y garantías jurídicas fundamentales), presupone un juicio previo de antijuridicidad y de culpabilidad del correspondiente órgano judicial tras un procedimiento rodeado de plenas garantías de imparcialidad y defensa» STC 23/2002 de 28 de enero. En el mismo sentido la STC 8/2002 de 14 de enero. Y, especialmente, la STC el Pleno 47/2000 de 17 de febrero.

7

aunque el tribunal se pronuncie en un caso de un delito grave debe en todo caso: «.... *ponderar otros estándares, tales como el arraigo, cargas familiares, etc. que puedan acreditar la ausencia del peligro de fuga del imputado...*» (STC 62/1996, de 15 abril). Es decir, cualquier decisión sobre prisión o libertad provisional debe individualizarse con referencia expresa al investigado sometido a la medida[6].

**3.- La libertad provisional como situación ordinaria del investigado.**

Si atendemos a lo expuesto en los dos apartados anteriores resulta que en el supuesto que se presente una imputación frente a un sujeto la situación ordinaria será la de acordar su libertad provisional sometida a unas garantías previstas en la Ley para asegurar la presencia del investigado ante el tribunal cuando sea llamado a cualquier efecto (art. 529 LECrim). Así será cuando la pena solicitada sea inferior a los dos años de prisión. En el caso que la pena solicitada fuese superior podrá acordarse pero únicamente cuando **además concurran los requisitos legales que se expusieron anteriormente.**

La libertad provisional puede quedar condicionada a ciertas obligaciones acordadas por el tribunal. Estas pueden ser las siguientes:

1º La obligación de comparecer periódicamente los días que se establezcan, normalmente los días 1 y 15 de cada mes o cuando fuese requerido por el tribunal.

2º La entrega de ciertos documentos como el carnet de conducir o el pasaporte con la consiguiente prohibición de abandonar el país (art. 529 bis y 530s LECrim).

3º La prestación de una fianza (art. 531 y ss. LECrim).

La adopción de una u otra condición obligación vendrá determinada por las circunstancias del caso concreto, pero prevaleciendo la medida de comparecencia ante el tribunal. De modo que el investigado puede permanecer en libertad provisional sin necesidad de prestar fianza. Así será cuando no concurra un riesgo de no comparecencia del investigado. El Tribunal Constitucional ha declarado, a este respecto que la situación de libertad provisional no precisa de una prestación de fianza cuando no existe o ha desaparecido el riesgo de fuga o incomparecencia del inculpado. Así se pronunció en un supuesto en cual tras permanecer en prisión provisional un investigado se revisó su situación entendiendo el Tribunal Constitucional que si no existía un riesgo razonado no podía condicionarse la libertad provisional a la prestación de una fianza: «*consignándose como única finalidad legítima perseguida con el mantenimiento de la situación de prisión provisional incondicional la de asegurar el normal desarrollo de la instrucción, la desaparición de este riesgo, apreciada por el órgano judicial, no puede conllevar la mutación de la medida cautelar mediante la exigencia de fianza, sino la puesta en libertad provisional*

---

[6] «Las decisiones relativas a la adopción y al mantenimiento de la prisión provisional deben expresarse en una resolución judicial motivada. Para que la motivación se considere suficiente y razonable es preciso que la misma sea el resultado de la ponderación de los intereses en juego (la libertad de la persona cuya inocencia se presume, por un lado; la realización de la Administración de justicia penal y la evitación de hechos delictivos por otro) y que esta ponderación no sea arbitraria, en el sentido de que resulte acorde con las pautas del normal razonamiento lógico y especialmente con los fines que justifican la prisión provisional [SSTC 128/1995, de 26 de julio (RTC 1995\128), F. 4 b), y 47/2000, de 17 de febrero, F. 2]. Entre los criterios que este Tribunal ha considerado relevantes para el enjuiciamiento de la suficiencia y razonabilidad de la motivación se encuentran, en primer lugar, las características y la gravedad del delito imputado y de la pena con que se amenaza y, en segundo lugar, «las circunstancias concretas y las personales del imputado», siendo relevante, a estos efectos, el momento procesal en que la medida se adopta (SSTC 37/1996, de 11 de marzo [RTC 1996\37], F. 6, 62/1996, de 16 de abril [RTC 1996\62], F. 5)» STC 146/2001 de 18 de junio.

*del imputado. Y ello porque, en otro caso, si la fianza no llega a consignarse, la situación de privación de libertad que la prisión provisional comporta quedaría carente de la cobertura finalista que constitucionalmente la legitima»* STC 14/2000 de 17 de enero.

La cantidad de la fianza se fijará teniendo en cuenta la naturaleza del delito, el estado social y antecedentes del procesado y las demás circunstancias que pudieran influir en el mayor o menor interés de éste para ponerse fuera del alcance de la autoridad judicial (art. 531 LECrim). En cualquier caso, la fianza que se fije por el tribunal deberá atender las circunstancias socio-económicas del investigado no pudiendo acordarse una fianza de tal cuantía que imposibilite su abono y suponga, en la práctica, que se adopten medidas de prisión provisional según la capacidad económica de los individuos.

## 3.- Sistema legal de extradición en España atendiendo especialmente a las medidas cautelares que pueden adoptarse en los procedimientos de extradición.

El sistema de extradición en España se fundamenta en la distinción entre: 1º La extradición en el espacio judicial Europeo. 2º La extradición con países con los que no existe Tratado Internacional. 3º La extradición con países con los que existe un Tratado Internacional. La regulación legal se contiene en la Ley 23/2014, de 20 noviembre de reconocimiento mutuo de resoluciones penales en la Unión Europea; los arts. 824 a 833 que regulan la extradición activa; y la Ley 4/85, de 21 de marzo que regula la extradición pasiva. Finalmente, la extradición entre España y los Estados Unidos de América se regula en el Instrumento previsto en el artículo 3(2) del Acuerdo de Extradición entre la Unión Europea y los Estados Unidos de América de 25 de Junio de 2003, para la aplicación del Tratado de Extradición entre España y EEUU de 29 de mayo de 1979 y Tratado Suplementario de Extradición de 25 de enero de 1975, 9 de febrero de 1988 y 12 de marzo de 1996, hecho ad referéndum en Madrid el 17 de diciembre de 2004.

A los fines de este Dictamen resulta de especial interés el procedimiento seguido en España respecto a la situación personal del requerido de extradición por otro país que se contiene en la Ley 4/1985 de 21 de marzo. No se pretende, por tanto, exponer ni analizar cuestiones relacionadas con el procedimiento de extradición.

Respecto a la situación personal del investigado pendiente de un procedimiento de extradición el art. XI del Instrumento que desarrolla el Tratado de Extradición entre los Estados Unidos de América y España dispone que: «*A. En casos de urgencia, cualquiera de las Partes podrá solicitar de la otra Parte la detención provisional de la persona reclamada, en espera de la presentación de la solicitud de extradición, a través de la vía diplomática. Esta solicitud podrá ser hecha, además de por vía diplomática, por comunicación directa entre los respectivos Ministerios de Justicia.../.... D. La persona detenida en virtud de esta solicitud será puesta en libertad si después de transcurridos 45 días desde la fecha en que la embajada del país que reclama la extradición es informada por vía diplomática de la detención, no se ha recibido la solicitud de extradición*».

Naturalmente, la decisión sobre la prisión provisional del investigado requerido por otro Estado recae sobre los tribunales nacionales. En el caso de España el tribunal competente es la Audiencia Nacional con sede en Madrid y concretamente al Juez Central de Instrucción, de acuerdo con el art. 88 LOPJ (Ley Orgánica del Poder Judicial). Y la legislación aplicable es la Ley 4/1985 de 21 de marzo, que dispone que el Juez español podrá acordar la detención y prisión provisional cuando se solicite por el Estado requirente. Ahora bien, el art. 8 de la citada

9

Ley dispone que: « *3. El Juez podrá, en cualquier momento y en atención a las circunstancias del caso, acordar la libertad del detenido, **adoptando alguna o algunas de las medidas siguientes para evitar su fuga**: vigilancia a domicilio, orden de no ausentarse de un lugar determinado sin la autorización del Juez, orden de presentarse periódicamente ante la autoridad designada por el Juez, retirada de pasaporte y prestación de una fianza. El incumplimiento de estas medidas dará lugar a la prisión provisional dentro del plazo establecido en el apartado anterior*».

Como se puede ver la legislación especial de extradición prevé el riesgo de fuga como único criterio aplicable para poder acordar la medida de prisión provisional respecto del investigado. Así lo ha declarado el Tribunal Constitucional en diversas resoluciones.

En primer lugar, en el ATC 158/2000 de 15 de junio en el que establece que: « ***el art. 8.3 de la Ley 4/1985 de Extradición Pasiva determina que la finalidad de la libertad bajo fianza de un reclamado en una solicitud de extradición es únicamente la de evitar su fuga.*** *El precepto no tiene en cuenta otros posibles objetivos, como por ejemplo el cumplimiento de una condena, ya que el proceso extraditorio no tiene por objeto determinar si existe o no responsabilidad penal, sino si la pretensión del Estado requirente de que se le entregue a un sujeto para enjuiciarle o para ejecutar la pena o medida de seguridad, cumple las garantías formales y materiales previstas en las disposiciones a las que se refiere el art. 13.3 de la Constitución*».

También se pronuncian en el mismo sentido las SSTC 71/2000 y 5/1998, de 12 de enero; y la STC 207/2000 de 24 de julio que declara que. «*Cierto es que la privación cautelar de libertad en estos casos es, por sus efectos materiales, idéntica a la que cabe acordar en el proceso penal, pero mantiene puntos diferenciales que han de ser resaltados. Así, se produce en un proceso judicial dirigido exclusivamente a resolver sobre la petición de auxilio jurisdiccional internacional en que la extradición consiste. No se ventila en él la existencia de responsabilidad penal, sino el cumplimiento de las garantías previstas en las normas sobre extradición, y, por ello, **no se valora la implicación del detenido en los hechos que motivan la petición de extradición, ni se exige la acreditación de indicios racionales de criminalidad, ni son aplicables en bloque las normas materiales y procesales sobre la prisión provisional previstas en la LECrim,*** aunque el párrafo tercero del art. 10 LEP se remita, subsidiariamente, a los preceptos correspondientes de la misma reguladores del límite máximo de la prisión provisional y los derechos que corresponden al detenido. **Además, su adopción, mantenimiento y duración se regula expresamente en la LEP y se dirige exclusivamente a evitar la fuga del sometido a extradición –art. 8.3– LEP. Y se decreta, por último, sobre quien no está dispuesto a comparecer ante los Tribunales que le reclaman sean o no de su nacionalidad pues para ello ha huido de su territorio o se niega a regresar a él*».

Es decir, que la única finalidad de la prisión provisional mientras dura el procedimiento de extradición en España es la de impedir la fuga del sujeto investigado, sin necesidad de atender a otras circunstancias referentes al delito, máxime cuando la extradición se fundamenta no en una sentencia condenatoria, sino en una investigación judicial. En consecuencia, se deberá poner en libertad al requerido en la extradición cuando no exista tal riesgo de fuga. Este es el caso resulto muy recientemente por la Sala de apelación de la Audiencia Nacional de España que admitió un recurso de apelación interpuesto por el antiguo Juez peruano D. César José Hinostroza, a quien reclaman las autoridades peruanas por la presunta comisión de graves delitos de organización criminal, tráfico de influencias y negociaciones vetadas a funcionarios. En ese caso, el Juez DE LA MATA de la Audiencia Nacional acordó la prisión provisional que ahora ha revocado la Sala de Apelación por entender que el riesgo de fuga del investigado «*ha disminuido*» por lo que se le pone en libertad provisional con la obligación de comparecer ante el Tribunal determinados días señalados en la resolución. La citada resolución

10

es del 11 de abril de 2019, razón por la que no aparece en el repertorio legal, pero puede consultarse la noticia publicada por la agencia Europa-Press (véase la noticia y su contenido: https://www.europapress.es/nacional/noticia-audiencia-nacional-deja-libertad-ex-juez-hinostroza-pese-peticion-peru-le-reclama-cohecho-20190411173711.html»

# III. ANÁLISIS DE LA DOCUMENTACIÓN APORTADA POR EL SOLICITANTE DEL DICTAMEN: DOCUMENTOS JUDICIALES Y OTROS DOCUMENTOS Y DATOS SOCIALES Y PERSONALES DE D. CRISTOPHER PHILIP AHN.

Los profesores RIFÀ y RICHARD, expertos legales, que firman este dictamen jurídico han podido examinar la documentación judicial y personal aportada por los solicitantes a cuyo contenido y significación jurídica nos referimos a continuación. Debemos resaltar que únicamente se destacan los hechos que, a nuestro juicio, tienen valor y relevancia jurídica a efectos de las preguntas que se nos formulan y a las que contestamos más adelante.

## 1. Documentación judicial

**1.1 Querella del 12 de abril de 2019 solicitando la prisión provisional con base en la petición de extradición (April 12, 2019 Complaint for provisional arrest with a view towards extradition).**

Hemos examinado la reclamación petición del Sr. AHN que conforme consta en el documento está siendo perseguido en España por distintos delitos presuntamente cometidos por el Sr. AHN y otros en Madrid (España) el pasado 22 de abril de 2019. Se trata de una relación de delitos que son los que motivan la reclamación del Juez DE LA MATA de la Audiencia Nacional de España para el arresto inmediato que se produjo del Sr. AHN bajo la presunción de que si conociera de la existencia de la orden de arresto probablemente huiría.

No se nos solicita análisis alguno del contenido o fundamento de la reclamación que no es objeto de esta opinión jurídica. Sin embargo, sí que cabe destacar lo siguiente: — que la petición de arresto se fundamenta en unos delitos presuntamente cometidos por el Sr. AHN que deberán ser, en su caso, juzgados en su día; — que la presunta intervención del Sr. AHN en los hechos se fundamenta en declaraciones personales y reconocimiento videográfico no en pruebas materiales; — que no se permite al Sr. AHN comparecer voluntariamente ante el tribunal, lo cual le sitúa en una posición de indefensión al tener que defenderse de la imputación desde la situación de prisión provisional; — que la clase y naturaleza de los delitos que se imputan al Sr. AHN en el auto de prisión provisional emitido por el Juzgado de Instrucción nº 5 de la Audiencia Nacional de España no es un criterio relevante en España para determinar la prisión provisional, sino la existencia de los criterios y circunstancias contenidos en el art. 503 LECrim especialmente el riesgo de fuga..

**1.2 Auto de prisión provisional emitido el 11 de abril de 2019, por el Juzgado Central de Instrucción nº 5 de la Audiencia Nacional de España (April 11, 2019 Spanish arrest warrant issued by Judge De La Mata).**

Hemos examinado el auto de prisión provisional emitido por el Juzgado Central de Instrucción nº 5 de la Audiencia Nacional, pudiendo comprobar que se trata de una resolución dictada en

11

el marco de unas diligencias previas de investigación, previstas en los arts. 774 y ss. LECrim. En consecuencia, la resolución contiene una decisión provisional sobre la presunta responsabilidad del Sr. Kahn  en determinados hechos que están siendo investigados y cuya realidad y autoría aún no son conocidos.

## 2. Documentación social y personal del Sr. AHN.

Se examinan los siguientes documentos proporcionados por la defensa del Sr. AHN:

2.1 Declaración de D. BEN NOONAN amigo y socio del Sr. AHN que se refiere a la trayectoria y conducta personal del Sr. AHN. En este documento se contiene una declaración del Sr. NOONAN en la que se pone de manifestó: 1º Su vinculación con su país, su comunidad, amigos y socios. Vinculación expresada y mantenida de forma prolongada en el tiempo lo que determina una pauta de conducta inserta en la personalidad del Sr. AHN. 2º Su compromiso personal con su familia que vive en la Zona de los Ángeles (California).

2..2 Declaración de D. CURTIS FLOOD. Oficial del Ejército y compañero y amigo del Sr. AHN. En la declaración se hace referencia a las actividades sociales y solidarias del Sr. AHN y da cuenta del impacto social que la conducta del Sr. AHN ha tenido sobre sus compañeros y la sociedad en su conjunto.

2.3 Declaración de D. DANIEL AHN. Hermano del Sr. AHN que relata la situación familiar y el modo en el que la ayuda y el apoyo del investigado Sr. AHN ha sido y es decisiva para el bienestar familiar. Se hace especial referencia en concretos y excepcionales gestos del sr. AHN para cuidar de su familia en las peores circunstancias. Destacan en especial dos frases que escribe D. DANIEL AHN y que queremos destacar: «*My brother is dedicated to our family and his purpose in life is to help and support the people he loves. **He will never do anything to jeopardize our family**.*»

2.4 Declaración de D. DANIEL KAM. Socio del Sr. AHN que declara respecto a su conducta ejemplar y sus vínculos empresariales y familiares con la comunidad en la que vive.

2.5 Declaración de Dª GRACE AHN. Esposa del Sr. AHN explica los hechos que marcan la trayectoria vital de  su marido haciendo especial referencia a su compromiso moral, social y familiar.

2.6 Declaración de D. JOSH GRODIN. Compañero del Sr. AHN en la Asociación de veteranos menciona el trabajo que desempeñó en esa área. Destaca de esta declaración el convencimiento y apoyo personal del declarante respecto al Sr. AHN con el que declara haber compartido sólo 2 años de trabajo. Aun así la declaración es absolutamente contundente en favor del investigado Sr. AHN.

2.7 Declaración de D. MITCHELL BIALOSKY. Amigo del Sr. AHN. Destaca sus valores personales del siguiente modo: «*Chris is an asset to his community and has never been a threat*».

2.8 Declaración de RODOLFO QUILES. Coronel del Ejército que conoció al Sr. AHN en asuntos relacionados con el apoyo del ejército a las comunidades locales donde se hallen. La importancia de esta declaración es especial por tratarse de un oficial de alto rango del ejército que valora excepcionalmente la conducta del Sr. AHN. Además de un modo absolutamente decidido se ofrece a aclarar cualquier duda que se pueda tener sobre su declaración.

2.9 Declaraciones de RYAN W.FISHER, TOD CONETTA, WADE W. BUICK, WILL PRESCOTT, todos ellos personas de acreditada buena conducta social y compañeros del Sr. AHN en la DARDEN Military Association. Todos ellos loan la conducta, carácter y diligencia del Sr. AHN en su trayectoria personal haciendo referencia a su integridad y su vinculación con su familia y la comunidad.

**3. Referencias sobre las propiedades inmobiliarias de la familia AHN que están dispuestos a ofrecer a efectos de fianza.**

También se nos ofrecen referencias de diversos inmuebles propiedad de la familia AHN que podrían ser ofrecidos como garantía o fianza de la libertad provisional del Sr. AHN.

De las declaraciones y documentos citados se desprende que: — el Sr. AHN ha mantenido en toda su vida una conducta intachable; — que tiene un entorno laboral, personal y familiar completamente normalizado y absolutamente saludable; — que es hermano, esposo hijo y nieto de personas de las que se preocupa y que se preocupan por él. Resulta reveladora la cantidad de personas de su ámbito familiar y social que se han manifestado respecto a la personalidad y conducta del Sr. AHN. Todas estas declaraciones suponen una abrumadora evidencia de la falta de peligrosidad o riesgo de fuga que pudiera darse si se permite al Sr. AHN quedar en libertad provisional.

Siendo así resulta que no existe ningún indicio o sospecha que pueda indicar que el Sr. AHN puede representar un peligro para el desarrollo del procedimiento judicial o que pueda eludir la acción de la Justicia. Todo ello se desprende de un modo absolutamente claro del análisis de la documentación examinada. Pocas veces un jurista tiene la oportunidad de razonar respecto a hechos como los que se ofrecen en este caso que muestran un perfil personal completamente alejado de lo que pueda entenderse como un peligro para el desarrollo del procedimiento judicial. No se aprecia por tanto ningún peligro o riesgo. Siendo así y teniendo en cuenta que la finalidad de las medidas de aseguramiento en los procedimientos de extradición es únicamente la de evitar el riesgo de fuga, consideramos que en España se entendería que el Sr. AHN debería ser puesto en libertad provisional conforme con la interpretación del art. 503.3.a LECrim y 8.3 Ley de Extradición 4/1985.

# IV. PREGUNTAS PLANTEADAS POR LOS SOLICITANTES DEL DICTAMEN JURÍDICO.

Los peritos firmantes del presente dictamen van a proceder a contestar las preguntas planteadas por los solicitantes del presente Dictamen Jurídico de forma directa y sintética con base en la previa exposición de la legalidad y jurisprudencia vigentes en España que se ha expuesto en los apartados anteriores.

## 1. Describe Spanish law on bail in criminal proceedings. Specifically explain what circumstances the decision on bail should be grounded on.

1.1.- La libertad provisional con o sin fianza es la situación ordinaria del investigado en España. La prisión provisional exige la acreditación de las circunstancias expuestas de: peligro de incomparecencia del investigado en el juicio o la vista;  riesgo de destrucción de pruebas, peligro para la víctima o reiteración delictiva.

1.2.- La situación de libertad provisional es la ordinaria y se funda en los principios constitucionales y legales vigentes en España. Corresponde a la acusación acreditar y probar que existen las circunstancias legales expresadas en el art. 503 LECrim que requieren que el investigado esté en situación de prisión provisional durante el desarrollo de la causa.

13

1.3.- La libertad provisional en España no precisa de la previa prestación de fianza pudiendo acordarse la puesta en libertad del investigado sin prestar fianza. El tribunal puede acordar otras medidas de garantía como la obligación de comparecer ante el tribunal unos días determinados, o cuando se le llame, o bien la entrega del pasaporte.

1.4.- También puede el tribunal acordar la libertad provisional sometida a la previa prestación de fianza. Así lo acordará atendiendo a las circunstancias del caso y, especialmente, al riesgo de incomparecencia del investigado atendiendo a los criterios que se contienen en el art. 503.3.a LECrim, que son los siguientes: *«la naturaleza del hecho, a la gravedad de la pena que pudiera imponerse al investigado o encausado, a la situación familiar, laboral y económica de éste, así como a la inminencia de la celebración del juicio oral».*

1.5.- CONCLUSIÓN: Un investigado en España tiene el derecho a estar en libertad provisional en tanto se desarrolla su causa porque es inocente hasta que no se demuestre lo contrario. Esta libertad sólo puede quedar limitada con la entrada en prisión provisional en los casos excepcionales previstos en la Ley que deben ser alegados y probados por la acusación y razonados por el Juez. La libertad provisional puede quedar condicionada a la previa prestación de fianza que se fijará teniendo en cuenta la situación personal y familiar del investigado. En cualquier caso, la fianza no puede ser de tal cuantía que someta al investigado a una privación de libertad simplemente por su situación económica. Esto significa que la fianza, si se acuerda, debe adaptarse a la capacidad económica del investigado.

## 2. Describe Spanish law on bail in extradition proceedings. Specifically explain what circumstances the decision on bail should be grounded on.

2.1.- El tratamiento procesal de la situación del sometido a un procedimiento de extradición en España se regula en la Ley 4/1985 que establece el riesgo de fuga es el único motivo por el que una persona pendiente de extradición puede permanecer en prisión provisional. Esta es también la interpretación jurisprudencial dada por el Tribunal Constitucional de España.  El riesgo de fuga debe ser acreditado por la acusación y valorado por el tribunal y debe estar fundado en hechos que permitan considerar que el riesgo es real y existe.

2.2.- La situación inicial de prisión provisional acordada inicialmente a petición del Estado que solicita la extradición está sujeta a posterior revisión y eventual modificación conforme con el art. 8.3 Ley 4/1985. Por tanto, el tribunal podrá, en cualquier momento y en atención a las circunstancias del caso, acordar la libertad del sometido a un procedimiento de extradición cuando o bien no exista riesgo de fuga o bien se acrediten circunstancias sociales y personales del investigado que permitan razonar que esa fuga no se producirá.

2.3.- El art. 8.3 Ley 4/1985 establece las medidas alternativas que el tribunal puede acordar para sustituir la medida de prisión provisional. Estas son las siguientes: « *vigilancia a domicilio, orden de no ausentarse de un lugar determinado sin la autorización del Juez, orden de presentarse periódicamente ante la autoridad designada por el Juez, retirada de pasaporte y prestación de una fianza».*

2.4.- De modo que el tribunal puede considerar la puesta en libertad provisional del investigado sometido a un procedimiento de extradición acordando, o no, una fianza. Es decir, la puesta en libertad provisional no exige una previa prestación de fianza, sino que el tribunal podrá acordar otras medidas de garantía como las citadas y contenidas en el art. 8 de la Ley 4/1985 de comparecencia ante el tribunal o entrega del pasaporte con prohibición de salir del país.

14

2.5.- CONCLUSIÓN: La decisión de puesta en libertad bajo fianza de los sujetos sometidos a un procedimiento de extradición es una situación ordinaria prevista en la Ley 4/1985 que se fundamentará en el «*favor libertatis*» que se reconoce al investigado. El tribunal puede adoptar esta decisión u otra menos gravosa como la prohibición de abandonar el país o la obligación de comparecer ante el tribunal cuando se le requiera.

## 3. State your opinion on the basis of the judicial documents you have been able to review on the probability of bail being granted to a defendant in a similar case in Spanish criminal proceedings.

3.1.- En el art. 503 LECrim se establecen los supuestos tasados de riesgo o peligro para la sociedad, las víctimas o el propio procedimiento que pudieran darse en el caso que un investigado se halle en libertad. Estos riesgos son sintéticamente los siguientes: riesgo de fuga, peligro para las víctimas o sus familiares, destrucción de pruebas, reiteración delictiva. A efectos de declarar la libertad provisional con o sin fianza el Juez debe considerar, siempre a petición de la acusación, la existencia de alguno de estos riesgos. La decisión debe ser razonada con base en la circunstancias del caso.

3.2.- En el presente caso no existe peligro alguno de reiteración delictiva: el Sr. AHN no tiene antecedentes criminales; no existe peligro de destrucción de pruebas o para las víctimas al tratarse de unos hechos singulares que tuvieron lugar en España que no pueden repetirse por su propia naturaleza. Siendo así, el único peligro que pudiera darse y por tanto debe valorarse es el riesgo de fuga del Sr. AHN.

3.3.- De las circunstancias concurrentes resulta que el investigado Sr. AHN no ha huido en ningún momento, sino que se ha prestado a todas las peticiones que le han sido realizadas por parte de las autoridades. En el caso de España el sr. AHN entró y salió del país legalmente sin quebrantar orden alguna de las autoridades. En los Estados Unidos el Sr. AHN ha respondido cuando se le ha requerido por las autoridades. De ese modo ha mantenido una coherencia en la conducta que no tiene porqué frustrar si se le pone en libertad. No existe por tanto riesgo de fuga.

3.4.- Precisamente, de las circunstancias sociales y familiares se desprende que el sr. AHN está inserto en un entorno absolutamente normalizado. Es esta la clase de apreciación a la que se refiere el art. 503.3.a) LECrim cuando establece que se atenderá a a: « …*la situación familiar, laboral y económica de éste, así como a la inminencia de la celebración del juicio oral…*». De modo que la Ley valora a efectos de decidir sobre la libertad del investigado que la persona conviva en una familia normalizada con asunción de responsabilidades morales, personales y económicas. Con ello se pretende garantizar la presencia del investigado a llamamiento del tribunal lo cual acaecerá cuando, como es el caso del Sr. AHN, existen fuertes vínculos de dependencia moral, familiar y económica. Ciertamente, examinando el conjunto de hechos y declaraciones aportadas resulta difícil pensar que el Sr. AHN pudiera poner en riesgo a su propia familia que, en gran parte depende de él, abandonándola y dándose a la fuga. En este sentido, existe una palabra de uso judicial en España que es «*arraigo*». Palabra que hace referencia a la fuerte vinculación que tienen las personas con su hogar, su familia y su comunidad. Es este arraigo el que entendemos que se da en el presente caso.  Por otra parte debe tenerse presente la pendencia de un procedimiento de extradición que puede prolongarse durante mucho tiempo, careciendo de sentido que mientras tanto el Sr. AHN permanezca en prisión provisional sin que

15

se haya dictado una sentencia de culpabilidad y sin poder mientras tanto trabajar para atender las necesidades de su familia.

3..5.- CONCLUSIÓN: A nuestro juicio en el presente caso un tribunal español muy probablemente resolvería en favor de la libertad provisional del Sr. AHN atendiendo al fuerte arraigo social y familiar en la comunidad en la que vive y que se desprende de los hechos obrantes en la causa. Además debe tenerse en cuenta el largo tiempo que se puede prolongar el procedimiento de extradición durante el cual no sería ni procedente ni necesario que el investigado se hallara en prisión provisional respecto de unos hechos por los que no ha sido juzgado. Por todo ello conforme con la Ley y la jurisprudencia de los tribunales españoles entendemos que debería ponerse en libertad provisional al Sr. AHN en tanto se sustancia el procedimiento acordando las medidas de garantía que sean adecuadas como la comparecencia, la retirada del pasaporte o, en su caso, la fijación de una fianza. La opinión dada no queda afectada por la clase y naturaleza de los delitos que se imputan al Sr. AHN en el auto de prisión provisional emitido por el Juzgado de Instrucción nº 5 de la Audiencia Nacional de España . Esto es así, porque a pesar que los delitos que se imputan puedan ser considerados graves este no es un criterio que se acoja en la Ley española. Además, la imputación de los delitos citados es provisional y no suponen, por el momento,  una acusación formal para el Sr. AHN que en tanto no sea juzgado tiene el derecho, conforme con la legislación española a permanecer en libertad.

## 4.  State your opinion on the basis of the judicial documents you have been able to review on the probability of bail being granted to a defendant in a similar case in Spanish extradition proceedings.

4.1.- La situación personal de las personas sujetas a un procedimiento de extradición se determina por lo previsto en el Tratado Internacional y por lo dispuesto en la Ley 4/1985 de Extradición pasiva. Concretamente se refiere a esta cuestión el art. 8.3 Ley 4/1985, que regula como debe resolverse la situación procesal de las personas requeridas por terceros países.

4.2.- La situación personal del Sr. AHN acreditada por los hechos y documentos que hemos examinado le acredita en España para permanecer en libertad mientras se sustancia el procedimiento de extradición.

4.3.- Así se desprende de la aplicación del art. 8.3 Ley 4/1985 a los hechos y circunstancias relativos al Sr. AHN que acreditan una ausencia de peligro alguno de fuga. Téngase en cuenta que conforme a la Ley española la única razón que puede motivar la prisión provisional de las personas pendientes de un procedimiento de extradición es el riesgo de fuga que en el caso del Sr. AHN no parece que exista. De hecho es relevante que en realidad al Sr. AHN se le está investigando respecto de unos hechos que pudieran ser delito. Pero, se trata de una investigación judicial que puede finalizar sin que se acuse formalmente al investigado. De modo que el Sr. AHN no ha cometido en el momento presente ninguna infracción en España. Es relevante a este respecto que el Sr. AHN abandonó España libre y legalmente sin que existiera ninguna orden o mandato de clase alguna que le impidiera hacerlo. Siendo así no cabe duda alguna que debe prevalecer plenamente su derecho a la presunción de inocencia y a la libertad en tanto no se resuelve el procedimiento de extradición.

4.4.- Una persona con las referencias y antecedentes del Sr. AHN perfectamente arraigado en la comunidad y con una actividad empresarial de la que depende su familia sería probablemente

puesto en libertad atendiendo a la aplicación de la ley a todos los factores concurrentes en su persona.

4.5.- CONCLUSIÓN: La decisión de un tribunal español con relación a la situación personal del Sr. AHN atendiendo a la ley y a la jurisprudencia debiera ser la de su puesta en libertad provisional en tanto se tramita el procedimiento de extradición acordando las medidas de garantía que sean adecuadas para garantizar su comparecencia ante el tribunal cuando sea llamado. Esto es así porque la regla ordinaria, especialmente en los  procedimientos de extradición, determina que sólo pueda acordarse prisión provisional cuando se acredite un riesgo de fuga conforme está previsto en el art. 8.3 Ley 4/1985 de Extradición pasiva. La aplicación de estas normas al caso del Sr. AHN determinaría en España la necesidad de su puesta en libertad en tanto que de los hechos y circunstancias obrantes en la causa no se desprende riesgo de fuga alguno que pudiera justificar el sometimiento a una situación de prisión provisional que puede ocasionar un perjuicio irreparable al investigado que, no olvidemos, debemos considerar y tratar como inocente en tanto no se demuestre lo contrario. Efectivamente, no se acredita ningún riesgo de fuga. Al contrario, sus antecedentes y su propia conducta personal perfectamente descrita tanto por sus registros militares, académicos y personales como por las declaraciones efectuadas por diversas personas que conocen al Sr. AHN acreditan un fuerte arraigo social. Finalmente, debemos destacar la inexistencia de ninguna evidencia material que permita atribuir al Sr. AHN la autoría de los hechos objeto de acusación en España. País que abandonó libre y legalmente, sin quebrantar ninguna orden o limitación a ese respecto, para volver a su lugar de residencia. Nótese, por tanto, que en el momento presente no se ha acreditado que el Sr. AHN haya quebrantado ninguna ley o cometido ningún delito en España, estando sujeto simplemente a una investigación judicial. Es evidente, por tanto, que el Sr. AHN no es un fugitivo, sino simplemente un ciudadano Americano sometido a investigación en otro país. En este caso España. Siendo así las más elementales reglas de justicia determinarían en España que el Sr. AHN debería tener el derecho de poder defenderse en el procedimiento de extradición desde la libertad provisional en tanto se sustancia el procedimiento de extradición acordando, en su caso, las medidas de garantía que sean adecuadas como la comparecencia, la retirada del pasaporte o, en su caso, la fijación de una fianza.

Esta es nuestra opinión que emitimos en Barcelona (España) con fecha de 4 de Junio de 2019.

Dr. Manuel Richard González                    Dr. José María Rifà Soler

17